# EXHIBIT A





**John C. Musto**
Chief Trial Counsel
Department of Law, Civil Division
City of Dayton
101 W. Third Street
Dayton, OH 45401
937.333.4116
937.333.3628 (f)
john.musto@daytonohio.gov

**Stephen N. Haughey**
Member, Environmental Practice Group
FROST BROWN TODD LLC
301 E. Fourth Street, Suite 3300
Cincinnati, OH 45202
513.651.6127
513.6516981 (f)
shaughey@fbtlaw.com

March 31, 2021

**Via Certified Mail:**
Lloyd J. Austin III, Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

John P. Roth
Acting Secretary of the Air Force
1670 Air Force Pentagon
Washington, DC 20330-1670

Colonel Patrick G. Miller, Commander
Colonel Michael Phillips, Vice-Commander
88th Air Base Wing
Wright-Patterson Air Force Base
5135 Pearson Road, Building 10
Wright-Patterson AFB, OH 45433

Via Regular First Class U.S. Mail:
Michael S. Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Mail Code 1101A
Washington, DC 20460

Cheryl Newton, Acting Regional
Administrator, Region 5
Leverett Nelson, Regional Counsel
U.S. Environmental Protection Agency
77 West Jackson Boulevard
Chicago, IL 60604-3507

Laurie A. Stevenson, Director
Todd Anderson, Deputy Director of
Legal Affairs
Ohio Environmental Protection Agency
P.O. Box 1049
Columbus, Ohio 43216-1049

Merrick B. Garland
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Jean E. Williams
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources
Division, Law and Policy Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dave Yost, Ohio Attorney General
30 East Broad Street, 14th Floor
Columbus, OH 43215

Emily Simmons Taposci, Section Chief
Ohio Attorney General
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, OH 43215

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 2

Re:     Notice of Intent by the City of Dayton, Ohio to Commence Enforcement for (1) Violations of the Clean Water Act ("CWA"), Safe Drinking Water Act ("SDWA"), and Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"); (2) Imminent and Substantial Endangerment under the Resource Conservation and Recovery Act ("RCRA"), and (3) Violations of Ohio's Solid and Hazardous Wastes Act ("SHWA"), Arising from Per- and Polyfluoroalkyl Substances ("PFAS") Contamination of the City's Drinking Water Supply from Operations at Wright-Patterson Air Force Base, Ohio ("WPAFB" or "the Base")

To All Concerned:

Please take notice that the City of Dayton, Ohio ("the City" or "Dayton"), intends to file a citizen suit pursuant to: (1) 33 U.S.C. § 1365 of the CWA and implementing rules codified at 40 C.F.R. Part 135, Subpart A; (2) 42 U.S.C. § 300j-8 of the SDWA and implementing rules codified at 40 C.F.R. Part 135, Subpart B; (3) 40 C.F.R. § 9659 of the CERCLA and implementing rules codified at 40 C.F.R. Part 374; (4) 42 U.S.C. § 6972 of the RCRA and implementing rules codified at 40 C.F.R. Part 254; and (5) O.R.C. § 3734.101 of the Ohio Solid and Hazardous Wastes Act ("SHWA") against WPAFB, the U.S. Department of Defense, and the U.S. Air Force ("the Defense Agencies" collectively, or individually as "WPAFB" or "the Base," "DOD," and "USAF," respectively), to address (1) ongoing violations of requirements under these statutes, and (2) an ongoing endangerment to human health, public welfare, and the environment, relating to contamination of the City's drinking water supply, production wells, and early detection monitoring wells with PFAS released by WPAFB in operations occurring at the Base.

## Background Facts

1.      Dayton provides potable water to over 400,000 residents and contract customers. The City's service area includes most of Montgomery County, Ohio, including the Cities of Dayton, Kettering, Riverside, Centerville, Trotwood, and Brookville, and Harrison Township; customers in Greene County, Ohio; and service to the Dayton International Airport as well.

2.      The City's distribution lines extend over 50 square miles and carry an average of 65 million gallons each day. The City's Water Department operates wellfields in the Great Miami River and Mad River basins that include production wells supplying groundwater to two water treatment plants, one lime recovery facility, two main pumping stations, six booster pumping stations, and eleven water storage facilities. Surrounding the City's production wells are hundreds of monitoring wells ("sentinel wells") installed as an early warning system for detecting potential contaminants in groundwater that may be migrating into the capture zone of the production wells. Sentinel wells are required as a part of Ohio EPA's delegated SDWA program. WPAFB's operations are located immediately upgradient of the City's Mad River wellfield.

3.      Dayton relies solely on groundwater for its source of drinking water. There is no other source if the aquifer becomes contaminated and unusable. In order to protect the aquifer,

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 3

the City successfully petitioned U.S. EPA in 1988 to designate the aquifer as a "sole source aquifer" under Section 1424 of the SDWA, the first such designation in the Midwest. Such designations are rare. Less than 75 exist across the United States. The sole source aquifer that provides drinking water to the City also serves as the source of drinking water for over 2.5 million residents and businesses in Southwestern Ohio.

4.      Under the SDWA, U.S. EPA's sole source designation required, among other things, that Dayton develop, implement, and enforce a comprehensive aquifer management plan, wellfield/source protection plan, and wellfield protection ordinance ("WPO"), in order to control surface activities that might contaminate the aquifer.[1]

5.      Under Dayton's wellfield protection program, operations at WPAFB Areas A and B are located partly inside the 1-year, and partly inside the 5-year, time of travel boundaries for the City's wellfields, which are groundwater contour lines drawn by the City's consultants, and approved by Ohio EPA under the State's delegated SDWA program, in order to establish zones in which restrictions are imposed to minimize the risk of contaminating groundwater.[2]

6.      For many decades, representatives for WPAFB have known about the City's wellfield protection program and that operations at the Base were located inside these time of travel protection zones. Thus, they knew that operations at the Base had the potential, if not properly managed, to contaminate the aquifer that provides the sole source of water for WPAFB's own drinking water system for its 20,000+ residents and employees, as well as for the City's drinking water system that supplies 400,000 direct and indirect customers.

7.      Until elevated levels of PFAS above U.S. EPA's 2016 Health Advisory Level ("HAL") (70 ppt) were discovered in WPAFB's drinking water supply early in 2016, the Base had complied with the Dayton's WPO by entering into five successive 5-year Memorandums of Understanding ("MOU") with the City, dating back to 1990. The MOUs implemented a detailed series of on-site limitations and reporting obligations, thereby reducing the risk of contaminating the groundwater that supplies the City's production wells.[3] As discussed below, WPAFB unilaterally decided in December 2016 not to renew the MOU, in violation of the City's WPO and the SDWA, just a few months after sampling revealed widespread PFAS contamination of groundwater under the Base, and an imminent threat to the City's water supply.

**WPAFB Operations Relating to PFAS-Containing AFFF**

8.      WPAFB is operated by the USAF, a branch of the DOD, and is located adjoining the northeast boundary of Dayton, Ohio, with operations in both Montgomery and Greene Counties, Ohio. WPAFB's records indicate that it began using PFAS-containing aqueous firefighting foam(s) ("AFFFs") in 1970 to extinguish aviation fuel-based and oil-based fires, and to conduct firefighting training exercises.

---

[1]   Ex.# 1.   Dayton Municipal Ordinance Title 5, Chapter 53, §§ 53.01-53.99.   (available at https://library.municode.com/oh/dayton/codes/code_of_ordinances?nodeId=TITVPUUT_CH53PUWASUPO_DIV3AD).
[2] Ex.# 2.
[3] Ex.# 3.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 4

9.      Upon information and belief, thousands of gallons of PFAS-containing AFFF concentrate were stored each year at the Base and used in fire suppression and regular firefighting training exercises for decades. Based on WPAFB's own records, the use of these AFFFs to extinguish fires and in firefighting training exercises occurred under circumstances where little or no steps were taken to minimize the potential for significant runoff of AFFF residues onto the ground and into surrounding soils and nearby surface waters. The absence of such steps may be understandable during the initial years of use of PFAS-containing AFFF, because manufacturers of the foam characterized it at that time as "environmentally neutral," and "biodegradable, low in toxicity, and…can be treated in biological treatment systems."[4]

10.      However, beginning as early as 1973, information became known to, or at least readily available to, WPAFB, indicating that PFAS-containing AFFF were not the "environmental *sine qua non*" as represented by manufacturers. For example, as early as 1973 the USAF issued a report finding that the foam was toxic to aquatic life and not biodegradable, and stating that "numerous Air Command environmental coordinators expressed concern for disposing of AFFFs after use," and that USAF HQ itself "voiced concern about the disposal of large volumes of AFFF from…warehouse and hanger deluge systems."[5] A year later the USAF issued another report confirming these findings and recommending that wastewaters from firefighting operations be collected and treated before discharge.[6]

11.      Over the next 16 years, numerous additional reports were issued by various branches of DOD, copied to the other branches, (a) further confirming these findings; (b) finding separately that PFAS-containing AFFF were toxic to animals; and (c) recommending that residual AFFF-containing wastewaters not be discharged to stormwaters until first collected and treated.[7]

12.      WPAFB knew at least as far back as early 1988 that its use of AFFF and, more importantly, the lack of sufficient controls over the handling of residues created from fire suppression activities and firefighting training exercises, had contaminated many areas at the Base. In February 1988 WPAFB entered into an administrative order with Ohio EPA under CERCLA and the Agency's delegated CWA and RCRA programs, obligating the Base to investigate and potentially remediate more than 30 separate waste disposal areas, including numerous past and current fire suppression areas ("FSAs") and firefighting training areas ("FTAs").[8]

13.      With respect to contaminated FSAs/FTAs, the 1988 order obligated WPAFB to

---

[4] Ex.# 4.
[5] Ex.# 5.  Treatability of Aqueous Film-Forming Foams Used for Fire Fighting, USAF Technical Report No. AFWL-TR-73-279 (August 1973).
[6] Ex.# 6.  Biodegradability and Toxicity of Light Water FC206 Aqueous Film Forming Foam, USAF EHL (K) 74-27 (November 1974).
[7] Ex.# 7.  *See e.g.* USAF AFAMRL-TR-82-50 (March 1983); USAF AFOEHL Report 89-129EQ0063LEA (November 1989); Minutes of the DOD AFFF Environmental Meeting, Report 6180/0394A:FWW, September 2000.
[8] Ex.# 8.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 5

prepare within 120 days preliminary assessments of five separate FTAs, consisting of:

    a.  Identifying the source and nature of wastes disposed in those areas;

    b.  Evaluating potential threats to public health and environment; and

    c.  Evaluating factors necessary to determine whether cleanup is needed, including actual or potential contamination of drinking water supplies.

14. Under the 1988 order, WPAFB was also obligated to prepare a remedial investigation/feasibility study ("RI/FS") workplan within 60 days after Ohio EPA's notice of concurrence with each preliminary assessment prepared for the five FTAs.

15. When contamination at WPAFB was subsequently determined to be significant enough to merit placing the site on CERCLA's National Priorities List, the Base entered into a separate federal facility agreement ("FFA") in March 1991 with U.S. EPA Region 5 under Section 120 of CERCLA, designed to "ensure that environmental impacts associated with past and present activities at the Site are thoroughly investigated and appropriate remedial action taken...to protect public health, welfare and the environment," and to "expedite the cleanup process...consistent with protection of human health and the environment."[9] As of the date of that agreement, WPAFB had already completed the preliminary assessment required for the five contaminated FTAs under the earlier 1988 order between WPAFB and Ohio EPA.

16. Among other obligations under the FFA, WPAFB agreed "to take such response actions as may be necessary to abate"..."an endangerment to the public health or welfare...because of an actual or threatened release of a hazardous substance, *contaminant or pollutant* at or from the site, including but not limited to discovery of contamination of a drinking water well at concentrations that exceed *any* state or federal drinking water *action level* or standard."[10]

17. In March 2011 DOD's Materials of Emerging Regulatory Interest Team ("MERIT") issued Risk Alert # 03-11 to all military branch environmental coordinators stating, among other things, that (a) the discharge of PFAS-containing AFFF was regulated under the CWA; (b) potential liability for the release of such foam needed to be weighed against the cost of disposal and resupply with alternative chemicals; (c) uncontrolled, repeated application of PFAS-containing AFFF at FTAs could be expected to contaminate soil and groundwater and thus such activities needed to be managed; and (d) containment, treatment, and proper disposal of foam discharges through the use of lined pits and improved wastewater treatment were recommended.[11]

18. To comply with WPAFB's obligations under the 1988 and 1991 orders with Ohio

---

[9] Ex.# 9.

[10] *Id.* at p. 38. As of the date of this notice, PFAS are not listed as "hazardous substances" under CERCLA, but are included under the definition of "pollutant or contaminant" under the statute. 42 U.S.C. § 9601(33).

[11] Ex.# 10.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 6

EPA and U.S. EPA, respectively; in response DOD's Risk Alert; and, most importantly, in response to detecting PFAS in its own finished drinking water in sampling performed in 2014 under U.S. EPA's SDWA unregulated contaminants monitoring rule ("URCMR"), the Base conducted a preliminary assessment of 50+ areas known or suspected to be sources of PFAS contamination from past and current FTAs, FSAs, and spill sites in early 2015. The final preliminary assessment report was issued in September 2015.[12]

19.     The 2015 preliminary assessment report concluded that PFAS contamination had been documented, in terms of mass of PFAS released, at 25 different areas sufficient to warrant a formal site investigation. Importantly, the report stated that contamination in four areas (FTAs 2, 3, 4, & 5) was just over a mile upgradient of the City's production wells; was inside the City's wellfield protection zone; and was so significant that it warranted classification as "Group 1," denoted in the report as "High mass of AFFF released and probability of groundwater contamination."[13]

20.     While groundwater was not sampled in the 2015 assessment, WPAFB stated in the report that, pursuant to sampling in 2014 and 2015 of its finished drinking water under U.S. EPA's SDWA URCMR, PFAS was present in water supplied to its own employees and residents at concentrations as high as 210 ppt - three times higher than the Agency's 2016 HAL (70 ppt) - and even higher than the Agency's earlier 2009 Provisional Health Advisory level of 200 ppt in effect at the time of the assessment. Despite the information presented in the 2015 assessment and the obvious threat to Dayton's water supply, WPAFB did not alert Ohio EPA to the results of the assessment.[14]

### Discovery of Widespread PFAS Contamination and Responses Thereto

21.     On or about March 2016, in compliance with U.S. EPA's SDWA URCMR, WPAFB again sampled drinking water that is supplied to its employees and residents, and again discovered PFAS contamination, this time significantly above U.S. EPA's 2016 HAL. In response to the receipt of this data, emergency on-site measures, including issuing health advisories, supplying bottled water, and shutting down impacted on-site wells, were ordered by Ohio EPA in two May 2016 orders issued under the authority of the Agency's delegated SDWA program.[15]

22.     On June 2 and 20, 2016, Ohio EPA issued follow-up letters to WPAFB under the emergency provisions in the 1988 administrative order between the Agency and WPAFB, directing it to undertake "an expedited removal action…to ensure that PFAS detected in ground

---

[12] Ex.# 11.

[13] *Id.* at pp. 4-2, 4-3.

[14] Despite an obligation to submit the assessment report to Ohio EPA under the 1988 order between WPAFB and the Agency, the Base failed to submit it, leading to a notice of violation issued by Ohio EPA in February 2016, for failing to submit the report, and failing to provide it in draft for Ohio EPA's review and comment. Ex.# 12. As a result, Ohio EPA instructed WPAFB to expand the assessment to investigate additional areas of potential PFAS contamination. *Id.*

[15] Ex.## 13, 14.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 7

water at the Base are prevented from affecting…the downgradient City of Dayton production wells."[16]

23.     In Ohio EPA's June 20, 2016, letter, the Agency stated:

"The activities outlined in this letter…are paramount to protecting Dayton's drinking water supply. Ohio EPA has diligently worked with you in an attempt to reach agreement on a reasonable schedule for the work which is protective of the Dayton drinking water supply. It appears, despite our best efforts, you have not been willing to commit to the removal activities…Please be advised that…Ohio EPA will pursue all legal actions available to it to ensure citizens are safe. Legal actions may include, but are not limited to, administrative orders and/or coordination with the Ohio Attorney General to pursue judicial remedies."

24.     WPAFB has never undertaken the removal action directed by Ohio EPA. Instead, in response to (a) WPAFB's continued delay, (b) subsequent detection of elevated PFAS levels in several groundwater monitoring wells at the Base, and (c) the imminent threat to the wells in the City's Huffman Dam wellfield immediately downgradient from the Base, Ohio EPA advised the City to shut down seven production wells closest to WPAFB, which the City did to protect its residents, thereby immediately losing 33% of the City's production capacity from its wellfield.

25.     In addition, at Ohio EPA's direction, the City began quarterly testing for PFAS in its early sentinel wells located between the production wells and WPAFB. These wells are required under the Agency's delegated SDWA program, as part of Ohio's wellfield protection program. In addition, at the Agency's request and at the recommendation of the City's drinking water consultant, the City installed more than 100 additional sentinel wells in the geographical area between the City's wellfield and WPAFB in order to increase the ability to detect migration of PFAS-contaminated groundwater from the Base into the cone of influence for the City's production wells.

26.     Since beginning its PFAS monitoring program in mid-2016, the City has consistently detected PFAS above U.S. EPA's 2016 HAL (70 ppt) in sentinel wells through the date of this notice letter. These levels also exceed U.S. EPA's December 19, 2019, recommended groundwater screening levels and preliminary remediation goals for PFOA and PFOS in groundwater that is a current source of drinking water.[17] This data has been shared with WPAFB, but to no avail.[18]

27.     Follow-up sampling by WPAFB to the 2016 detection of PFAS revealed more than two dozen areas of soil, surface sediments and groundwater with PFAS concentrations above U.S. EPA's HAL and U.S. EPA's Groundwater Remediation Guidelines scattered across Areas A and B at the Base, and immediately upgradient of the City's wells. *Because of these*

---

[16] Ex.# 15.
[17] Ex.# 16. "Interim Recommendations to Address Groundwater Contaminated with Perfluorooctanoic Acid and Perfluorooctanesulfonate," December 19, 2019. (available at https://www.epa.gov/sites/production/files/2019-12/documents/epas_interim_recomendations_for_addressing_groundwater_contaminated_with_pfoa_and_pfos_dec_2019.pdf). (hereinafter "U.S. EPA's PFAS Groundwater Remediation Guidelines").
[18] Ex.# 17.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 8

*elevated readings and the unabated, ongoing migration of PFAS contamination from WPAFB's property to the City's wellfield, the City's seven production wells have been forced to remain shut down for over four years.*

28.     In addition, late in 2017 the City begin detecting PFAS in other active production wells in the Huffman Dam wellfield (located further away from WPAFB), and the City continues to consistently detect PFAS in these wells as of the date of this notice letter.  Although levels in these wells have not been above U.S. EPA's HAL or U.S. EPA's Groundwater Remediation Guidelines, they are above other health-based PFAS drinking water standards and action levels adopted over the past three years in as many as 10 other states, and above the recommended safe level proposed by the Center for Disease Control in 2018.[19]  Consequently, the City has been forced to develop and implement a detailed, expensive pumping/blending program with its production wells in order to reduce PFAS levels in raw and treated water.  Despite this program, finished water from the City's Ottawa Street treatment plant has consistently shown PFAS levels ranging between 5 ppt and 15 ppt.

29.     For several decades, the City and WPAFB were parties to a MOU issued under the City's Ohio EPA-approved WPO, setting forth detailed practices required at the Base in order to comply with the WPO, and thereby minimize the risk of releases that could contaminate the groundwater that supplies the City's wells.  Within a few months after discovering substantial PFAS contamination of its production wells and an imminent threat to the City's wells, representatives for WPAFB sent a letter to the City, dated December 20, 2016,[20] unilaterally deciding not to renew the MOU, in violation of the WPO, asserting that the MOU was obsolete, while, at the same time, stating that WPAFB remained committed to preventing contaminants from being introduced into Dayton's water supply:

> After conducting the five-year review of the subject MOU, the original intent of the MOU has exceeded current necessity.  Wright-Patterson Air Force Base (WPAFB) and the United States Air Force (USAF) have incorporated the intentions/requirements into current guidance documents, plans and programs.  We are excited to say the MOU reiterates existing obligations and commitments captured in federal, state, and USAF environmental rules and regulations, and would only be duplicated in the renewal of the MOU.  WPAFB will and commits to continue the highest level of environmental stewardship to protect the safety and portability of the regional drinking water supply, the Great Miami Buried Valley Aquifer.  Examples of the inherit applied standards are 1) Bureau of Underground Storage Tank Regulations storage tank management program; (2) USEPA spill prevention, countermeasures and control program; (3) USAF waste minimization and hazardous material inventory program; (4) USAF installation restoration program; (5) USAF pest management program; (6) Ohio EPA source water protection program; (7) National Pollutant Discharge Elimination System permitting; and (8) Emergency Planning and Community Right-to-Know Act chemical storage and toxic release inventory reporting.  The implementation of these programs are significant components in establishing an active area-wide groundwater protection strategy for the present and the future.

> WPAFB is committed and will strive to remain proactive with the City and local community governments to prevent the introduction of contaminants into the regional drinking water supply.  Should you have any questions or concerns please contact me at 257-0177.

---

[19]Ex.# 18 - Northeast Biosolids & Residuals Association (August 2020 compilation of state PFAS standards). (https://static1.squarespace.com/static/54806478e4b0dc44e1698e88/t/5f3e8aee62203a7828feb229/1597934320314/ PFASLimitsMatrixForBiosolidsProfession-NEBRA-V6-20Aug2020.pdf). (last visited January 30, 2021)  Ex.# 19 - Center for Disease Control, ATSDR Toxicological Profiles, Excerpts from Draft 2018 PFAS toxicological profile (https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=1117&tid=237).
[20] Ex.# 20.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 9

30.    In response to discovering PFAS contamination of its own drinking water supply, WPAFB quickly developed plans to install a $2.7 million granular activated carbon ("GAC") treatment system, designed to remove PFAS to non-detect levels. The plans were submitted to Ohio EPA early in 2017, approved by the Agency in May 2017, and WPAFB installed the system in record time, becoming fully operational the first week of June 2017.

31.    For its approximately 20,000 drinking water users (employees and residents), WPAFB moved rapidly from detecting PFAS contamination in drinking water to designing, permitting, and installing a treatment system for groundwater in less than 15 months. Unfortunately, for the City and its 400,000 customers, it has been a different story.

32.    WPAFB's initial response to discovering that PFAS contamination at the Base threatened the City's nearby water supply was to say nothing. Despite the rather ominous conclusions reached in its September 2015 PFAS assessment report, no one from WPAFB notified the City of a threat to its wells. Even when subsequent PFAS sampling under U.S. EPA's SDWA URCMR early in 2016 confirmed contamination of treated drinking water at least an order of magnitude above U.S. EPA's 2016 HAL, WPAFB did not notify the City of the threat, despite the obvious fact that the level of contamination in untreated groundwater had to be higher. The City learned of the threat to its water supply for the first time when Ohio EPA shared a copy of its June 2, 2016, letter with the City, which, as discussed above, directed the Base to "implement an expedited removal action…to ensure that PFAS detected in ground water at the Base are prevented from affecting…downgradient City of Dayton production wells." WPAFB has never taken this action.[21]

33.    When WPAFB continued to not comply with Ohio EPA's 2016 orders, the Agency issued another order dated January 29, 2018,[22] this time including a notice of violation ("NOV") of Ohio's delegated CWA program, and, for the second time, directing WPAFB to take action under the 1988 order to, among other things, submit a workplan within 30 days to: (a) "initiate source removal from known areas of soil and sediment contamination…to terminate leaching to ground water;" (b) "initiate an engineering study to determine the most effective way to prevent additional PFAS contamination from migrating beyond the WPAFB boundary…includ[ing] increased pumping to augment the current [VOC capture system],

---

[21] A "removal action" is a short-term response to a release designed to eliminate, reduce, or otherwise control an imminent threat, as opposed to a "remedial action," which is a long-term response designed to permanently remove a threat through some combination of treatment and engineering or institutional controls. 42 U.S.C. §§ 9601 (23) & (24). At the time of Ohio EPA June 2, 2016, letter, WPAFB was already operating a large-scale groundwater extraction well at its boundary between Area A and Huffman Dam, designed to extract VOC-contaminated groundwater for treatment in an air stripping unit, thereby removing VOCs before they migrate into Dayton's immediately downgradient production wells. WPAFB installed this removal system in the early 90s to address widespread VOC contamination of groundwater at the Base, and it continues to operate today. Despite the availability of this technology, coupled with GAC treatment, to remove PFAS from groundwater, thereby eliminating, or at least substantially reducing, the continued migration of PFAS into Dayton's wellfield, WPAFB has steadfastly refused to implement it or any other type of removal action despite Ohio EPA's direction to do so under the terms of the 1988 order between WPAFB and the Agency's delegated SDWA, RCRA and CWA authorities.

[22] Ex.# 21.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 10

install[ing]…additional extraction wells, or using existing production wells to prevent further migration downgradient;" (c) "evaluate storm water discharge locations…to determine if the[y] may also be a…source…that could impact…the City of Dayton production wells [and] [i]f they are…implement actions to prevent this impact;" and (d) evaluate long-term actions so that Dayton's…Huffman Dam wellfield and the Ottawa Drinking Water Plant are no longer impacted…." In his letter, the Director of Ohio EPA characterized WPAFB's failures as follows:

> While WPFAB has developed a sentinel monitoring well network and continues to monitor the ground water, WPAFB has not taken any steps to prevent PFAS contamination present at WPAFB from migrating beyond your boundary, nor evaluated any actions that could prevent surface water contamination present at WPAFB from impacting the city of Dayton's Mad River drinking water wellfield. Further, you have taken no action to prevent further impacts to WPAFB's Area B water supply. Adding to this list of issues, we now know that PFAS contamination has been detected in the raw water at Dayton's Ottawa Drinking Water Treatment Plant. This plant is directly in the migration path of contaminated ground water emanating from WPAFB.
>
> This lack of urgency to take additional appropriate action is very concerning. And while we wish to continue to work collaboratively with WPAFB on a solution, I feel compelled to require immediate action on your part to protect the ground water, which is also the primary source of drinking water not just for WPAFB, but for 1.5 million people that live in and around the city of Dayton.
>
> Specifically, I find it appropriate to hold WPAFB in violation of Chapter 6111.04 of the Ohio Revised Code (ORC), which states in pertinent part:
>
>> (A)[••• (1) No person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state.
>>
>> (2) Such an action prohibited under division (A)(1) of this section is hereby declared to be a public nuisance."

34.     WPAFB responded to Ohio EPA's January 29, 2018, letter in a letter dated February 27, 2018,[23] rejecting the Agency's order for a workplan to address the four subjects listed above, which would directly address off-site impacts caused by the PFAS contamination. Instead, WPAFB asserted that it needed to collect more data to evaluate its on-site sources of PFAS contamination: (a) as part of the Base's ongoing sitewide investigation of PFAS contaminated areas, (b) as part of its future, planned expanded site investigation of those areas, and (c) as part of its future plan to conduct additional "rigorous studies" under a formal remedial investigation *after* completing the ongoing site investigation and the planned expanded site investigation. As discussed below, this letter turned out to be a harbinger of substantial delays to follow.

35.     Ohio EPA followed up on its January 29, 2018, NOV in a letter dated August 15, 2019,[24] stating that the CWA violations addressed in the NOV had not been resolved, and that "further action is necessary to address the violations listed in the letter, and since these violations affect two public water systems [*i.e.*, the Base and the City], the timeliness of those actions is critical."

36.     With respect to the instruction that WPAFB initiate an engineering study to determine the most effective way to prevent additional PFAS contamination from migrating to the City's wells, the Agency's August 15, 2019, follow-up letter (a) restated that the City's wells

---

[23] Ex.# 22.
[24] Ex.# 23.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 11

had been shut down for over two years, and (b) urged WPAFB to "work with the City of Dayton to determine…what interim actions are necessary to protect [the wells] from PFAS impacts…."

37.     Ohio EPA's August 15, 2019, letter also urged WPAFB to complete its evaluation of whether PFAS contamination was being discharged via stormwater outfalls at the Base into the Mad River and its tributaries, which recharge the aquifer that supplies the City's water, and that, once the evaluation was completed, "immediate action may be necessary…to prevent PFAS contaminated storm water from migrating off base and into Dayton's Mad River wellfield." Ohio EPA closed by requesting a response within 90 days, stating that once its requests were completed the Agency, WPAFB, and the City could discuss a strategy for longer term actions "necessary to resolve the violation of ORC 6111.04." WPAFB did not respond to Ohio EPA's letter.

38.     Instead of taking action(s) expeditiously to address the contamination of, and ongoing threat to, Dayton's water supply, WPAFB's response thereto has been a series of monitoring and investigations, culminating in a decision in December 2020 to engage in yet another series of lengthy investigations that, unless reversed, will not result in any potential removal or remedial action designed to reduce, much less eliminate, the contamination and ongoing threat to the City's water supply for at least the next 7-10 years. In summary, WPAFB's response to the off-site groundwater impacts created by its PFAS contamination has been the following:

      a.  Conducting a preliminary site assessment in 2015 resulting in a 200+ page report in September 2015 that concluded that PFAS contamination had been documented, in terms of mass of PFAS released, at 25 different FSAs, FTAs, and spill sites sufficient to warrant a formal site investigation;[25]

      b.  Installing seven new monitoring wells and beginning quarterly sampling of 29 monitoring wells for PFAS late in 2016 or early in 2017, followed by installation of an additional 55 monitoring wells late in 2017, as part of a site investigation of the PFAS contaminated areas identified in the 2015 assessment;

      c.  Completing a 1200+ page site investigation report of the PFAS contamination in June 2018;[26]

      d.  Completing a 400+ page expanded site investigation report of PFAS contamination in August 2020, addressing three new sites for the first time and further evaluating four documented PFAS-contaminated areas to determine "whether groundwater and/or surface water impacted with [PFAS] from previous

---

[25] Ex.# 11. WPAFB's 2015 preliminary assessment of PFAS contamination of its current and former FTAs did not occur in a vacuum. It followed on the Base's earlier preliminary assessments of contamination at its 5 largest FTAs, assessments that the Base completed between 1988 and 1991 under obligations the Base agreed to under the 1988 order it signed with Ohio EPA. While the earlier assessments did not include PFAS testing, upon information and belief, no contaminated soils were removed from any of the FTAs in response to these assessments, which could have substantially reduced the PFAS threat that followed.

[26] Available at https://ar.afcec-cloud.af.mil/Search.aspx.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 12

firefighting activities is migrating off-base and presenting a possible threat to human health via ingestion of contaminated drinking water."[27] *The report concluded that all four of the existing areas and one new area had PFAS levels exceeding U.S. EPA's 2016 HAL, and also exceeding U.S. EPA's Groundwater Remediation Guidelines.* Instead of recommending some type of immediate removal or remedial action to address the off-site threat to groundwater, the report "recommended additional investigation…to determine the extent of PFAS contamination in [each] area."

e. Preparing in late August 2020 a 76-page "Relative Risk Site Evaluation" of 26 PFAS-contaminated areas, including more than 12 in Areas A and B immediately upgradient of the City's production wells.[28] The evaluation rated the health risk of each area based on (i) level of PFAS contamination, (ii) migration potential, (iii) human exposure risk potential, and (iv) type of contaminated media, to arrive at a qualitative ranking of relative risk. *23 of the 26 identified areas, including 12 areas immediately upgradient of the City's wells and the area denoted as "Area A & B Perimeter Wells," received the highest assigned risk level.* Unfortunately, according to the evaluation, its stated purpose was <u>not</u> to provide information in order to undertake some type of expedited removal or remedial action to address the threats, but "to prioritize funding for…sites/installations having the highest priority to begin a Remedial Investigation."[29]

f. Convening on December 18, 2020, a "scoping meeting" to discuss its prioritization of PFAS-contaminated areas for a phased remedial investigation. Despite a request by Ohio EPA to allow the City to attend the meeting, WPAFB refused. In addition, despite Ohio EPA's request that WPAFB focus first on investigating alternative removal/remedial actions to address contaminated groundwater that continues to migrate into the City's wellfield, WPAFB refused, stating that it intended to conduct a multi-year, multi-phased remedial investigation of 16 on-site areas instead.

g. Convening on December 29, 2020, a PFAS Technical Group, of which the City's Water Department is a member, at which meeting WPAFB announced that (i) it would take until the end of 2021 just to develop a workplan for the first phase of

---

[27] *Id.*

[28] Ex.# 24.

[29] Under CERCLA, "[t]he remedial investigation…serves as the mechanism for collecting data to characterize site conditions, determine the nature of the waste, assess risk to human health and the environment, and conduct treatability testing to evaluate the potential performance and cost of the treatment technologies that are being considered." (https://www.epa.gov/superfund/superfund-remedialinvestigationfeasibility-study-characterization). *The extensive data and information collected by WPAFB over the last 4½ years has already fulfilled all objectives of a remedial investigation. In addition, WPAFB already evaluated alternative treatment technologies for PFAS before it selected and installed a GAC system in 2017 to treat its own contaminated drinking water.* **Thus, there is no reason to perform yet another investigation, and, most importantly, no reason why WPAFB cannot move immediately to select a removal or remedial action designed to remove the contamination of, and ongoing threat to, the City of Dayton's water supply.**

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 13

its multi-phased remedial investigation of on-site PFAS contamination, dealing with just eight of the 16 on-site areas, and (ii) once the workplan was approved, it would take four years to complete the remedial investigation of the eight on-site areas.[30]  *Assuming a similar period for the second phase remedial investigation for the remaining 8 on-site areas, the earliest that WPAFB would be in a position to even begin evaluating alternative remedies to address the sources of PFAS contamination that continue to migrate into Dayton's wellfield is sometime close to the end of this decade.*

39.     Under the 1988 and 1991 orders signed by WPAFB with Ohio EPA and U.S. EPA, respectively, every five years WPAFB must prepare a comprehensive report detailing the status of cleanup activities.   In the reports, it must document the short and long-term protectiveness of all interim and final remedies in place for each area of contamination.   The latest report was issued in November 2020.[31]   With respect to PFAS contamination of groundwater at the Base and migration thereof into the City's wellfield, the report concluded:

"As PFOS/PFOA are emerging contaminants, a drinking water standard has not yet been proposed or promulgated....Therefore, a statement of [long-term] protectiveness is deferred until sufficient information is obtained.  The remedy for the [groundwater] is deemed to be short-term protective because ICs and ECs are in place to manage exposure pathways that could result in unacceptable risks."

40.     Under CERCLA, "ICs" and "ECs" refer to enforceable institutional controls, such as land use controls and deed restrictions, and engineering controls, such as containment, which are often put in place as short-term interim measures while a release is being investigated.[32]  *But they may not be used in lieu of a removal action designed to address an immediate threat, nor in lieu of a remedial action designed as a permanent remedy.*[33]  Nor may WPAFB use Dayton's voluntary shut down of its seven most-impacted production wells as part of a package of nonbinding institutional controls used to support the Base's assertion that a sufficient "interim remedy" for PFAS-contaminated groundwater is in place that is protective of human health and the environment.

41.     In response to WPAFB's refusal to take action to eliminate or reduce the ongoing contamination, or at least reduce the migration of PFAS into the City's wellfield, the City sought relief in the spring of 2020 under Section 332 of the National Defense Authorization Act ("NDAA") for Fiscal Year 2020,[34] signed into law on December 19, 2019.  It requires that the DOD address PFAS contamination as follows:

"Upon request from the Governor...of a state the Secretary of Defense shall work expeditiously...to finalize a cooperative agreement, or amend an existing cooperative

---

[30] Ex.# 25.
[31] Available at https://ar.afcec-cloud.af.mil/Search.aspx.
[32]   https://www.epa.gov/sites/production/files/documents/final_pime_guidance_december_2012.pdf.  (U.S.  EPA guidance for the use of such controls).
[33] 40 C.F.R. § 300.430.
[34] Public Law 116-92.  (available at https://www.congress.gov/bill/116th-congress/senate-bill/1790).

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 14

> agreement, to address testing, monitoring, removal, and remedial actions relating to the contamination or suspected contamination of drinking, surface, or ground water from PFAS originating from activities of the Department of Defense....
> * * * *
> A cooperative agreement shall meet or exceed the most stringent of the following standards for PFAS in any environmental media: (A) An enforceable State standard, in effect in that State, for drinking, surface, or ground water, as described in section 121(d)(2)(A)(ii) of [CERCLA] (42 U.S.C. 9621(d)(2)(A)(ii)); (B) An enforceable Federal standard for drinking, surface, or ground water, as described in section 121(d)(2)(A)(i) of [CERCLA] (42 U.S.C. 9621(d)(2)(A)(i)); [or] (C) A health advisory under section 1412(b)(1)(F) of the [SDWA] (42 U.S.C. 300g–1(b)(1)(F)).
> * * * *
> In addition to the requirements for a cooperative agreement, when...authorized to expend funds for the purpose of addressing ground or surface water contaminated by a perfluorinated compound, the Secretary of Defense may...enter into a...cooperative agreement...with (A) the local water authority with jurisdiction over the contamination site, including...a public water system.
> * * * *
> Beginning on February 1, 2020, if a cooperative agreement is not finalized or amended...within one year after the request from the Governor..., and annually thereafter, the Secretary of Defense shall submit to the appropriate committees and Members of Congress a report...(1) explaining why the agreement has not been finalized or amended, as the case may he; and (2) setting forth a projected timeline for finalizing or amending the agreement."[35]

42.    Congress' mandate under the NDAA was coupled with $251 million in new funding earmarked for PFAS remediation in fiscal year 2020.[36] With the new law and funding, the City felt a renewed sense of hope that something would be done to address the ongoing contamination of its water supply. Therefore, in late spring 2020, after Ohio Governor Mike DeWine had successfully navigated the State of Ohio through the emergency conditions created by the pandemic, the City and Ohio EPA approached the Governor to request that he issue a letter to DOD, asking for the PFAS cooperative agreement required under the NDAA.

43.    Recognizing the significance of the threat to the City's water supply, Governor DeWine agreed, sending a letter dated August 27, 2020, to the Secretary for DOD, requesting the agreement, and summarizing the significance of the contamination and the importance of the sole source designation under the SDWA for the aquifer that supplies drinking water for millions of people. The Governor ended his letter with "I look forward to hearing from your office as soon as possible so that we can begin moving expeditiously with the City of Dayton and WPAFB on a cooperative agreement to protect one of the Ohio's most vital water resources."[37]

44.    Hearing no response, Governor DeWine sent a second letter to the Secretary, dated January 8, 2021, reiterating his request, stressing the urgency of the matter, and referencing a series of interim steps/projects proposed by the City and Ohio EPA to WPAFB that could be implemented immediately to reduce the rate of ongoing migration of PFAS from the Base into

---

[35] *Id.*
[36] "Congress Announces Appropriations Deal," Everstine, Air Force Magazine, December 16, 2019. (https://www.airforcemag.com/congress-announces-appropriations-deal/). (summary of funding authorizations).
[37] Ex.# 26.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 15

the City's wellfield.[38] The Governor closed his follow-up letter stating that "Ohio EPA and the City of Dayton want to work cooperatively with WPAFB to address the PFAS contamination…a signed cooperative agreement would enable DOD/WPAFB to request a portion of the…$251 million…to be applied to the projects….Ohio looks forward to working with you."

45. In a letter dated January 18, 2021,[39] DOD's Undersecretary of Defense for Acquisition and Sustainment responded to the Governor's August 27, 2020, letter. The Undersecretary asserted that (a) the NDAA only "authorizes" DOD to enter into PFAS cooperative agreements, and (b) such agreement was already in place, in the form of an agreement dating back to the early 1990s whereunder DOD agreed to reimburse Ohio EPA to review WPAFB's cleanup-related documents prepared under its ongoing sitewide remediation, as required under the 1988 and 1991 orders that WPAFB signed with Ohio EPA and U.S. EPA, respectively.[40] The Undersecretary did not respond to the Governor's January 8 letter and, more importantly, did not respond to the request therein that WPAFB implement interim measures that the City and Ohio EPA have proposed to reduce/mitigate the ongoing migration of PFAS into the City's wellfield. Finally, the Undersecretary stated that WPAFB remained committed to its current plan to conduct a multi-year, multi-phased remedial investigation of the sources of PFAS contamination at the Base, but "[i]f during the RI the Air Force determines that PFAS…is moving toward a drinking water well and levels…in that well will meet or exceed EPA's [HAL] in the near future, the Air Force will take appropriate action under CERCLA."

46. The Undersecretary's letter is the functional equivalent of a rejection of the request of Ohio's Governor, Ohio EPA, and the City of Dayton for WPAFB to enter into a cooperative agreement under the NDAA to address the PFAS contamination that continues to: (a) migrate into the City's wellfield, (b) force the City to keep seven production wells off-line, (c) force the City to continue a complicated/expensive blending program with other production wells, and (d) be detected in the City's sentinel wells above U.S. EPA's 2016 HAL and its 2019 Groundwater Remediation Guidelines. It is also a rejection of the request of Ohio EPA and the City for WPAFB to undertake interim measures that will reduce the ongoing migration into the City's wells. *Unless changed, based on WPAFB's December 2020 announced schedule, the Undersecretary's letter means that the City cannot expect WPAFB to do anything to eliminate, or even reduce, the continued migration of its PFAS contamination into the City's wellfield for the rest of this decade, while the Base continues to "study" the sources of the contamination.*

47. Finally, the Undersecretary's letter conveyed a position that conflicts with U.S. EPA's December 2019 PFAS Groundwater Remediation Guidelines.[41] Contrary to the assertion that no immediate or interim action is necessary until one or more of the City's production wells has PFAS levels above U.S. EPA's 2016 HAL (70 ppt), U.S. EPA's 2019 PFAS Groundwater

---

[38] Ex.# 27.

[39] Ex.# 28.

[40] Ex.# 29. How an agreement entered into between DOD and Ohio close to 30 years ago, whereunder DOD reimburses Ohio EPA for its oversight costs to review WPAFB's cleanup-related documents, can rise to the level of a PFAS cooperative agreement required under the 2019 NDAA (which must specifically address testing, monitoring, removal, and remedial actions relating to PFAS contamination), is a mystery. Obvious, it does not.

[41] Ex.# 16.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 16

Remediation Guidelines provide the following, more-stringent recommended remedial guidelines:

> "[T]his guidance provides interim recommendations for screening levels and preliminary remediation goals (PRGs) to inform the development of final cleanup levels for PFOA and/or PFOS contamination of groundwater that is a current or potential source of drinking water....[T]his guidance recommends the following:
>
> • Screening sites using a recommended groundwater screening level based on a target Hazard Quotient...of 0.1 for PFOA or PFOS individually, which is currently 40 ng/L or parts per trillion (ppt).
>
> • Using the PFOA and PFOS Lifetime Drinking Water Health Advisories (HAs) of 70 ppt (combined or individually) as the recommended Preliminary Remediation Goal (PRG) *for groundwater that is a current or potential source of drinking water*, where no state or tribal MCL or other applicable or relevant and appropriate requirements (ARARs) are available or sufficiently protective.
>
> • In situations where groundwater is currently being used for drinking water, EPA expects that responsible parties will address levels of PFOA and/or PFOS over 70 ppt.[42]

48.     U.S. EPA's PFAS Groundwater Remediation Guidelines make clear that remediation is recommended when PFAS levels exceed 40 ppt individually (PFOA or PFOS) or 70 ppt combined (PFOA + PFOS) in *__groundwater__* that is a current source of drinking water, not just when these levels are exceeded in a drinking water production well. *Sentinel well data collected by the City and provided to WPAFB has consistently found PFAS levels above the Agency's guidelines in the groundwater in the City's wellfield just upgradient of the City's production wells.*

49.     The City of Dayton and WPAFB have enjoyed a longstanding, mutually-beneficial economic, civic, and cultural relationship dating back before WWI. Many of the Base's close-to 30,000 employees live in the City or in surrounding Montgomery County. Because the County is a major contract purchaser of water from the City, most of the Base's employees are direct or indirect customers of the City's Water Department. The City's customers rely on the Department to deliver safe, potable water to their homes and places of business. Their right to safe water is no less important than the same right enjoyed by WPAFB's approximately 20,000 residents and employees served by its own drinking water system. The lightning-fast response of the Base once it discovered that its own water supply was contaminated with PFAS stands in stark contrast to its response to the same contamination of the City of Dayton's water supply.

50.     The dogmatic insistence of WPAFB that insufficient information exists to act now with respect to the contamination of the City's wells and that at least 4-6 more years of further investigation is needed; the Base's defiance of orders and NOVs issued by Ohio EPA; and the Base's refusal to even consider interim measures requested by the Agency and the City that

---

[42] *Id.* (emphasis added).

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 17

would at least reduce the ongoing migration of PFAS into the City's wellfield, is disturbing. While the City of Dayton strongly desires to maintain a close working relationship with WPAFB, addressing a threat to the City's water supply is paramount and a civic responsibility that cannot be ignored.

### Environmental Regulation of WPAFB's PFAS-Related Activities

51.     Like all U.S. military installations, WPAFB is subject to federal environmental statutes and the delegated state programs thereunder. In each of the major statutes, its applicability to the military is expressly spelled out, along with the right of citizens, including the City, to enforce the obligations thereunder.[43] With respect to WPAFB, in addition to being subject to all requirements under these statutes applicable to its activities on an *ad hoc* basis, the Base has the following administrative orders and permits issued under these statutes, which govern ongoing activities *directly related to the violations for which the City will seek relief:*

   a. CERCLA – Section 120 FFA between WPAFB and the Ohio EPA, dated February 17, 1988, entitled "Director's Final Findings and Orders: Administrative Order on Consent," addressing the Base's sitewide investigation and remediation of at least 30 separate waste disposal areas, including numerous past and current FSAs and FTAs.[44] The order provides the following reservation of rights for citizen enforcement:[45]

   A.  Nothing in these Orders shall be construed to limit in any way the right of the public or of any citizen to obtain public information about  the work to be performed  under these  Orders or  the technical basis for these Orders; the right of the public, any citizen and the State of Ohio to  sue or  to intervene in any action to enforce state or federal law against Res···nts; or the right of the public or any citizen to be  fully informed  pursuant to  the procedures established  by  state  and  federal  environmental  law of  the actions taken pursuant to these Orders.

   b. CERCLA - Section 120 FFA between WPAFB and U.S. EPA, dated March 21, 1991, entitled "Federal Facility Agreement Under CERCLA Section 120,"[46] which order was necessary after WPAFB was placed on the NPL in 1991 for U.S. EPA to provide its oversight and structure to the Base's investigation and remediation that began under the 1988 order between WPAFB and Ohio EPA. The order provides the following reservation of rights for citizen enforcement:[47]

---

[43] *See* CERCLA Sections 120(a)(1) and 310(a)(1) [42 U.S.C. §§ 9620(a)(1) & 9659(a)(1)]; RCRA Sections 6001 and 7002 [42 U.S.C. §§ 6961(a) & 6972(a)(1)(A)]; SDWA Sections 1428(h), 1447(a), and 1449(a) [42 U.S.C. §§ 300h-7(h), 300j-6(a), & 300j-8(a)]; CWA Sections 313(a) and 505(a)(1) [33 U.S.C. §§ 1313(a) & 1365(a)(1)]. Each statute defines the term "citizen" to include a municipality.
[44] Ex.# 8.
[45] *Id*. at p. 29.
[46] Ex.# 9.
[47] *Id*. at pp. 46-47.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 18

    (a)  Upon the effective date of this Agreement, any standard, regulation, condition, requirement or order which has become effective under CERCLA and is incorporated into this Agreement is enforceable by any person pursuant to Section 310 of CERCLA, and any violation of such standard, regulation, condition, requirement or order will be subject to civil penalties under Sections 310(c) and 109 of CERCLA;

    (b)  All timetables or deadlines associated with the RI/FS shall be enforceable by any person pursuant to Section 310 of CERCLA, and any violation of such timetables or deadlines will be subject to civil penalties under Sections 310(c) and 109 of CERCLA;

    (c)  All terms and conditions of this Agreement associated with removal actions and interim and/or final remedial actions, including corresponding timetables, deadlines or schedules, and all work associated with the removals and interim and/or final remedial actions, shall be enforceable by any person pursuant to Section 310(c) of CERCLA, and any violation of such terms or conditions will be subject to civil penalties under Sections 310(c) and 109 of CERCLA; and

  c.  CWA –

    (i)    Ohio EPA NPDES Permit No. 1IO00001*ID,[48] issued August 2020, governing the discharge of stormwater from WPAFB, include stormwater outfalls at locations in Areas A and B in the immediate vicinity of known PFAS contaminated areas, and immediately upgradient of the City's wellfield.

    (ii)    Ohio EPA NPDES Permit No. 1IN00156*ID,[49] issued August 2020, governing the discharge of wastewater from WPAFB's Volatile Organic Compound ("VOC") air stripping system that treats contaminated groundwater extracted from groundwater located directly between areas of PFAS contamination in Area A and the City's downgradient Mad River wellfield.

    52.    In addition to federal environmental statutes and their delegated state programs, WPAFB is also subject to the following state and local requirements that govern activities that relate to PFAS contamination:

---

[48] Ex.# 30.
[49] Ex.# 31.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 19

    a.  Ohio's SHWA – Section 6001 of RCRA subjects WPAFB to all "…state…and local requirements…respecting control and abatement of solid waste…disposal and management…."[50] In Ohio's SHWA, Revised Code (R.C.) § 3734.03 prohibits disposal of solid waste without a permit, classified as open dumping. Under R.C. 3734.101, any person adversely affected by unpermitted open dumping may commence an action to obtain injunctive and other relief to abate the illegal disposal.

    b.  City of Dayton Wellfield Protection Ordinance (WPO) – As a requirement of U.S. EPA's 1988 sole source designation of the City's aquifer under 42 U.S.C. §§ 300h-6 and 300h-7 of the SDWA, the City and Ohio EPA were required to develop local and state regulatory programs, respectively, to protect the aquifer through (i) a state wellfield protection program, (ii) local development of source protection zone/map with designated one and five-year time of travel protection zones, and (iii) local enforcement authority to regulate activities in the zones sufficient to protect the aquifer from contamination.[51] WPAFB is subject to the City's ordinance under the SDWA and Ohio law.[52]

### Ongoing Violations at WPAFB

**A.   SDWA.**

    53.    Under the SDWA, a citizen may commence an action for civil penalties and injunctive relief against any person, including a U.S. military installation, for ongoing violations of a requirement prescribed by or under the SDWA.[53] The June 2, 2016, June 20, 2016, January 29, 2018, and August 15, 2019, compliance orders issued by Ohio EPA to WPAFB all consistently conveyed the same instructions relating to the PFAS contamination: "Take action immediately to eliminate, or at least begin expeditiously to reduce, the ongoing migration of PFAS contamination into the City of Dayton's water supply." The orders were issued by Ohio EPA under the State of Ohio's delegated SDWA, CWA, and RCRA programs, as well as under the terms of the 1988 administrative order that the Base executed with Ohio EPA under these program authorities and Section 120 of CERCLA.

    54.    WPAFB has refused, and continues to refuse, to comply with these compliance orders. Neither Ohio EPA nor U.S. EPA has commenced and is prosecuting the Base's violations. Therefore, the City of Dayton will commence an action in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to enforce Ohio EPA's compliance orders.

    55.    Under the City's WPO, WPAFB is obligated to (a) comply with the planning, handling, inventory and reporting obligations thereunder designed to minimize the risk of a

---

[50] 42 U.S.C. § 6961(a).
[51] Ex.# 1.
[52] 42 U.S.C. §§ 300h-7(h) & 300j-6(a); R.C. § 3750.11(G).
[53] 42 U.S.C. § 300j-8.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 20

regulated substance contaminating the City's sole source aquifer; (b) notify the City immediately upon knowledge of a release of a regulated substance that might contaminate the aquifer; and (c) if a release has occurred, implement steps within 180 days to address the release and eliminate the risk of recurrence.[54] In addition, the Base is prohibited from handling any regulated substance in a manner inconsistent with the purpose and scope of the ordinance.[55] The ordinance also provides that any person responsible for the release of a regulated substance is liable for the costs incurred by the City to investigate, sample, and remediate the release, and take steps to protect the City's water supply.[56] Finally, the City is authorized to issue NOVs and compliance orders to enforce its ordinance.[57]

56.     As discussed above, in a letter dated December 20, 2016, WPAFB notified the City that the Base would no longer comply with the City's WPO, which had been enforced at the Base for 25 consecutive years in a detailed MOU executed by the City and Base, renewed every 5 years.[58] WPAFB had no authority to make such decision. In addition, the Base has released regulated substances, and continues to release regulated substances today, in the form of PFAS, that have contaminated, and continue to contaminate today, the sole source aquifer that supplies drinking water to the City of Dayton, in violation of the WPO.

57.     Neither Ohio EPA nor U.S. EPA has commenced and is prosecuting the Base's violations of the City's WPO. Therefore, the City of Dayton will commence an action under the SDWA in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to enforce the WPO.

**B.      RCRA.**

58.     Under Section 7002(a) of RCRA, a citizen may commence an action against any person in violation of an order that has become effective under RCRA, or against any person whose past or present handling or disposal of solid waste may present an imminent and substantial endangerment to health or the environment.[59] An "imminent and substantial endangerment" requires only that "there…be a threat which is present *now*, although the impact of the threat may not be felt until later."[60]

59.     The 1988 administrative order executed by Ohio EPA and WPAFB stated that it was issued under, among other authorities, the Agency's delegated RCRA program, R.C.

---

[54] Ex.# 1, §§ 53.21-53.23, 53.27. The term "regulated substance" is defined to include any substance contained on U.S. EPA's SDWA URCMR. *Id.* at § 53.01(C). PFAS are included on U.S. EPA's URCMR.

[55] *Id.* at §§ 53.01, 53.39.

[56] *Id.* at § 53.27(B).

[57] *Id.* at §§ 53.41(A), 53.43 & 53.99.

[58] Ex.# 20.

[59] 42 U.S.C. § 6972(a).

[60] *Meghrig v. KFC Western*, 516 U.S. 479, 486 (1996) (internal citations omitted, emphasis in original); *The Little Hocking Water Association, Inc., v. E.I. DuPont de Nemours and Company*, 91 F. Supp. 3d 940, 957-963 (S.D. OH 2015) (applying *Meghrig* and finding the "imminent and substantial endangerment" provision applicable to on-site disposal of PFAS migrating via groundwater into a nearby wellfield).

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 21

Chapter 3734.[61] The June 2, 2016, June 20, 2016, January 29, 2018, and August 15, 2019, compliance orders issued by Ohio EPA to WPAFB were issued under the terms of the 1988 order and under, among other authorities, Ohio EPA's delegated RCRA authority. WPAFB failed to comply with the 1988 administrative order, as well as Ohio EPA's four subsequent compliance orders, and continues to violate the orders today.

60. Neither Ohio EPA nor U.S. EPA has commenced and is prosecuting the Base's violations of these orders as it pertains to the PFAS contamination. Therefore, the City of Dayton will commence an action under RCRA in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to enforce the orders.

61. WPAFB has disposed, and continues to dispose today, solid waste in the form of PFAS from more than two dozen confirmed locations immediately upgradient of the City of Dayton's wellfield, which, as discussed above, are contaminating the City's wellfield and water supply, and presenting an imminent and substantial endangerment to public health.

62. Neither Ohio EPA nor U.S. EPA has commenced and is prosecuting the imminent and substantial endangerment presented by WPAFB's disposal of PFAS. Therefore, the City of Dayton will commence an action under RCRA in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to eliminate the endangerment to the City's water supply.

**C.    Ohio's SHWA.**

63. R.C. § 3734.03 prohibits the disposal of solid waste without a permit, classified as "open dumping." Under R.C. § 3734.101, any person adversely affected by illegal open dumping may commence an action to obtain injunctive and other relief to abate the illegal disposal. Under Section 6001 of RCRA, WPAFB is subject to all "…state…and local requirements…respecting control and abatement of solid waste…disposal and management."[62]

64. As indicated in WPAFB's 2015 preliminary assessment, its 2017 site investigation, and its 2020 expanded site investigation, substantial quantities of PFAS-containing AFFFs have been disposed, or otherwise released, without a permit, at dozens of FSAs, FTAs and spill sites around the Base dating back to 1970. WPAFB never obtained a permit authorizing the disposal of PFAS-containing AFFF residuals onto the ground and into nearby waterways during decades of fire suppression activities, firefighting training exercises, and spills of AFFFs. Such unpermitted disposal constitutes open dumping in violation of R.C. § 3734.03. Based on dye testing performed by WPAFB at several PFAS-contaminated areas in 2019 and 2020, its past disposal continues today to cause new unpermitted discharges of PFAS in stormwater outfalls downgradient of these contaminated areas.

65. Neither Ohio EPA nor U.S. EPA has commenced and is prosecuting the

---

[61] Ex.# 8.
[62] 42 U.S.C. § 6961(a).

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 22

unpermitted open dumping of PFAS occurring at the Base. Therefore, the City of Dayton will commence an action under RCRA and Ohio's SHWA in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to abate the unpermitted open dumping.

**D.    CWA.**

66.    Sections 301 and 402 of the CWA prohibit the discharge of pollutants from a point source discharge to waters of the United States without an NPDES permit.[63] Section 505 of the CWA authorizes a citizen to commence an action against any person, including a U.S. military installation, for such unpermitted discharge, or for violating an order issued with respect to such unpermitted discharge by a state acting pursuant to its delegated CWA program.[64]

67.    Neither Ohio EPA NPDES Permit No. 1IO00001*ID[65] (stormwater discharge), nor Ohio EPA NPDES Permit No. 1IN00156*ID[66] (air stripper discharge) issued to WPAFB authorize it to discharge PFAS in stormwater outfalls or from the Base's air stripper treatment system, respectively. The air stripper system has been treating groundwater contaminated with VOCs since the mid-1990s. The extraction well (EW-1) for the treatment system is located at the boundary of Area A immediately downgradient of more than a dozen PFAS contaminated areas, and immediately upgradient of the City's Mad River wellfield. The permit issued by Ohio EPA for the discharge of treated groundwater from the air stripper authorizes a discharge into Twin Lake, which has an overflow into a tributary that confluences with the Mad River less than a quarter mile away. Twin Lake is therefore a "water of the United States" under Section 502 of the CWA.[67]

68.    Because PFAS are resistant to air stripping, pursuant to instructions from Ohio EPA, the Base tested its air stripper discharge to Twin Lake for PFAS for the first time in October 2020, finding PFAS in the discharge.[68] The Base's extraction/air stripping treatment system operates continuously, with a substantial discharge to Twin Lake. Based on (a) the Base's October 2020 sampling result, (b) the location of the air stripper extraction well, (c) the continuous operation and discharge from the treatment system, and (d) the nature of air stripping technology, the Base has in the past, and continues today, to discharge PFAS to Twin Lake without an NPDES permit, in violation of Section 301 of the CWA.[69]

69.    Using a combination of (a) sampling of stormwater outfalls and (b) dye testing of surface/subsurface flows in areas immediately downgradient of significant PFAS-contaminated areas, WPAFB documented that PFAS are being discharged in numerous stormwater outfalls at the Base.[70] These outfalls discharge to the Mad River and its tributaries Mud Run Creek and

---

[63] 33 U.S.C. §§ 1311(a) & 1342(a).
[64] *Id.* at § 1365(a)(1).
[65] Ex.# 30.
[66] Ex.# 31.
[67] 33 U.S.C. § 1362.
[68] Ex.# 32.
[69] 33 U.S.C. § 1311(a).
[70] Ex.## 25, 33, 34.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 23

Heeble Creek, and to unnamed tributaries that confluence within a short distance of these waterways. These outfalls are "point source discharges" under Section 502 of the CWA, and the receiving waterways are "waters of the United States" under that same Section.[71] WPAFB's Ohio EPA permit has never authorized the discharge of PFAS in stormwater outfalls at the Base. This unpermitted discharge of PFAS is ongoing, or at least chronic and likely to recur each time rainfall occurs at the Base.

70.     WPAFB has failed to comply with, and continues to fail to comply with, Ohio EPA's January 29, 2018, order issued under Ohio's delegated CWA program.[72] Among other things, the order found WPAFB to be in violation of Ohio's delegated CWA program due to ongoing discharge of PFAS, and required WPAFB to submit a workplan within 30 days to: (a) implement source removal from known areas of PFAS contamination to terminate leaching into groundwater; (b) initiate an engineering study to determine the most effective way to prevent additional PFAS from migrating off the Base's property and into the City's wellfield; and (c) evaluate long-term response actions so that the City's wells and water supply are no longer impacted by the contamination.[73]

71.     Neither Ohio EPA nor U.S. EPA has commenced and is prosecuting the unpermitted discharge of PFAS occurring at the Base in its stormwater outfalls and from its air stripper treatment system, nor the continued violation of Ohio EPA's January 29, 2018, order. Therefore, the City of Dayton will commence an action under the CWA in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to abate the ongoing violations.

**E.     CERCLA.**

72.     Under Section 310 of CERCLA, any person may commence a civil action against any other person, including a U.S. military installation, alleged to be in violation of any regulation or order that has become effective under the statute, including any provision of a FFA entered into under Section 120.[74] The administrative orders entered into by WPAFB in 1988 and 1991 with Ohio EPA and U.S. EPA, respectively,[75] are each a FFA under Section 120 of CERCLA, and thus enforceable by any person, including the City of Dayton. In addition, in each FFA, WPAFB agreed to terms expressly confirming the right of any person to enforce the agreement.[76]

73.     Ohio EPA issued multiple orders to WPAFB under the terms of the 1988 FFA, instructing the Base to, among other things, take immediate action to eliminate, or at least substantially reduce, the ongoing migration of PFAS-contaminated groundwater into the City's

---

[71] 33 U.S.C. § 1362.
[72] Ex.# 21.
[73] *Id.*
[74] 42 U.S.C. § 9659(a).
[75] Ex.## 8, 9.
[76] *Id.* at pp. 29 and 46-47, respectively.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 24

wellfield.[77] WPAFB failed to comply with the orders, and its violations are ongoing today.

74. Neither Ohio EPA nor U.S. EPA has commenced and is prosecuting the ongoing violations of the 1988 FFA between Ohio EPA and WPAFB. Therefore, the City of Dayton will commence an action under CERCLA in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to abate the ongoing violation of the 1988 FFA.

75. Under the terms of the 1991 FFA between WPAFB and U.S. EPA, the Base agreed "to take such response actions as may be necessary to abate"…"an endangerment to the public health or welfare…because of an actual or *threatened* release of a hazardous substance, *contaminant or pollutant* at or from the site, including but not limited to *discovery of contamination of a drinking water well at concentrations that exceed **any** state or federal drinking water **action level or standard**.*"[78]

76. PFAS are "contaminants or pollutants" under CERCLA, and their release from the Base has contaminated the City's wells at concentrations that exceed, at a minimum, U.S. EPA's 2019 PFAS Groundwater Remediation Guidelines.[79] Their release has also contaminated the City's wells above PFAS action levels or standards adopted in as many as 10 other states over the past three years, as well as CDC's recommended health advisory level in its 2018 draft PFAS toxicological profile.[80] Under express terms that WPAFB agreed to in the 1991 FFA, WPAFB is obligated to take all necessary response actions to abate the contamination of, and ongoing threat to, the City's water supply, but the Base has failed to comply with its obligation.

77. In addition, under the terms of the 1991 FFA, WPAFB was obligated to review and revise as necessary its Community Relations Plan ("CRP") at least annually.[81] As reflected in the 1991 FFA[82] and in CERCLA's National Contingency Plan ("NCP"),[83] the CRP is critically important to protecting the right of the public and interested stakeholders to have meaningful input into the decisionmaking process under CERCLA. Beyond just updating outdated contact information, the NCP requires that a CRP be continually updated/revised to reflect current site conditions, and in particular to address any newly-found contaminants, new risks, and new remedial steps that may be required.[84]

78. WPAFB has not updated its CRP since 1997.[85] Despite discovering widespread PFAS contamination over the course of the last four years and preparing four detailed investigations thereof, including a human health risk assessment, the CRP has not been updated

---

[77] Ex.## 13-15, 21, 23.
[78] Ex.# 9 p. 38 (emphasis added). As noted above, PFAS are not yet listed as "hazardous substances" under CERCLA, but are included under the definition of "pollutant or contaminant" under the statute. 42 U.S.C. § 9601(33).
[79] Ex.# 16.
[80] Ex.## 18, 19.
[81] Ex.# 9, p. 30.
[82] *Id.* at pp. 66-67.
[83] 40 C.F.R. § 300.430.
[84] *Id.*
[85] Ex.# 35.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 25

with any of this information. Perhaps most importantly, the CRP has not been revised to indicate how WPAFB will "enlist...support and advice on significant activities"[86] from the City of Dayton, which is the stakeholder directly impacted by the contamination, relating to what necessary and appropriate response actions should be taken to address the contamination, and the timing and prioritization thereof. WPAFB's failure to update its CRP is an ongoing violation of the 1991 FFA and CERCLA's NCP.

79.     Neither Ohio EPA nor U.S. EPA has commenced and is prosecuting these ongoing violations of the 1991 FFA. Therefore, the City of Dayton will commence an action under CERCLA in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to abate the ongoing violations.

---

As the owner and operator of the WPAFB facility, the DOD and the Air Force are responsible for allowing widespread releases of PFAS-containing AFFFs onto soils and into surface waters and groundwater immediately upgradient of the City of Dayton's Mad River wellfield, a wellfield that draws its water from a specially designated "sole source aquifer" under the SDWA. Representatives for WPAFB have known for decades (1) that operations at the Base are located inside the wellfield protection zones for the City's wellfield, and (2) that acts or omissions occurring during the handling of chemicals could contaminate the sole source aquifer that supplies those wells.

The releases of PFAS at WPAFB continue each day to migrate from the Base's property, trespassing onto the City's property via groundwater and surface water runoff, and continue each day to cause new, ongoing contamination of the City's monitoring and production wells that are part of a public water system that supplies potable water to 400,000 direct and indirect customers in the City and surrounding Montgomery County. The refusal to comply with state and federal environmental obligations that would eliminate the contamination, or at least expeditiously and substantially reduce the ongoing migration thereof into Dayton's wellfield, is very troubling to the City.

It is particularly distressing that for its own drinking water customers the USAF moved at near breakneck speed to assess the contamination, evaluate alternative remedies, and install treatment that reportedly reduces the PFAS concentration in drinking water to nondetect. Yet when it comes to addressing the ongoing migration of the same contamination into a nearby public wellfield directly adjoining WPAFB that serves almost twenty times the number of customers, DOD and the USAF continue to insist that almost five years of studying the contamination is not enough, and that an additional 4-6 years (or more) of further investigation is needed before even considering some type of remedy.

---

[86] *Id.* at p. 21.

U.S. Department of Defense, *et. al.*
March 31, 2021
Page 26

     The City of Dayton has been more than patient the past four years.  The City is unwilling to continue to sit idly by with significant production wells closed for more than four years, and the City incurring substantial expenses as a result of the contamination and the closure of its wells.  In order to avoid the commencement of litigation, please contact the undersigned immediately to discuss the steps DOD and the USAF will commit to in order to remedy the ongoing violations and alleviate the ongoing endangerment to the City's Mad River wellfield.

Very truly yours,

**CITY OF DAYTON, OHIO**                                    **FROST BROWN TODD LLC**


By: *ss/John C. Musto*                                          By: *ss/Stephen N. Haughey*
    John C. Musto, Esq.                                      Stephen N. Haughey, Esq.
    Chief Trial Counsel                                      Christina Wieg, Esq.
    Department of Law, Civil Division                        Environmental Practice Group

Enclosure (Thumb drive with Ex.## 1-35)

cc:    Mayor Nan Whaley
        City Manager Shelley Dickstein
        City of Dayton Commission
        Barbara Doseck, Esq., Law Director

0105357.0730840 4825-1681-0424v1