# EXHIBIT B





**John C. Musto**
Deputy Law Director
Department of Law
City of Dayton
101 W. Third Street
Dayton, OH 45401
937.333.4116
john.musto@daytonohio.gov

**Stephen N. Haughey**
Partner, Environmental Practice Group
FROST BROWN TODD LLP
301 E. Fourth Street, Suite 3300
Cincinnati, OH 45202
513.651.6127
shaughey@fbtlaw.com

February 24, 2025

<u>Via-Email and Regular U.S. Mail</u>
Andrew D. Knudsen, Esq.
Environmental & Natural Resources Division (ENRD)
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044

Re: *City of Dayton, Ohio v. United States et al.*, MDL No. 2:18-mn-2873 (D.S.C.) – CERCLA Response Cost Recovery Demand Letter for Past and Future Costs Incurred by the City of Dayton in Response to Release of PFAS at Wright Patterson Air Force Base ("WPAFB" or "the Base")

Mr. Knudson:

As counsel for the City of Dayton, Ohio (hereinafter "Dayton" or "the City") in its FTCA complaint against the United States that is pending in above-referenced MDL action, we are submitting this CERCLA cost-recovery demand letter in response to your May 10, 2024, letter inviting plaintiffs in the MDL litigation (captioned as *In re Aqueous Film Forming Foam Products Liability Litigation*, MDL No. 2:18-mn-2873 (D.S.C.)) (hereinafter "the AFFF MDL" or "the MDL court") with potential cost-recovery claims against the U.S. for the release of PFAS to send a demand letter to you to initiate settlement discussions.

By way of procedural background, on May 3, 2021, Dayton filed its FTCA complaint (captioned as *City of Dayton, Ohio v. United States*, No. 3:21-cv-00135, S.D. Ohio) against the U.S. for damages to the City's property and water supply due to the release of PFAS at WPAFB and its migration into the City's Mad River Wellfield and drinking water supply, which wellfield directly adjoins the northwestern boundary of the Base. Late that summer, the City's complaint was transferred to the AFFF MDL in S.C., where it remains pending with other PFAS-related complaints.

Although USEPA finalized its proposed listing of the principal PFAS compounds as CERCLA hazardous substances in April, 2024, in response to your May 10 letter, Dayton has delayed filing an amended or new complaint under Section 107 of CERCLA to recover the City's response costs, to see if the City and WPAFB can reach a settlement.

Below we provide background facts for the City's cost-recovery claim, the information requested in your May 10 letter, and supporting documentation (in the form of a Sharefile link and thumb

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 2

drive) for the response costs incurred so far. We also provide a summary of WPAFB's response to the release of PFAS at the Base.

Based on our assumption that your office represents WPAFB with respect to this claim, we have not copied representatives for the Base. Therefore, please distribute this letter and one of the thumb drives to the following individuals who are responsible for managing or overseeing WPAFB's response to the release of PFAS:

Joseph Ferentz, Site Remedial Project Manager
Environmental Restoration
AFCEC/CZOM
Building 20012, Area B
2145 Monahan Way
Wright-Patterson AFB, OH 45433
joseph.ferentz.1@us.af.mi

Syed Quadri, Remedial Project Manager
USEPA Region 5, Superfund Response Section #7
77 West Jackson Blvd
Mail Code SR-6J
Chicago, IL 60604-3507
quadri.syed@epa.gov

Dwayne Tolson, Site Coordinator
Division of Environmental Response and Revitalization
OEPA Southwest District Office (SWDO)
401 East Fifth Street
Dayton, OH 45402
Dwayne.Tolson@epa.ohio.gov.

These individuals can answer any questions you may have about the status of WPAFB's response to the release of PFAS. Mr. Ferentz can confirm Dayton's participation as a member of WPAFB's Restoration Advisory Board, meeting with representatives and contractors for the Base, other local officials, and representatives for OEPA and USEPA on a regular basis for many years. He can also confirm the City's participation in monthly technical meetings with the Base and representatives for both Agencies. During these RAB and technical meetings, the City's response actions to the release of PFAS were presented and discussed in great detail. Mr. Ferentz can also confirm that Dayton has provided to WPAFB the City's PFAS sampling data, as well as copies of technical reports from the City's consultants addressing investigations and emergency removal actions taken in response to the contamination. Messrs. Quadri and Tolson, as well as OEPA SWDO Chief Bonnie Buthker, will confirm these meetings and the Agencies' knowledge of, support for, and in many cases affirmative recommendation of, the steps Dayton has taken in response to the release.

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 3

Essentially, these and other individuals representing WPAFB and the Agencies, as well as the enclosed Exhibits, document/confirm that the City's emergency response actions and associated costs complied with all applicable requirements of the NCP. Finally, WPAFB maintains a CERCLA/DERP administrative record of investigatory, response, and remedial documents on the USAFCEC's webpage at https://ar.cce.af.mil/Search, which contains additional documents bearing on the City's response actions and NCP compliance.

## SUMMARY OF RELEVANT BACKGROUND FACTS FOR THE CITY'S RESPONSE COSTS

Dayton operates two large wellfields (Mad River Wellfield and Miami River Wellfield) that supply water for treatment at two water treatment plants ("WTP") for distribution to more than 400,000 residents, businesses and contract customers. The wellfields pump from one of the largest USEPA-designated sole-source aquifers in the nation, supplying water to more than 3.2 million people in Southwest Ohio. The sole-source designation under the Safe Drinking Water Act ("SDWA") dates back to 1987, is one of only 64 in the U.S., and by definition such designation means that if contaminated there is no other source of water.

WPAFB is located northeast and immediately upgradient of the Mad River Wellfield. The Base is located between the Cities of Dayton and Fairborn on approximately 8,000 acres. It is composed of two main sections, Areas A and B - Area A containing Patterson Field, and Area B containing Wright Field. The two areas are separated by a state route and railroad tracks. Area A is located northeast of Area B. In some locations, operations at the Base are less than a mile from the nearest Dayton production well, and only a few hundred yards from the City's sentinel monitoring well network that surrounds the production wells. The monitoring well network is required under the SDWA, and serves as an early detection warning system for potential contamination of the aquifer.

WPAFB was constructed and in continuous use since 1917. Under Dayton's wellfield protection program, which is another requirement of a sole-source designation under the SDWA, operations in Areas A and B are located inside the 1- and 5-year time-of-travel boundaries for the City's wellfield protection zones, which boundaries define how rapidly potential contamination occurring in each zone is expected to reach the nearest production wells.

For your reference, examples of maps depicting (1) the Mad River Wellfield and WPAFB, (2) the groundwater flow direction and contours from WPAFB to the wellfield, and (3) the 1-year and 5-year time-of-travel boundaries are enclosed as Exhibits 1-3, respectively. Numerous groundwater modeling studies performed for Dayton and WPAFB over many decades have documented that contaminants released at the Base migrate quickly through the underlying porous sands and gravel into the aquifer that flows directly toward the Mad River and the City's wellfield. In fact, in 2021 USGS, in cooperation with USAFCEC, updated the groundwater flow model for the aquifer underlying WPAFB specifically to track the movement of particles released at the Base into and rapidly through the aquifer. The report is available at https://pubs.usgs.gov/sir/2021/5115/sir20215115.pdf. WPAFB acknowledged this contaminant pathway and its impact on Dayton's water supply at least as far back as the early 90s, when the

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 4

Base agreed to reimburse Dayton for its costs to (1) investigate the impacts of VOCs released at the Base on the City's wellfield and water supply, and (2) install and operate an air-stripping treatment system at the Ottawa Street WTP to remove VOCs. A copy of the 1994 MOU between Dayton and the U.S. Air Force is enclosed as Exhibit 4. In addition, the Base installed, and continues to operate today, a pump-and-treat system that strips VOCs from groundwater at its northwest boundary, just upgradient of the City's Mad River Wellfield.

WPAFB's records indicate that it began using PFAS-containing liquids and firefighting foams in 1970 for hanger-based fire suppression systems, to extinguish aviation fuel-based and oil-based fires, and to conduct firefighting training exercises. Thousands of gallons of PFAS-containing liquid concentrates were stored and used each year at the Base. WPAFB records indicate that the use of these liquids and foams occurred under circumstances where no steps were taken to minimize the risk that significant residues would be left on the ground to seep into surrounding soils and run off into nearby drainage areas and surface waters. Its records also show several accidental releases from storage tanks and suppression systems, and during the transfer of PFAS-containing liquids.

A report prepared by WPAFB in 2015 concluded that releases of PFAS at WPAFB had contaminated 25 different areas at the Base sufficient to warrant a formal site investigation. Importantly, the report stated that contamination in several areas was located immediately upgradient of the Mad River Wellfield's production wells; was located inside the City's wellfield protection zones; and was so significant in scope that it warranted the highest classification as "Group 1," denoted as "high mass…released and probability of groundwater contamination." A copy of the report is enclosed as Exhibit 5.

In early 2016, Dayton began detecting PFAS in its finished water at the Ottawa Street WTP, as well as in sentinel monitoring wells and production wells closest to WPAFB's northwest boundary line. Concentrations in finished water were as high as 25 ppt, and more than 300 ppt in some of the sentinel monitoring wells, indicating that a plume of elevated PFAS was migrating into the wellfield from the Base's property. At the behest of OEPA, the City immediately shut down seven production wells closest to WPAFB in an effort to slow the contamination entering the WTP. An additional five wells have since been shut down to further slow the migration of PFAS into the water supply, making the total lost production capacity of the wellfield at least 33%.

Dayton also began regular testing for PFAS in sentinel monitoring wells, production wells, and finished water. Because test methods for PFAS are complex, highly-specific, carry a high risk of cross-contamination, and, at least until recently, were limited in the number of USEPA-approvals and available labs, the City has incurred significant costs to develop specialized sampling protocol and hire outside labs capable of performing such analysis.

At the recommendation of its consultants and with OEPA's knowledge and approval, in order to (1) better evaluate the rate of migration and the different groundwater pathways leaving the Base's property and entering into the cone of influence for the production wells; (2) begin assessing the mass loading of PFAS released into groundwater; and (3) support additional emergency removal

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 5

actions and evaluate potential remedial actions, the City installed more than 150 additional sentinel monitoring wells distributed across the perimeter between the wellfield and WPAFB's northwest fence line boundary. To do this work, the City incurred substantial costs to hire consultants with the expertise to (1) design the installation of the new sentinel monitoring wells (2) evaluate sampling and pumping data, and (3) perform gradient and fate-and-transport modeling of the aquifer. The City also paid contractors to install the new sentinel monitoring wells.

In addition, due to the lost production from the Mad River Wellfield, and in an effort to reduce the PFAS concentration entering the Ottawa Street WTP, with OEPA's knowledge and approval, the City's consultants devised a plan to install pipes, pumps and manifolds to transport untreated water from the Miami River Wellfield to the Ottawa Street WTP for blending with Mad River Wellfield water. The consultants also prepared a written operation and monitoring program to implement this action step. Some of the blending system has been completed, and additional piping is under construction.

Enclosed as Exhibit 6 are Excel spreadsheets containing the City's sampling data collected so far for the Mad River production wells, the surrounding sentinel monitoring wells, and the incoming and finished concentrations from the Ottawa Street WTP. For your reference, enclosed as Exhibit 7 are maps identifying the location of each production and sentinel monitoring well from which this sampling data has been collected.

Despite the City's emergency measures, finished drinking water from the Ottawa Street WTP has consistently remained three to four times higher than USEPA's new drinking water standards, even with 12 production wells closest to the Base shut down. If those wells were brought back into production, the concentration in finished water would almost certainly increase significantly.

Perhaps more importantly, sentinel monitoring wells between the production wells and WPAFB's northwest boundary have consistently remained as high as three to four hundred fold above the new drinking water standards, demonstrating that (1) a significant plume of elevated PFAS contamination remains and continues to migrate from the Base into the wellfield, and (2) the City's blending program will not be sufficient, standing alone, to enable it to meet the new drinking water standards, thus also necessitating some singular or combination of additional remedial steps, including a PFAS treatment system at the WTP, siting of a new wellfield, and expanding the Base's groundwater pump-and-treat system and adding PFAS treatment.

Consultants for Dayton have conducted preliminary evaluations of these options, estimating membrane treatment for a water supply of this size at a capital construction cost of approximately $384 million, with an additional 20-year O&M of more than $70 million. Exploration of potential sites for a new wellfield has been limited so far to a very preliminary evaluation of a site in Clark County, northeast of WPAFB. However, informal estimates of the capital cost to design and install a new wellfield the size of the Mad River Wellfield, along with the necessary piping, pumps and manifolds to deliver water to the Ottawa Street WTP, as well as the cost for land acquisition and necessary easements, is greater than the estimated capital cost for PFAS treatment at the Ottawa Street WTP.

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 6

### SUMMARY OF WPAFB'S RESPONSE TO THE RELEASE OF PFAS

WPAFB's response to the release of PFAS is part a broader response to the release of a variety of hazardous substances across Areas A and B. The Base is operating under two administrative orders for these releases, the first signed in 1988 with OEPA under Ohio's state law versions of RCRA and CWA, and the second signed in 1991 with USEPA under Section 120 of CERCLA after the Base was placed on the NPL in 1989. Both orders identify for investigation and potential remediation numerous areas where releases of AFFF foams and liquids occurred from hanger fire suppression systems, tank storage areas, firefighting, and firetraining exercises. The Base has been divided into 11 operable units ("OU"), whose focus includes investigating PFAS contamination of soils, drainage areas, stream sediments, and landfill leachate, along with a separate OU to address PFAS contamination of groundwater.

WPAFB first detected PFAS in 2015 in its own on-base production wells used to supply treated potable water to its more than 30,000 employees, contractors and residents. After supplying bottled water as an interim emergency measure, contractors for the Base designed and installed a GAC-based treatment system at its WTP in late spring 2017. After completing that installation, WPAFB's focus on PFAS turned to (1) installing an extensive network of monitoring wells, (2) developing/implementing a PFAS sampling plan for the wells, (3) undertaking a series of preliminary and supplemental site assessments, risk assessments, and remedial investigations, and (4) designing/installing small on-site, non-time-critical removal/remedial systems for two PFAS "hot spots" in Areas A and B.

With respect to PFAS contamination of the City's water supply, WPAFB's position, at least through mid-June 2022, was that due to a DOD policy the Base would not agree to fund or reimburse the City's costs to investigate the release and take interim emergency measures, nor fund or reimburse the estimated cost to install a treatment system, unless finished water exceeded USEPA's health advisory level ("HAL") under the SDWA, even though levels in sentinel monitoring wells were above the HAL.

When USEPA revised the HAL downward in June 2022 to below the level in the City's finished water, WPAFB maintained this position based on a revised DOD policy stating that the revised HAL was just an "interim" standard and not binding. DOD did not change its position even after USEPA issued a separate finding months later that PFOA was a probable human carcinogen, a finding finalized in April 2024. Finally, when USEPA issued the final drinking water standards for PFAS in April 2024, the Assistant Secretary for DOD issued a revised policy/memorandum on September 3, 2024, stating that, if authorized, its branches would expedite interim removal actions, including providing treatment, for public water systems above the new standards, on a most-impacted priority basis, in time to allow systems to meet USEPA's April 2029 compliance deadline. Because it is the current DOD policy impacting WPAFB's ability to respond directly to the impact of its PFAS release on Dayton's water supply, a copy of the September 3, 2024, policy/memorandum is enclosed as Exhibit 8.

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 7

The purpose of this summary of WPAFB's "PFAS response" is not necessarily to impugn the Base's lack of affirmative steps to address the PFAS contamination of the City's water supply. Dayton understands that WPAFB must comply with DOD's policies. However, despite multiple written requests from the City, Ohio Governor DeWine, and U.S. Senator Brown to DOD asking for the Air Force to enter into a cooperative agreement with Dayton under the National Defense Authorization Act, so that the City and WPAFB could explore options to remediate the contamination and implement corrective action steps, these requests were ignored or rejected by DOD.[1] As a result, Dayton has been forced to address the ongoing threat to the safety of its water supply largely on its own, with guidance only from its consultants and OEPA, a circumstance we believe a court would construe strongly in Dayton's favor if a question were raised whether the City's emergency response actions and associated costs were necessary and consistent with the NCP.

### RESPONSES TO INITIAL INFORMATION REQUESTED FOR INCLUSION IN SETTLEMENT LETTERS

**A. Site Use and Ownership History**

    **1. Timeline of ownership, leases, occupancy, and uses for the site.**

The basics of this responsive information are provided above. More specifics as to the locations, causes or sources, and quantities of PFAS released in Areas A and B at the Base are summarized in Exhibits 1 and 5. Substantially more detail is provided in numerous documents prepared for WPAFB and contained in its administrative record maintained at https://ar.cce.af.mil/Search.

    **2. Timeline of ownership, leases, occupancy, and uses for any Affected Property.**

The Mad River Wellfield is approximately 600 acres, contains 189 sentinel monitoring wells, and 66 production wells. The property is owned by the City of Dayton and has been developed by the City's Water Department as a source for drinking water since 1870.

    **3. Documents pertaining to the nature and extent of activities performed at each building, landfill, or other discrete area where hazardous substances are or were present at the Site since operations began at the Site, including, but not limited to, any firetraining areas, hangars, or emergency response locations where AFFF was used, stored, released, or disposed of.**

The basics of this responsive information are provided above. More specifics as to the locations, causes or sources, and quantities of PFAS released in Areas A and B at the Base are summarized

---

[1] Letters to DOD/USAF from Ohio's Governor and U.S. Senator are not contained in the enclosed Exhibits, but if requested the City can provide copies of these and other letters sent to representatives for WPAFB, OEPA and USEPA requesting that steps immediately be taken to assist the City with its response to the contamination of its water supply. In addition to these written requests, Dayton's City Manager met several times with representatives for WPAFB to make the same request orally.

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 8

in Exhibits 1 and 5. Significantly more detail is provided in numerous documents prepared for WPAFB and contained in its administrative record maintained at https://ar.cce.af.mil/Search.

   **4. Documents pertaining to policies and/or practices regarding waste management and disposal and waste management inspections at the Site since operations began at the Site.**

The basics of this responsive information are provided above, at least with respect to the DOD policies that have restricted WPAFB's ability to take direct steps at the Base to slow the migration of PFAS from the Base's property into the City's water supply. With respect to practices followed by WPAFB that caused or contributed to the release of PFAS at the Base, most of this information is contained in site assessments, expanded site assessments, and related documents contained in WPAFB's administrative record maintained at https://ar.cce.af.mil/Search.

With respect to PFAS-related DOD or USAF policies or practices that were in place at the time of the PFAS releases at the Base that may have governed the operation, practice or event that led to the release, Dayton has not seen such policies or practices referenced or cited in documents contained in WPAFB's administrative record maintained at https://ar.cce.af.mil/Search. However, the City independently found the following documents addressing the Base's practices for management and dispose of PFAS-related wastes and residuals:

   **a.** A 1973 report from the USAF finding that PFAS foams were toxic to aquatic life and not biodegradable, and stating that "numerous Air Command environmental coordinators expressed concern for disposing of AFFFs after use," and that USAF HQ "voiced concern about the disposal of large volumes of AFFF from…warehouse and hanger deluge systems;"[2]
   **b.** A 1974 report from the USAF confirming the 1973 findings and recommending that residuals from firefighting operations be collected and treated before discharge;[3]
   **c.** A series of additional documents spanning the next 16 years issued by various branches of DOD, copied to the other branches, also recommending that PFAS residues not be discharged to stormwaters until first collected and treated;[4] and
   **d.** A 2011 DOD MERIT Risk Alert sent to all military branch environmental coordinators stating that (i) the discharge of PFAS residues was regulated under the CWA; (ii) potential liability for the release of such residuals must be weighed against the cost of disposal and use of alternative chemicals; (iii) uncontrolled, repeated application of PFAS-containing AFFF at firetraining areas could be expected to contaminate soil and groundwater, and such activities needed to be managed; and (iv) containment, treatment, and proper disposal of PFAS-containing discharges through the use of lined pits and improved wastewater

---

[2] Treatability of Aqueous Film-Forming Foams Used for Fire Fighting, USAF Technical Report No. AFWL-TR-73-279 (August 1973).
[3] Biodegradability and Toxicity of Light Water FC206 Aqueous Film Forming Foam, USAF EHL (K) 74-27 (November 1974).
[4] See e.g. USAF AFAMRL-TR-82-50 (March 1983); USAF AFOEHL Report 89-129EQ0063LEA (November 1989); Minutes of the DOD AFFF Environmental Meeting, Report 6180/0394A:FWW, September 2000.

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 9

treatment was recommended.[5]

**5. Descriptions of waste facilities at the Site since operations began at the Site, including any connections to sanitary sewer systems or stormwater sewer systems.**

The basics of this responsive information are provided above. More specifics as to the locations, causes or sources, and quantities of PFAS released in Areas A and B at the Base are summarized in Exhibits 1 and 5. Substantially more detail is provided in numerous documents prepared for WPAFB and contained in its administrative record maintained at https://ar.cce.af.mil/Search.

**6. Any development plans and contemplated future use of the Site and any Affected Property**.

WPAFB's development plan or contemplated future use is unknown. The Affected Property is the City's Mad River Wellfield, an essential part of Dayton's water production system that draws water from the sole-source aquifer. The City needs to continue to use the wellfield, or to site another wellfield outside of any influence from the PFAS contamination, to produce raw water for treatment to supply potable water to over 400,000 customers for the indefinite future.

**7. A description of the source, uses, and filtration or treatment system (if any) for any water utilized at any Affected Property.**

Raw water pumped from the Mad River Wellfield is treated at the Ottawa Street WTP. It is a conventional lime-softening process with a current treatment capacity of 96 mgd. The process starts with the addition of lime slurry to the raw water for coagulation. The water moves to flocculation basins and then to sedimentation basins. After the softening process, the water is treated with carbon dioxide, fluoride and chlorine gas. Following chemical addition, the water is filtered through rapid sand filters to remove small particles not removed during the sedimentation process. The final step before distribution is additional contact time through the clear well. The City provides potable water to over 400,000 people in Montgomery County and parts of Greene County, with approximately 142,000 customers residing in the City of Dayton. The City currently has no treatment system to remove PFAS.

**8. A description of any facilities in the vicinity of the Site and/or any Affected Property that may (in the past or currently) use, store, manufacture, dispose of, or release PFOS, PFOA, or materials containing PFOS or PFOA, including, but not limited to, any airport, fire training area, metalplating facility, carpet manufacturing facility, or**

---

[5] DOD Materials of Emerging Regulatory Interest Team (MERIT) Risk Alert # 03-11. This Risk Alert is consistent with the CWA's requirement that military operations obtain an NPDES permit before discharging any pollutant, including PFAS, from a point source to any water of the U.S., a requirement dating back to 1972. It is also consistent with the RCRA's prohibition against unpermitted open dumping of any solid waste, including PFAS, at military operations, a requirement dating back to 1976. These statutes "governed" WPAFB practices for proper handling/disposal of PFAS spills and residues almost as far back as when the Base began using PFAS-containing liquids and foams. The fact that WPAFB never applied for such permits does not mean that no laws or regulations existed that governed its PFAS-related activities.

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 10

**chemical manufacturing or processing facility.**

The City has a firetraining center that previously used PFAS-containing AFFF. It is located at 200 McFadden Avenue, Dayton, Ohio. Geographically, the center is located south of the Mad River Wellfield, east of the City's Tait's Hill production wells, west of the City's Eastwood Park production wells, and north of Springfield Street, and thus is downgradient groundwater-wise from the Mad River Wellfield. The City employed WOOD Environmental to investigate an area of suspected PFAS contamination of soils at the center, in order to delineate the scope of the contamination for future excavation and disposal, and to confirm that it is downgradient from the City's Madd River Wellfield, and thus not a contributing source of PFAS entering the Ottawa Street WTP. A copy of WOOD's report is enclosed as Exhibit 9.

**B. Environmental History**

9. **Parcel maps and parcel descriptions of the Site, covering all periods of time since operations began at the Site until the present, that include the location and date of the construction of buildings, underground and aboveground storage tanks, and other appurtenances.**

The basics of responsive information are covered above. Additional detailed responsive information, including maps and descriptions of WPAFB's operations over the years, as well as its buildings, tanks and other structures, is provided in numerous documents prepared for WPAFB and contained in its administrative record maintained at https://ar.cce.af.mil/Search.

10. **A description of the timing and history of hazardous substances used at the Site by any party, including dates and volumes purchased or used, with supporting documentation.**

The basics of this responsive information are provided above. More specifics as to the locations, causes or sources, and quantities of PFAS released in Areas A and B at the Base are summarized in Exhibit 1. Substantially more detail on releases of PFAS and other hazardous substances is provided in numerous documents prepared for WPAFB and contained in its administrative record maintained at https://ar.cce.af.mil/Search.

11. **A description of the timing and history of hazardous substances released at, onto, or from the Site by any party, including a summary and any direct evidence of the locations of hazardous substance releases, the amount of substances released, and the dates of such releases.**

The basics of this responsive information are provided above. More specifics as to the locations, causes or sources, and quantities of PFAS released in Areas A and B at the Base are summarized in Exhibits 1 and 5. Substantially more detail on releases of PFAS and other hazardous substances is provided in numerous documents prepared for WPAFB and contained in its administrative record maintained at https://ar.cce.af.mil/Search.

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 11

12. **To the extent that there may have been releases of hazardous substances from upgradient or surrounding properties that could have affected the Site or any Affected Property, a timeline of property ownership at such upgradient or surrounding property and the nature and extent of any work performed at such properties.**

The City knows of no properties upgradient from its Mad River Wellfield other than WPAFB that have released PFAS. WPAFB has also investigated potential sources upgradient of its property and not identified any sources. As noted above, the City's firetraining center has limited PFAS soil contamination, but is located downgradient from the City's Mad River Wellfield.

13. **A summary explanation of the environmental cleanup activities for which the claimant has incurred or expects to incur response costs related to releases from the Site that the claimant believes are recoverable under CERCLA, including past activities and expected future action.**

A summary is provided above of the City's emergency removal actions and a preliminary evaluation of remedial options for installation of treatment or siting of a new wellfield. In terms of providing more detail for specific action steps, the City employed consultants and/or contractors to:

a. Prepare a preliminary feasibility study and design for a PFAS treatment system;
b. Evaluate sites for a potential new wellfield;
c. Perform detailed, multi-faceted hydrogeological investigations of the impacted groundwater, including modeling of the aquifer, groundwater movement, and assessment of the mass of PFAS migrating from the Base into the wellfield;
d. Drill numerous soil borings to aid in the assessment of underlying geology;
e. Install 170 new sentinel monitoring wells along the perimeter between the wellfield and the northwestern boundary of WPAFB;
f. Design a transmission main to go from the Miami River Wellfield to the Ottawa Street WTP as part of the water blending program;
g. Design and install a water level and telemetry system;
h. Conduct vertical aquifer profiling;
i. Expand the Miami River Wellfield to increase production capacity;
j. Expand the Miami River Wellfield recharge lagoon to aid in increased production;
k. Expand the Union Road Wellfield to increase production capacity;
l. Design/implement a PFAS monitoring program for Trey Landfill;
m. Design/implement specialized PFAS sampling protocol and supporting QA/QC;
n. Purchase/install specialized analytical sampling/analysis equipment for PFAS at the City's internal testing lab;
o. Design other pipes, pumps and manifolds and an operating plan for the water blending program;
p. Create, and then modify/expand, a dedicated City webpage providing detailed information for customers and the public about the City's sampling data and action steps in response to

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 12

      PFAS contamination of the water supply, and prepare/distribute water confident reports to customers providing a summary of this information and links to sites containing health and safety information about PFAS;

**q.** Address public relations issues created by concerns from customers about the safety of the City's water supply due to the PFAS contamination;

**r.** Assist with preparation of Dayton's action steps and a list of recommended action steps for WPAFB, and presentations to the Base at Restoration Advisory Board meetings;

**s.** Prepare numerous documents summarizing Dayton's action steps, its requests for funding, and its requests for affirmative action steps to be taken by WPAFB, and presenting them to representatives for WPAFB, OEPA, USEPA, and also to representatives for DOD, Ohio Governor DeWine, U.S. Senators Brown and Portman, and U.S. Congressman Turner; and

**t.** Employ outside legal counsel with the expertise to help the City in its response actions, including (i) its efforts to qualify for and obtain funding to address the contamination from numerous sources, including state and federal funding programs and the settlements in the AFFF MDL, (ii) correspondence with OEPA, USEPA, DOD and state and federal elected officials seeking collaborative agreements with WPAFB to address the contamination, and (iii) counseling the City on legal and contractual issues associated with the hiring and use of outside labs, consultants and contractors.

The documented costs expended thus far by Dayton to respond to the contamination of its water supply is at least $13,529,075.56. The total is higher, and work is ongoing to find/collect additional supporting documents. The supporting documents for $13,529,075.56, including a spreadsheet with invoice numbers, are enclosed as Exhibit 10. . A substantial number of the City's emergency action steps are ongoing, and therefore these costs will continue to accrue.

With respect to anticipated or planned new or additional response costs, the City expects to incur the following :

**a.** Approximately $100 million to complete the design and installation of pipes, pumps and manifolds to bring water from the Miami River Wellfield to blend with water from the Mad River Wellfield to mitigate/control PFAS levels coming from production wells in the Mad River Wellfield;

**b.** Approximately $384 million to install PFAS treatment at the Ottawa Street WTP; and

**c.** Approximately $3.3 million in annual O&M cost to operate the treatment system and replace membranes, with a present day estimated value of $50.1 million for 20 years.

The supporting documents for these future costs are enclosed as Exhibits 11(a),(b), and (c) and 12.

**14. A history of the cleanup activities related to releases from the Site to date, including any notices of violation, regulatory orders, negotiations, settlements, redevelopment, public involvement, etc., with supporting documentation.**

With respect to the response activities of WPAFB for the release of PFAS, a summary of them is provided above. A much more detailed history is available in the documents prepared for WPAFB

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 13

and contained in its administrative record maintained at https://ar.cce.af.mil/Search.

In terms of public involvement, the administrative record contains WPAFB's CERCLA Community Relations Plan. Each of its many meeting minutes, sign-in sheets, and handouts for the meetings of the RAB, of which Dayton is a participant, are also in the administrative record. A copy of Dayton's documentation of the monthly technical meetings with WPAFB and both Agencies, along with documents presented or discussed at these meetings, is included in the enclosed Exhibits. In addition, Dayton maintains a detailed webpage on its website providing information for its customers and the public about the contamination, and summarizing the steps the City has taken, and plans to, to address the contamination, along with links to websites containing information about the health and safety of PFAS in drinking water. A snapshot/printout of the City's webpage is enclosed as Exhibit 13. The City has also distributed several consumer confidence reports/summaries to its customers containing this information, along with several letters from the Director of the Water Department, a copy of which is enclosed as Exhibit 14.

With respect to NOVs and orders issued to WPAFB relating to the release of PFAS at the Base and contamination of the City's water supply, enclosed as Exhibits 15 and 16 are the two administrative orders referenced above, signed by WPAFB and OEPA, and WPAFB and USEPA, respectively, addressing the Base's obligation to investigate and take whatever actions are needed to address contamination in areas involving firefighting, firetraining and fire suppression system releases. Also enclosed as Exhibits 17(a), (b) and (c) are NOVs and related correspondence between OEPA and WPAFB addressing the contamination of the City's water supply.

Dayton is unaware of any settlements or negotiations between WPAFB and OEPA or USEPA relating to response action steps for PFAS, other than the two orders the Base has signed with the Agencies, and the documentation of their ongoing oversight of, and comments on, actions taken by WPAFB in response to the release of PFAS. These documents are contained in the Base's administrative record.

**15. Any studies of the feasibility of remedial actions, evaluation of remedial alternatives, and remedy selection for any Affected Property.**

The enclosed Exhibits contain these responsive documents, including the feasibility study and design for an on-site PFAS treatment system at the Ottawa Street WTP; a preliminary evaluation of an alternative site for a new wellfield; and a combination of expansions/additions of production wells/pumping capacity at other wellfields and a system of pipes, pumps and manifolds to deliver water from these other wellfields for blending with water from the Mad River Wellfield.

**16. A description of how the remedial or removal action for which the claimant is seeking response costs was selected, including any analysis or decision document by consultants, experts, and/or government representatives.**

The enclosed Exhibits contain these responsive documents. Other responsive documents include (1) WPAFB's RAB meeting minutes, sign-in sheets, and handouts for its meetings, and (2) the

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 14

monthly technical meetings between WPAFB, the City and the Agencies, at which meetings Dayton's emergency removal action steps were discussed, along with its proposals for response actions to be taken by WPAFB. These documents are contained in WPAFB's administrative record.

**17. Any design and remedial action documents, including work plans, implementation reports, monitoring reports, long term operation reports, etc. related to the selected remedial action.**

No final remedial action has been selected for the contamination of the City's water supply. The enclosed Exhibits contain preliminary feasibility studies and designs for a PFAS treatment system, completion of installation of a system for blending water from other wellfields, and documentation of a very preliminary evaluation of an alternative site for locating a new wellfield. All efforts so far to engage WPAFB in the discussion and selection of a final remedy for the City's water supply have been for naught due to DOD policies that did not support such discussions.

The selection of a final remedy is a fluid situation, impacted by a number of variables, some controlled solely by WPAFB. For example, it continues to operate a substantial groundwater pump-and-treat system at the boundary of its property and the City's Mad River Wellfield for stripping/removing VOCs from VOC releases that occurred at the Base. A logical onsite remedial step that would directly impact the degree of requirement for and, if needed and selected, the size of, a treatment system at the City's WTP, would be expansion and modification of WPAFB's existing VOC treatment system to treat/remove PFAS from groundwater before it exits the Base's property and migrates into the City's wellfield. Such expanded system could dramatically reduce the size of a treatment system needed for the City, or at least substantially increase the operating life of filtration units for such system, thereby reducing annual O&M costs significantly.

It is also at least theoretically possible that such expanded pump-and-teat system, coupled with the City's planned completion of the infrastructure to complete the water blending program, might result in an outcome whereby PFAS treatment may not be needed at the City's WTP. The possibility of locating one or more new wellfields of different size outside the influence of the contamination, even if much smaller than the Mad River Wellfield, is another fluid factor that impacts the selection of a final remedy.

In the absence of a willingness on the part of DOD/USAF to authorize WPAFB to engage in this type of collaborative discussion with Dayton (which the City has repeatedly requested in writing and in person for many years), in order to avoid violating the upcoming compliance deadline to meet the new federal drinking water standards, the City will move ahead with the steps necessary to secure funding to complete the design work, permitting and construction for a full-scale PFAS treatment system at the Ottawa Street WTP, along with completing the infrastructure for the water blending program.

**18. Any contracts, site-wide assessments, regulatory orders, agreements with regulators,**

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 15

> **agreements with other PRPs, and complaints related to third-party litigation.**

To the extent this request pertains to the Base, responsive documents are in the enclosed Exhibits, and additional documents are in WPAFB's administrative record. There are no other PRPs that Dayton knows of that have potential CERCLA liability for the release of PFAS that has contaminated the City's water supply. Dayton has not entered into any agreements with OEPA or USEPA relating to any alleged liability on the part of the City for the contamination. To the extent that permits to install (PTI) approvals obtained by the City for installation of infrastructure for the water blending program constitute agreements with regulators, the City can provide copies of OEPA's PTI approvals if requested.

With respect to third-party litigation, the City filed a product-liability complaint against PFAS manufacturers in the U.S. District Court for the Southern District of Ohio in 2018, which was transferred to the MDL court shortly thereafter. That complaint remains pending with the MDL court, along with the City's FTCA complaint. A copy of the City's product-liability complaint is enclosed as Exhibit 18.

> **19. Any environmental reports prepared for the Site or any Affected Property, including any sampling and/or analysis of groundwater, drinking water, or soils; groundwater flow models; and fate and transport models, whether performed by the claimant, the claimant's consultants, any government agency, or any third party.**

The enclosed Exhibits contain the responsive documents to this request.

> **20. Any response actions taken by any federal government agency with respect to any Affected Property in response to releases from the Site, including provision of alternative drinking water and installation of filtration systems**.

WPAFB's response actions to the release of PFAS are summarized above, and set forth in detail in many documents contained in the Base's administrative record. The only provision of an alternative drinking water source and installation of a PFAS treatment system is WPAFB's provision of bottled water to its own employees, contractors, and residents on an interim basis after discovering the PFAS contamination of its own water supply, followed by its installation of a GAC treatment system at the Base's WTP.

With respect to response actions taken by OEPA relating to the contamination of the City's water supply, the Agency has provided some funding to the City to enable it to undertake its emergency response actions, none of which funding offsets or reimburses the current out-of-pocket response costs of $13.5million incurred by the City. Documentation of this funding is enclosed as Exhibit 19..

**C. Costs.**

> **21. A complete past costs package, including:**

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 16

      **a. A past-costs summary spreadsheet, with cost detail tabs and citations to supporting cost documentation. Each line item should be supported by an invoice, evidence of payment, and an accounting record.**

Documentation of current total, unreimbursed response costs is included in the enclosed Exhibits. The City's Excel spreadsheet with tabs and citations for its costs is enclosed as Exhibit 10.

      **b. If the claimant claims the cost of preparing any reports, the report should be included in the supporting documentation.**

These reports are included in the Exhibits.

      **c. If the claimant claims any costs for internal overhead or labor, the package should include a description of the tasks and internal employees related to remediation costs.**

The enclosed Exhibits contain some of these overhead/labor costs. However, significant additional costs of this type have been incurred, and a separate Excel spreadsheet is being prepared with this information, and the City will provide the spreadsheet to DOJ as soon as completed.

      **d. A description of the past activities that the claimant has included in its past costs package, and an explanation for how such costs are consistent with the NCP and (for claimants other than States and Indian tribes) necessary.**

This responsive information is summarized above, documented in the enclosed Exhibits, and further documented in the administrative record compiled by WPAFB. For purposes of documenting public participation, public involvement, and knowledge/oversight/tacit approval by WPAFB as the "lead agency," meeting minutes, sign-in sheets and handouts for the regular meetings of the Base's Restoration Advisory Board are contained in WPAFB's administrative record, and the enclosed Exhibits include the City's documentation of the monthly technical meetings between the City, WPAFB and the two Agencies.

All of Dayton's response costs, other than the costs to prepare a preliminary feasibility study and design for a PFAS treatment system, are emergency removal actions and associated response costs taken to respond to an immediate and substantial threat to human health and the environment caused by the PFAS contamination of the City's water supply. The City has complied with all applicable requirements of the NCP for its response actions, including requirements under 40 CFR §§ 300.410, 300.415 and 300.700 for removal actions taken by other parties. As "lead agency," WPAFB has not just known about, been kept fully apprised about at all times, and never objected to or questioned the necessity of, the City's emergency response actions or associated costs.

Furthermore, in an effort to reduce the level of necessary emergency response actions, on *numerous* occasions, in many different ways on multiple state and federal fronts, the City and its

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 17

representatives, including (1) its elected officials and legal counsel, (2) representatives for OEPA and (3) state and federal elected officials, have repeatedly requested in writing and face-to-face meetings that WPAFB (and DOD separately as controlling authority) agree to step forward to enter into a collaborative agreement with Dayton to address the PFAS contamination of the City's water supply. Each time an existing, revised or new DOD policy was cited as the reason why such collaborative agreement would not be signed. We are confident that under these circumstances the City's costs are not just fully NCP compliant, but any effort to question otherwise would be sharply criticized by a court if the City has to file a cost-recovery claim.[6]

**22. To the extent the claimant claims any future costs are recoverable, a complete future costs package, including:**

    **a. A description of any anticipated future work related to the Site for which the claimant seeks recovery from the United States, including a timeline for such work and any bids or professional estimates.**

Right now, the City does not anticipate any future work relating to WPAFB's response to the release of PFAS on the Base's property. However, if WPAFB agrees to work in collaboration with the City to address the contamination of the City's water supply, such response would logically include discussions, meetings, evaluations and potential action steps that would include expanding the Base's existing groundwater VOC pump-and-treat system to include PFAS treatment of groundwater to reduce the migration of PFAS from the Base's property into the City's production wells. Such collaboration would result in additional response costs incurred by the City and its consultants that would be recoverable.

If this request includes future work by the City relating to its contaminated water supply, the documents in the enclosed Exhibits provide information about the estimated costs to (1) complete installation of the infrastructure for the water blending program, and (2) complete the design and permit applications and associated funding documents to commence construction of a PFAS treatment system at the Ottawa Street WTP. With respect to the timeline for these steps, USEPA's April 2029 compliance deadline for the new drinking water standards controls, but time is of the essence due to the significant work that must be completed to enable a treatment system of this magnitude to be installed and operational by that deadline.

    **b. An explanation of how any estimate was reached and any supporting**

---

[6] While NCP compliance is fact sensitive, the following authorities, primarily from the Sixth Circuit Court of Appeals whose jurisdiction includes WPAFB, clearly support the recoverability of the City's response costs: *Regional Airport Authority of Louisville and Jefferson County v. LFG, LLC*, 460 F. 3d 697 (6th Cir. 2006); *Village of Milford v. K-H Holding Corporation*, 390 F. 3d 926 (6th Cir. 2004); *Franklin County Convention Facilities Authority v. American Premier Underwriters, Inc.*, 240 F. 3d 534 (6th Cir. 2001); *Pierson Sand & Gravel, Inc. v. Pierson Township*, 89 F.3d 835 (6th Cir. 1996); *Donahey v. Bogle*, 987 F. 2d 1250 (6th Cir. 1993); *United States v. R.W. Meyer, Inc.*, 889 F. 2d 1497 (6th Cir. 1989); *State of Ohio v. Breen*, 2022 WL 2586477 (S.D. Ohio 2022); *City of Toledo v. Beazer Materials and Services, Inc.*, 923 F. Supp. 1001 (N.D. Ohio 1996). *See also Santa Clara Valley Water Agency v. Whittaker Corporation*, 99 F. 4d 458 (9th Cir. 2024); *United States v. Sterling Centrecorp, Inc.*, 977 F. 3d 750 (9th Cir. 2020) (both contaminated water supply cases).

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 18

      **documentation.**

The enclosed Exhibits contain this explanation.

      **c. An explanation of how such costs are consistent with the NCP and (for claimants other than States and Indian tribes) necessary.**

This settlement demand letter and the enclosed Exhibits explain and demonstrate the NCP compliance of the City's emergency removal actions and associated response costs.

    **23. A summary, with supporting documentation, of all insurance policies, claims, settlements, or payments related to environmental costs incurred or anticipated in connection with the asserted claim. This should include claims for insurance coverage related to environmental conditions; the settlement of such claims; the amount of settlement proceeds; and any litigation, arbitration, or mediation of such claims.**

The City of Dayton has no insurance that could potentially provide coverage for or reimbursement of its response costs. The City's product-liability claim against PFAS manufacturers that is pending in the MDL court provides for potential recovery of response costs for PFAS treatment from settlements entered into by 3M, DuPont, BASF and TYCO. The City has submitted claim forms for the first two settlements, and will submit claim forms for the latter two settlements by the current April 8, 2025, due date. Currently there are no documents or other correspondence from the MDL court or the PEC indicating when funds are expected to begin being distributed under any of these settlements. In addition, without knowing the number of claimants or the size of their claims, the City has no way of knowing whether, for example, it will receive 100%, 50% or even as little as 1%, of the calculated dollar amount set forth in its claim forms. A copy of the City's 3M and DuPont claim forms and supporting documentation is contained in Exhibit 20. Once the BASF and TYCO claim forms are submitted, the City will supplement this response with a copy of those forms.

Finally, the City continues to seek affordable funding to address the PFAS contamination from several federal and state funding programs overseen primarily by OEPA and the Ohio Water Development Authority (OWDA). However, unless such funding is in the form of grants or principal forgiveness loans, the financial limitations of the City's residents would not make the necessary sewer rates affordable. In 2023 26.4% of the City's residents had an income below the federal poverty level, which was 49.6% greater than Ohio's state-wide poverty level of only 13.3%. An estimated 38,000 residents currently have incomes below the federal poverty level. Across the U.S., only seven other medium- to large-sized cities (defined as 100,000 or more population) have a greater share of their residents living in poverty.

    **24. An explanation of the claimant's treatment of overhead and charge back/cost recovery for the claimed costs, including any past or anticipated recoveries of claimed costs through federal contracts or other agreements, with supporting documentation.**

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 19

The enclosed Exhibits contain some documents setting forth internal overhead/labor costs for the City's employees that have worked on different emergency response actions, notably the lab employees working on PFAS sampling/analysis. Unlike USEPA or OEPA, the City does not have a program that segregates and documents labor and overhead/programmatic costs incurred by employees for PFAS-related response action steps. But there may be a way to approximate such costs if a cost-recovery claim must be filed. Finally, the enclosed Exhibits include invoices from the City's contractors for their PFAS-related response costs, most of which factor overhead/staff assistance in the rates/charges assessed to the City for the contractors' work.

**25. Any federal contracts or other agreements that allowed the claimant to charge the United States for environmental costs and liabilities.**

None known.

**26. A list of PRPs, other than the United States, identified by the claimant, and any past recoveries from other PRPs and any agreements for future recovery from other PRPs.**

None known. While the PFAS manufacturers are not CERCLA PRPs, the City does expect to recover some monies from the four settlements in the MCL court by 3M, DuPont, BASF and TYCO, to be used to address the cost to install and operate a PFAS treatment system. Under the terms of these settlements, these monies would offset WPAFB's liability for the associated response costs to install and operate such system.

**27. Any funding the claimant received or has been awarded from the federal or state government that was intended for use, or was used, to carry out response actions related to releases from the Site.**

The enclosed Exhibits contain information about funding that the City has received so far to assist with its emergency response actions taken to address the PFAS contamination of its water supply.

---

The City of Dayton appreciates the opportunity to present its CERCLA response costs, and the opportunity to discuss and hopefully reach an agreement with WPAFB for the reimbursement thereof. The City also welcomes an opportunity to negotiate terms for an agreement with WPAFB to collaborate together on the selection of the most cost-effective remedy (or group of remedies) that enables the City to achieve the new drinking water standards as soon as possible.

However, time is of the essence. If installation of a large PFAS treatment system costing several hundred million dollars is the necessary remedy, the combination of the time needed (1) to secure the necessary additional funding, (2) to prepare design documents and drawings, (3) to prepare and submit PTI applications and correspond with OEPA thereon, (4) prepare bid documents, follow public bidding requirements and award contracts, and (5) complete construction and reach operational status will require at least another three, if not four, years, to complete, assuming no

Andrew D. Knudsen, Esq.
U.S. Department of Justice, ENRD
February 24, 2025
Page 20

delays, which is perhaps unrealistic for a project of this size.

For this reason, the City cannot afford to engage in lengthy back-and-forth negotiations with WPAFB, particularly ones that involves a detailed, time-consuming evaluation of remedial options discussed above before a final remedy or group of remedies is selected.  While we cannot provide you a date certain after which the City must move ahead to file its cost-recovery complaint, and complete the remaining steps needed to begin installation of a PFAS treatment system, it is a matter of months, not years.  And the ability of the City to extend this period is directly proportional to the degree to which WPAFB and the City are able to reach at least an agreement in principal on selection of the remedy.

Please contact us if there are any questions about the City's settlement demand letter or the enclosed Exhibits.  We look forward to discussing potential dates and times with you for these important discussions to begin.  Thank you.

Very truly yours,

**CITY OF DAYTON, OHIO**                    **FROST BROWN TODD LLP**

By: *ss/John C. Musto*                              By: *ss/Stephen N. Haughey*
    John C. Musto, Esq.                          Stephen N. Haughey, Esq.
    Deputy Law Director                   Partner, Environmental Practice Group
    Department of Law

Enclosures (Exhibits 1-20)

cc:    Mayor Jeffrey J. Mims, Jr.
        City of Dayton Commission
        Shelley Dickstein, City Manager
        Barbara Doseck, Esq., Law Director

0105357.0730840  4903-0769-3855v1