# EXHIBIT C

# IAG COVER SHEET

FILE NAME: *WrightPat.pdf*

Title: Wright-Patterson Air Force Base, Dayton, Ohio

Subject: Region 5, V

Author: Air Force, DoD, Ohio, OH

Keywords: 3/31/91, 1991, FY91

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION V
AND THE
UNITED STATES DEPARTMENT OF THE AIR FORCE

IN THE MATTER OF:                    )
                                     )
The U.S. Department                  )
of The Air Force                     )        Administrative
                                     )        Docket Number:
Wright-Patterson Air Force           )
Base, Ohio                           )
                                     )
                                     )


FEDERAL FACILITY AGREEMENT UNDER CERCLA SECTION 120

TABLE OF CONTENTS

<u>SECTION</u>

1.  Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

2.  Parties . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

3.  Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . .   4

4.  Definitions . . . . . . . . . . . . . . . . . . . . . . . . .   6

5.  Findings of Fact and Determinations . . . . . . . . . . . . .   9

6.  Work To Be Performed . . . . . . . . . . . . . . . . . . . .  13

7.  Consultation with U.S. EPA . . . . . . . . . . . . . . . . .  14

8.  Subsequent Modification of Final Documents . . . . . . . . .  23

9.  Operable Unit Remedial Actions . . . . . . . . . . . . . . .  24

10. Remedial Investigation/Feasibility Study . . . . . . . . . .  26

11. Remedial Action Selection and Implementation . . . . . . . .  27

12. Schedules and Deadlines . . . . . . . . . . . . . . . . . . .  28

13. Extensions . . . . . . . . . . . . . . . . . . . . . . . . .  33

14. Force Majeure . . . . . . . . . . . . . . . . . . . . . . . .  35

15. Emergencies and Removals . . . . . . . . . . . . . . . . . .  36

16. Additional Work Or Modification To Work . . . . . . . . . . .  41

17. Dispute Resolution . . . . . . . . . . . . . . . . . . . . .  42

18. Enforceability . . . . . . . . . . . . . . . . . . . . . . .  46

19. Stipulated Penalties . . . . . . . . . . . . . . . . . . . .  48

20. Funding . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

21. Statutory Compliance / RCRA-CERCLA Integration . . . . . . .  52

22. Project Managers . . . . . . . . . . . . . . . . . . . . . .  53

23. Permits . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

ii

24. Reporting . . . . . . . . . . . . . . . . . . . . . . . . 58

25. Quality Assurance . . . . . . . . . . . . . . . . . . . . 58

26. Notification . . . . . . . . . . . . . . . . . . . . . . 59

27. Sampling and Data/Document Availability . . . . . . . . . 60

28. Confidential Information . . . . . . . . . . . . . . . . 61

29. Preservation of Records . . . . . . . . . . . . . . . . . 62

30. U.S. EPA Site Access . . . . . . . . . . . . . . . . . . 63

31. Technical Review Committee (TRC) . . . . . . . . . . . . 65

32. Public Participation . . . . . . . . . . . . . . . . . . 66

33. Five Year Review . . . . . . . . . . . . . . . . . . . . 67

34. Transfer of Real Property . . . . . . . . . . . . . . . . 68

35. Amendment or Modification of Agreement . . . . . . . . . 69

36. Termination . . . . . . . . . . . . . . . . . . . . . . . 69

37. Reservation of Rights . . . . . . . . . . . . . . . . . . 70

38. Other Claims . . . . . . . . . . . . . . . . . . . . . . 71

39. Recovery of Expenses . . . . . . . . . . . . . . . . . . 72

40. Effective Date and Public Comment . . . . . . . . . . . . 72

Based on the information available to the Parties on the effective date of this Federal Facility Agreement (Agreement), and without trial or adjudication of any issues of fact or law, the Parties agree as follows:

## 1. Purpose

1.1 - The general purposes of this Agreement are to:

a) ensure that the environmental impacts associated with past and present activities at the Site are thoroughly investigated and appropriate remedial action taken as necessary to protect public health, welfare and the environment;

b) establish a procedural framework and schedule for developing, implementing and monitoring appropriate response actions at the Site in accordance with CERCLA/SARA, the NCP, Superfund guidance and policy, and RCRA, RCRA guidance and policy, and applicable State law; and

c) facilitate cooperation, exchange of information and participation of the Parties in such actions.

1.2 - Specifically, the purposes of this Agreement are to:

a) Identify and implement removal actions and operable unit remedial action (OURA) alternatives which are appropriate at the Site prior to the implementation of final remedial action(s) for the Site. OURA alternatives shall be identified and proposed to the Parties as early as possible prior to formal proposal of OURAs pursuant to CERCLA. This process is designed to promote cooperation among the Parties in identifying OURA alternatives prior to final selection of OURAs.

b)  Establish requirements for the performance of a Remedial Investigation (RI) to determine fully the nature and extent of the threat to the public health or welfare or the environment caused by the release or threatened release of hazardous substances, pollutants or contaminants at the Site and to establish requirements for the performance of a Feasibility Study (FS) for the Site to identify, evaluate, and select alternatives for the appropriate remedial action(s) to prevent, mitigate, or abate the release or threatened release of hazardous substances, pollutants or contaminants at the Site in accordance with CERCLA and applicable State law.

c)  Identify the nature, objective and schedule of response actions to be taken at the Site.  Response actions at the Site shall attain that degree of cleanup of hazardous substances, pollutants or contaminants mandated by CERCLA and applicable State law.

d)  Implement the selected remedial action(s) in accordance with CERCLA and applicable State law, and meet the requirements of Section 120(e)(2) of CERCLA (42 U.S.C. 9620(e)(2)) for an interagency agreement between U.S. EPA and the Air Force.

e)  Assure compliance, through this agreement, with RCRA and other federal and state applicable or relevant and appropriate requirements (ARARS) for matters covered herein.



f) Coordinate response actions at the Site with the mission and support activities at WPAFB.

g) Expedite the cleanup process to the extent consistent with protection of human health and the environment.

h) Avoid conflict, to the maximum extent possible, between this Agreement and the Ohio Administrative Order on Consent (Ohio Consent Order) entered into on February 17, 1988 which parallels the scope of this Agreement. In the spirit of cooperation between WPAFB, U.S. EPA and OEPA for the expeditious cleanup of the Site, both Parties intend, to the maximum extent practicable, to coordinate the review of all applicable data with the State as it becomes available, and to coordinate with the State in the development of all studies, reports, and action plans.

## 2. Parties

2.1 - The Parties to this Agreement are the U.S. EPA and the United States Department of the Air Force (Air Force). The terms of this Agreement shall apply to and be binding upon the U.S. EPA and the Air Force.

2.2 - This Agreement shall be enforceable against the Parties to this Agreement. This Section shall not be construed as an agreement to indemnify any person. The Air Force shall notify its agents, members, employees, response action contractors for the Site, and all subsequent owners, operators and lessees of the Site of the existence of this Agreement.

3

2.3 - Each Party shall be responsible for ensuring that its contractors comply with the terms and conditions of this Agreement. Failure of a Party to provide proper direction to its contractors and any resultant noncompliance with this Agreement by a contractor shall not be considered a Force Majeure event or other good cause for extensions under Section 13, unless the parties so agree. Each Party shall notify the other of the identity and assigned tasks of its contractors performing work under this Agreement upon their selection.

2.4 - Under no condition shall a Party under this Agreement utilize the services of any consultant, prime contractor, or subcontractor who has been suspended, debarred, or voluntarily excluded within the scope of 40 CFR Part 32, or under the Federal Acquisition Regulations (FAR) at 48 CFR Subpart 9.4 et seq.

2.5 - Each undersigned representative of a Party certifies that he or she is fully authorized to enter into the terms and conditions of this Agreement and to legally bind such Party to this Agreement.

3. Jurisdiction

3.1 - Each Party is entering into this Agreement pursuant to the following authorities:

(a) The U.S. Environmental Protection Agency (U.S. EPA), Region V, enters into those portions of this Agreement that relate to the remedial

4

investigation/feasibility study (RI/FS) pursuant to Section 120(e)(1) of the
Comprehensive Environmental Response, Compensation, and Liability Act
(CERCLA), 42 U.S.C. §9620(e)(1), as amended by the Superfund Amendments and
Reauthorization Act of 1986 (SARA), Pub. L. 99-499 (hereinafter jointly
referred to as CERCLA/SARA or CERCLA), and sections 6001, 3008(h) and
3004(u) and (v) of the Resource Conservation and Recovery Act (RCRA), 42
U.S.C. §§6961, 6928(h), 6924(u) and (v), as amended by the Hazardous and
Solid Waste Amendments of 1984 (HSWA) (hereinafter jointly referred to as
RCRA/HSWA or RCRA) and Executive Order 12580;

(b)   U.S. EPA, Region V, enters into those portions of this Agreement
that relate to operable unit remedial actions and final remedial actions
pursuant to Section 120(e)(2) of CERCLA/SARA, 42 U.S.C. S9620 (e)(2), RCRA
sections 6001, 3008(h) and 3004(u) and (v), 42 U.S.C. S6961, 6928(h) and (v),
and Executive Order 12580;

(c)   The United States Air Force enters into those portions of this
Agreement that relate to the RI/FS pursuant to Section 120(e)(1) of CERCLA
(42 U.S.C. §9620(e)(1)), Sections 6001, 3008(h) and 3004(u) and (v) of
RCRA, Executive Order 12580, the National Environmental Policy Act, 42 U.S.C.
§4321, the Defense Environmental Restoration Program (DERP), 10 U.S.C. §2701
et seq.;

(d)   The Air Force enters into those portions of this Agreement that
relate to operable unit remedial actions and final remedial actions pursuant
to Section 120(e)(2), 42 U.S.C. 9620(e)(2) of CERCLA/SARA, Sections 6001,

5



3004(u) and 3008(h) of RCRA, Executive Order 12580 and the DERP, 10 U.S.C. §2701 et seq.

## 4. Definitions

4.1 – Except as noted below or otherwise explicitly stated, the definitions provided in CERCLA/SARA, CERCLA case law, and the National Contingency Plan (NCP) shall control the meaning of the terms used in this Agreement.

In addition:

4.2 – "Agreement" shall refer to this document and shall include all submittals provided pursuant to this document to the extent they are finalized through the process set forth in this Agreement. All such submittals shall be made an integral and enforceable part of this document. Copies of submittals shall be available as part of the administrative record as provided in Section 32 (Public Participation).

4.3 – "Air Force" shall mean the U.S. Air Force, its employees, members, agents and authorized representatives. "Air Force" shall also include the Department of Defense (DOD), to the extent necessary to effectuate the terms of this Agreement, including but not limited to, appropriations and Congressional reporting requirements.

4.4 – "Days" shall mean calendar days, unless business days are specified. Any Submittal, or written statement of dispute that under the terms of this

6



Agreement would be due on a Saturday, Sunday or holiday shall be due on the following business day.

4.5 - "EPA " or "U.S. EPA" shall mean the United States Environmental Protection Agency, its employees, agents, and authorized representatives.

4.6 - "National Contingency Plan" or "NCP" shall refer to t   regulations contained in 40 CFR 300.1 et seq.

4.7 - "Operable Unit Remedial Actions" or "OURA" shall have the same meaning as provided in the NCP.

4.8 - "RCRA" shall mean the Resource Conservation and Recovery Act of 1976, Public Law 94-580, 42 U.S.C. §6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984, Public Law 98-616, and any subsequent amendments.

4.9 - "Remedial Design/Remedial Action Work Plan" or "RD/RA Work Plan" shall mean a document or portion of a document that provides the basis for implementing the design and construction of the Remedial Action.  The RD portion of the Work Plan shall contain the elem   described in Section 4.2.2 of the Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER Directive 9355.5-01.  The RA portion of the Work Plan shall contain the elements described in Section 5.1.1 of the Guidance on EPA Oversight of Remedial

7

Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER Directive 9355.5-01.

4.10 - "Remedial Investigation/Feasibility Study Work Plan" or "RI/FS Work Plan" shall mean a document that presents the rationale and methodology (including detailed procedures and schedules) for performing the RI/FS. At a minimum, the RI/FS Work Plan shall be consistent with the elements of a work plan described in Section 2 of the Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA, OSWER Directive 9355.3-01.

4.11 - "Site" shall include WPAFB as defined in Subsection 4.14 and described in Section 5.1 (a), and any area off WPAFB to or under which a release of hazardous substances, pollutants, or contaminants has migrated, or threatens to migrate, from a source on or at WPAFB. The term "on-site" shall have the same meaning as provided in the NCP. The term "site(s)" (lower case) shall mean discrete areas of contamination located within the Site.

4.12 - "State" shall mean the State of Ohio, its agents, employees and authorized representatives.

4.13 - " U.S. EPA" shall mean the United States Environmental Protection Agency, its employees, agents, and authorized representatives.

4.14 - "WPAFB" shall mean Wright-Patterson Air Force Base, Ohio, its employees, agents, and authorized representatives.

8



5. Findings of Fact and Determinations

5.1 – For the purposes of this Agreement, the following constitutes a summary of facts upon which this Agreement is based. None of the facts related herein shall be considered admissions by any Party. This Section contains findings of fact by the U.S. EPA and shall not be used by any person related or unrelated to this Agreement for purposes other than determining the basis of this Agreement.

(a) Wright Patterson Air Force Base (WPAFB) is located in the Miami River Valley Basin northeast of the City of Dayton, Ohio and covers approximately 8,200 acres divided between "Areas A and C" and "Area B," as shown on Attachment 1.

(b) WPAFB overlies a portion of the Miami Buried Valley Aquifer which is the source of potable water for WPAFB and the Cities of Dayton and Fairborn. The Miami Buried Valley Aquifer consists generally of upper and lower sand and gravel water bearing zones in which the potential for migration of contamination to area aquifers is high due to their characteristic high permeabilities and transmissivities.

(c) WPAFB is participating in the Department of Defense Installation Restoration Program (IRP), a program established in 1978 to identify and evaluate hazardous waste sites and develop remedial action alternatives to mitigate environmental impacts from these sites.

9



(d)   Under the IRP, Phase I (records search) and Phase II Stage I
(confirmation) contracts have been completed and summary reports have been
generated by WPAFB which detail waste disposal activities that have resulted
in areas of contamination at the Site.

(e)   According to the Air Force's current records, past WPAFB activities
have resulted in at least 58 waste disposal sites (such as landfills, burial
sites, spills, fire training areas and coal storage piles) being spread
throughout the Site.

(f)   As calculated by U.S. EPA from the Air Force's Phase I Study, the
Industrial Shops, the Research and Development Laboratories and Maintenance
Shops have generated wastes including solvents, contaminated thinners,
degreasing sludges, tetraethyl lead sludge, and miscellaneous hazardous
chemicals, acids and reagents, all of which were disposed of on WPAFB
property from the 1920's to at least 1973.

(g)   Three WPAFB well fields, which contain seventeen (17) drinking
water-supply wells, and the Cities of Dayton and Fairborn municipal well
fields, draw water from the Miami Buried Valley Aquifer.

(h)   The 17 WPAFB drinking water supply wells contain contaminants
associated with substances used at WPAFB including the following volatile

organic compounds (VOCs): tetrachloroethylene; trichloroethylene; carbon tetrachloride; 1,1,1-trichloroethane; chloroform; 1,2-dichloroethylene and toluene.

(i) WPAFB operates five air stripping units to remove VOCs from water supplied from WPAFB drinking water wells.

5.2 — On the basis of the review of documents and reports, and of results of the testing and analyses described in the Findings of Fact, infra, and of the Parties' files and records, the Parties have determined that:

(a) This Agreement is based upon the placement of the Wright Patterson Air Force Base (WPAFB), Greene and Montgomery County, on the National Priorities List (NPL) by the Environmental Protection Agency on October 4, 1989, 54 Federal Register 191 at page 41021.

(b) WPAFB is a facility under the jurisdiction, custody, or control of the Department of Defense (DOD) within the meaning of Executive Order (E.O.) 12580, 52 Federal Register 2923, January 29, 1987. The Air Force is authorized to act on behalf of the Secretary of Defense for all functions delegated by the President of the United States through E.O. 12580 which are relevant to this Agreement.

(c) The WPAFB is a federal facility under the jurisdiction of the Secretary of Defense within the meaning of CERCLA section 120, 42 U.S.C. S9620, and Superfund Amendments and Reauthorization Act of 1986 (SARA), Sec.

11

211, 10, U.S.C. S 2701 et seq., and subject to the Defense Environmental Restoration Program (DERP).

(d)  The Air Force is the authorized delegate of the President under E.O. 12580 for receipt of notification by the State of its applicable or relevant and appropriate requirements (ARARs) required by CERCLA section 121(d)(2)(A)(ii), 42 U.S.C. S 9621 (d)(2)(A)(ii).

(e)  The authority of the Air Force to exercise the delegated removal authority of the President pursuant to CERCLA section 104, 42 U.S.C. S 9604 is not altered by this Agreement.

(f)  The actions to be taken pursuant to this Agreement are reasonable and necessary to protect the public health or welfare or the environment;

(g)  There are areas within the boundaries of the federal facility where hazardous substances have been deposited, stored, placed, or otherwise come to be located in accordance with 42 U.S.C. S 9601(9) and (14).

(h)  There have been releases of hazardous substances, pollutants or contaminants at or from the federal facility into the environment within the meaning of 42 U.S.C. S 9601(22), 9604, 9606 and 9607.

(i)  With respect to these releases, the Air Force is an owner/operator subject to the provisions of 42 U.S.C. S 9607.

12

6.    Work To Be Performed

6.1 - The Parties agree to perform the tasks, obligations and
responsibilities described in this Section in accordance with CERCLA and
CERCLA guidance and policy; the NCP; pertinent provisions of RCRA and RCRA
guidance and policy; Executive Order 12580; applicable State laws and
regulations; and all terms and conditions of this Agreement including
documents prepared and incorporated in accordance with Section 7
(Consultation).

6.2.- WPAFB has completed Preliminary Assessments, Site Investigations,
and other studies which have previously been submitted for regulatory review
and comment as detailed in Attachment 2 to this Agreement.

6.3 - In addition to the work and studies already completed or in progress
under this Agreement, the Air Force agrees to undertake, seek adequate
funding for, fully implement, and report as appropriate on the following
tasks, with participation of the U.S. EPA as set forth in this Agreement:

(a)  Operable unit remedial actions (OURAs) as described in Section 9 of
this Agreement.

(b)  Remedial investigations and feasibility studies for sites or site
groups and for the Site:

(c)  All ongoing response actions, including removal actions, at the
Site; and

13

(d)  Operation and maintenance of response actions as appropriate.

6.4.  The Parties agree to:

(a)  Make their best efforts to expedite the initiation of response actions for the Site.

(b)  Carry out all activities under this Agreement so as to protect the public health, welfare and the environment;

(c)  Upon request, U.S. EPA agrees to provide the Air Force with guidance or reasonable assistance in obtaining guidance relevant to the implementation of this Agreement.

## 7.  Consultation with U.S. EPA
### Review and Comment Process for Draft and Final Documents

7.1 — Applicability:  The provisions of this Section establish the procedures that shall be used by the Parties to provide each other with appropriate notice, review, comment and response to comments regarding RI/FS and Remedial Design/Remedial Action (RD/RA) documents, specified herein as either primary or secondary documents.  In accordance with Section 120 of CERCLA, 42 U.S.C. §9620 and 10 U.S.C. §2705, the Air Force will normally be responsible for issuing primary and secondary documents to U.S. EPA.  As of the effective date of this Agreement, all draft and final reports for any

14

deliverable document identified herein shall be prepared, distributed and subject to dispute in accordance with paragraphs 7.2 through 7.13 below.

7.2 - The designation of a document as "draft" or "final" is solely for purposes of consultation with U.S. EPA in accordance with this Part. Such designation does not affect the obligation of the Parties to issue documents, which may be referred to herein as "final", to the public for review and comment as appropriate and as required by law.

7.3 - General Process for RI/FS and RD/RA documents:

a) Primary documents include those reports that are major, discrete portions of RI/FS or RD/RA activities. Primary documents are initially issued by the Air Force in draft subject to review and comment by U.S. EPA. Following receipt of comments on a particular draft primary document, the Air Force will respond to the comments received and issue a draft final primary document subject to dispute resolution. The draft final primary document will become the final primary document 30 days after issuance if dispute resolution is not invoked or as modified by decision of the dispute resolution process.

b) Secondary documents include those reports that are discrete portions of the primary documents and are typically input or feeder documents. Secondary documents are issued by the Air Force in draft subject to review and comment by U.S. EPA. Although the Air Force will respond to comments received, the draft secondary documents may be finalized in the context of

15

the corresponding primary documents. A secondary document may be disputed at the time the corresponding draft final primary document is issued.

c) Should a new statement of work (SOW) for RI/FS activity be necessary, the Air Force will notify the U.S. EPA RPM by phone or facsimile, and transmit a draft (or revised draft) of the new SOW to the U.S. EPA Project Manager. The document shall be a primary document, and will be subject to the provisions of this Section until it becomes finalized by the Air Force as part of a solicitation or contract.

7.4 - Primary Documents: The Air Force shall complete and transmit drafts of the following primary documents to U.S. EPA for review and comment in accordance with the provisions of this Section. Some documents may either be combined or broken out into separate volumes:

(a) New RI/FS SOWs (pursuant to subsection 7.3(c))

(b) RI/FS Work Plans, including Field Sampling Plans for each site or site group and a Quality Assurance Project Plan (QAPP)

(c) Community Relations Plans (May be amended as appropriate to address current issues. Any such amendments shall not be subject to the threshold requirements of Subsequent Modification of Final Documents Section. Any disagreement regarding amendment of the CRP shall be resolved pursuant to Dispute Resolution).

(d) RI Reports, including Risk Assessments

(e) FS Reports

(f) Proposed Plans

16

(g)   Records of Decision (RODs) including responsiveness summaries

(h)   RD/RA Work Plans, (one or two documents)

(i)   Pre-Final (90%) / Final Remedial Designs containing the elements described in subsection 4.2.5 of the Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER Directive 9355.5-01. This document will also include a statement of the status of regulatory compliance needed to start remedial action.

(j)   Construction Quality Control Plan, as described in Subsection 5.1.4 of the Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER Directive 9355.5-01.

(k)   Project Close-out Report (Final Report).


7.5 – Only the draft final primary documents identified above shall be subject to dispute resolution. The Air Force shall complete and transmit draft primary documents in accordance with the timetable and deadlines established in Section 12 of this agreement.


7.6 – Primary documents may include target dates for secondary documents as provided in subsections 7.8. The purpose of target dates is to assist the Air Force in meeting deadlines, but target dates do not become enforceable by their inclusion in the primary documents and are not subject to Section 12 (Deadlines), Section 13 (Extensions) or Section 18 (Enforceability).

7.7 – Secondary Documents: The Air Force shall complete and transmit drafts of the following secondary documents to the U.S. EPA for review and comment in accordance with the provisions of this Section:

(a)  Data Quality Objectives for RI/FS

(b)  Sampling and Data Results

(c)  Description of the Current Situation (technical memos that serve as the basis for the RI)

(d)  Development of Alternatives (technical memo to support FS)

(e)  Alternatives Array Document containing the elements contained in U.S. EPA RI/FS Guidance Chapter 4, OSWER Directive 9355.3-01)

(f)  Treatability Studies (if generated)

(g)  United States Geological Survey Hydrogeologic Investigation Report

(h)  Remedial Design Phases at 30%, and at 60% subject to Subsection 12.4

(i)  Site Security / Health and Safety Plan, including Contingency Plan per OSWER Directive 9355.5-01


7.8 – Although U.S. EPA may comment on the drafts for secondary documents listed above, such documents shall not be subject to dispute resolution except as provided by Paragraph 7.3 hereof. Target dates shall be established for the completion and transmission of draft secondary documents pursuant to Section 12 (Deadlines) of this Agreement. The Project Managers may agree upon additional secondary documents that are within the scope of the listed primary documents.



7.9 – Meetings of the Project Managers.  The Project Managers shall confer approximately every thirty (30) days, except as otherwise agreed to by the Parties, to review and discuss the progress of work being performed at the Site, including progress on the primary and secondary documents.  Prior to preparing any draft document specified in Paragraphs 7.4 and 7.7 above, the Project Managers shall confer, as necessary, in an effort to reach a common understanding, to the maximum extent practicable, with respect to the contents of the draft document.

7.10 – Identification and Determination of Potential ARARs:

a)  For those primary documents or secondary documents for which ARAR determinations are appropriate, prior to the issuance of a draft document, the Project Managers shall meet to identify and propose all potential ARARs pertinent to the document being addressed, including any permitting requirements which may be a source of ARARS.  Draft ARAR determinations shall be prepared by the Air Force in accordance with Section 121(d)(2) of CERCLA, 42 U.S.C. §9621(d)(2), the NCP, and pertinent guidance issued by U.S. EPA.

b)  In identifying potential ARARs, the Parties recognize that actual ARARs can be identified only on a site-specific basis and that ARARs depend on the specific hazardous substances, pollutants and contaminants at a site, the particular actions associated with a proposed remedy and the characteristics of a site.  The Parties recognize that ARAR identification is necessarily an iterative process and that potential ARARs must be identified and discussed among the Parties as early as possible, and must be re-examined throughout the RI/FS process until a ROD is issued.

19

7.11 - Review, Comment on, and Revision of Draft Documents:

a)  The Air Force shall complete and transmit each draft primary document to U.S. EPA on or before the corresponding deadline established for the issuance of the document.  The Air Force shall complete and transmit the draft secondary document in accordance with the target dates established for the issuance of such documents pursuant to Section 12 of this Agreement.

b)  Unless the Parties mutually agree to another time period, all draft documents shall be subject to a sixty (60)-day period for review and comment. Review of any document by the U.S. EPA may concern all aspects of it (including completeness) and should include, but is not limited to, technical evaluation of any aspect of the document, and consistency with CERCLA, the NCP, and any pertinent guidance or policy issued by the U.S. EPA.  Comments by the U.S. EPA shall be provided with adequate specificity so that the Air Force may respond to the comments and, if appropriate, make changes to the draft document.  Comments shall refer to any pertinent sources of authority or references upon which the comments are based and, upon request of the Air Force, the U.S. EPA shall provide a copy of the cited authority or reference. In cases involving complex or unusually lengthy reports, U.S. EPA may extend the sixty (60) day comment period for up to ten (10) additional days by written notice to the Air Force Project Manager prior to the end of the Sixty (60) day period.  On or before the close of the comment period, U.S. EPA shall transmit its written comments to the Air Force.  In appropriate circumstances, this time period may be further extended in accordance with Section 13.

c) Representatives of the Air Force shall make themselves readily available to U.S. EPA during the comment period for purposes of informally responding to questions and comments on draft documents. Oral comments made during such discussions need not be the subject of a written response by the Air Force on the close of the comment period.

d) In commenting on a draft document which contains a proposed ARAR determination, U.S. EPA shall include a reasoned statement of whether it objects to any portion of the proposed ARAR determination. To the extent that U.S. EPA does object, it shall explain the bases for its objection in detail and shall identify any ARARs which it believes were not properly addressed in the proposed ARAR determination.

e) Within sixty (60) days of the close of the comment period on a draft primary document, the Air Force shall transmit to U.S. EPA a draft final primary document, which shall include the Air Force's response to all written comments received within the comment period. While the resulting draft final document shall be the responsibility of the Air Force, it shall be the product of consensus to the maximum extent possible.

f) Subsequent to the close of the comment period for a draft primary document, the Air Force may request a meeting of the Parties to discuss and clarify comments. Except as agreed to by all Parties, this meeting shall commence within fifteen (15) days of the close of the comment period, and shall not extend for longer than 5 business days.

g)  Within forty-five (45) days of the close of the comment period on a draft secondary document, the Air Force shall transmit to U.S. EPA its written response to comments. During the revision period, the Project Managers shall confer as necessary to discuss the comments.

h)  The Air Force may extend the period for either issuing the draft final primary document or responding to comments on a draft secondary document for an additional ten (10) days by providing written notice to the U.S. EPA Project Manager prior to the end of the respective response periods of sixty (60) days and forty-five (45) days. In appropriate circumstances, this time period may be further extended in accordance with Section 13 (Extensions) hereof.

7.12 - Availability of Dispute Resolution for Draft Final Primary Documents:

a)  Dispute resolution shall be available to the Parties for draft final primary documents as set forth in Section 17 (Dispute Resolution).

b)  When dispute resolution is invoked on a draft primary document, work may be stopped in accordance with the procedures set forth in Section 17.

7.13 - Finalization of Documents:  The draft final primary document shall serve as the final primary document if no party invokes dispute resolution regarding the document or, if invoked, at completion of the dispute

22

resolution process should the Air Force's position be sustained.  If the Air
Force's determination is not sustained in the dispute resolution process, the
Air Force shall prepare, within not more than twenty-one (21) days, a
revision of the draft final document which conforms to the results of
dispute resolution.  In appropriate circumstances, the time period for this
revision period may be extended in accordance with Section 13.

8.  Subsequent Modification of Final Documents

8.1 - Following finalization of any primary document pursuant to Paragraph
7.13 above, either U.S. EPA or the Air Force may seek to modify the document,
including seeking additional RI, FS, RD, or RA work, pilot studies, computer
modeling or other supporting technical work, only as provided in this Section
below.  These restrictions do not apply to the Community Relations Plan.

8.2 - Either Party may seek to modify a document after finalization if it
determines, based on new information (i.e., information that becomes
available, or conditions that become known, after the document is finalized)
that the requested modification is necessary.  Either Party may seek such a
modification by submitting a concise written request to the Project Manager
of the other Party.  The request shall specify the nature of the requested
modification and how the request is based on new information.

8.3 - In the event that a consensus is not reached by the Project Managers
on the need for a modification, either Party may invoke dispute resolution to
determine if such modification shall be conducted.  Modification of a

document shall be required only upon a showing that: (1) the requested modification is based on significant new information, and (2) the requested modification could be of significant assistance in evaluating impacts on the human health and the environment, in evaluating the selection of remedial alternatives, or in protecting human health and the environment.

8.4 - Nothing in this Section shall alter U.S. EPA's ability to request the performance of additional work which was not contemplated by this Agreement. The Air Force's obligation to perform such work must be established by either a modification of a document or by amendment to this Agreement.

8.5 - Any additional work to be performed pursuant to a reopening and modification shall be subject to the review and comment process of Section 7 above, and shall be an integral and enforceable part of this agreement.

8.6 - Nothing in this Section shall alter the Parties' rights under Section 18 (Enforceability), nor shall it alter the Parties' rights to seek an amendment under Section 35 (Amendment or Modification of Agreement), nor shall it alter the Parties' rights to seek an amendment under Section 22 (Project Managers).

## 9. Operable Unit Remedial Actions

9.1 - Pursuant to the NCP at 40 CFR 300.430 (a)(1), the Parties agree that remedial actions will be implemented at sites or site groups as soon as site

24

data and information make it possible to do so.  When early actions are necessary or appropriate to achieve significant risk reduction quickly, sites or site groups will be remediated in operable units (OU), as defined in the NCP at 40 CFR §300.5.

9.2 - Within seven (7) days after the Parties identify the need for an operable unit remedial action (OURA), the Parties shall confer to establish which primary documents are required to support an operable unit Record of Decision.  Within fourteen (14) days of such a conference, the Air Force shall propose in writing a schedule and deadlines for submittal of the primary documents deemed necessary by the Parties pursuant to this Section.

9.3 - Within ten (10) days of receipt of the proposed schedule, U.S. EPA shall review and provide comments or concurrence to the Air Force regarding the proposed schedule and deadlines.  Upon receiving concurrence from U.S. EPA on the OURA schedule and deadlines, the Air Force shall develop the documents and submit them to U.S. EPA for review and comment pursuant to Section 7 of this Agreement.  If the Parties fail to agree within fifteen (15) days on the proposed deadlines, the matter shall be immediately submitted for dispute resolution pursuant to Section 17 of this Agreement.

9.4 - Unless the Parties agree otherwise pursuant to subsection 9.2, data to support an operable unit Record of Decision, including qualitative risk information, shall be documented in a focused RI/FS.  A focused RI/FS shall consist of analysis of relevant data extracted from the ongoing site or site group RI/FS which supports evaluation of a limited number of alternatives.

25

9.5 - In cases where data relevant to the OURA can be summarized briefly and the alternatives are few and straightforward, the Parties may agree to bypass the focused RI/FS and document this supporting information in the Proposed Plan that is issued for public comment, and in the subsequent operable unit Record of Decision. Decision documents shall be prepared following the Interim Final Guidance on Preparing Superfund Decision Documents, OSWER Directive 9355.3-02 (publication number EPA/540/G-89/007).

9.6 - Proposed Plans and Records of Decision for operable units shall be subject to all the provisions of Section 11 of this Agreement.

## 10. Remedial Investigation/Feasibility Study

10.1 - The Air Force agrees to develop, implement, and report upon a RI and FS for the Site and for all sites or site groups within the Site identified by the Parties prior to and subsequent to the effective date of this Agreement in accordance with the requirements and purposes set forth in this Agreement. Except as noted in Subsection 10.2, all RI/FS documents will be subject to the consultation process, and the schedules and deadlines set forth in Sections 7 and 12, respectively, of this Agreement.

10.2 - The Air Force agrees to perform a RI/FS for the Landfills 8 and 10 site group within the following time frame to address a significant threat to public health or welfare, or the environment.

26

(a)   In consultation with U.S. EPA, the Air Force shall perform a RI/FS and submit to U.S. EPA a draft Record of Decision (ROD) pursuant to Section 11 of this Agreement, for a remedy to control contaminants emanating from Landfills 8 and 10 into and under the Woodland Hills Base housing area. Notwithstanding the schedules outlined in Section 12 of this Agreement, the schedule for submittal of primary documents for this site or site group shall be as follows:

| Primary Document | Due Date |
|---|---|
| Draft RI | May 15, 1992 |
| Draft FS | November 15, 1992 |
| Draft Proposed Plan | February 15, 1993 |
| Draft ROD | July 25, 1993 |

(b)   The documents developed under this effort will be subject to all the requirements of CERCLA/SARA, the NCP, and all requirements set forth in this Agreement.


11.   Remedial Action Selection and Implementation


11.1 — Following completion of the review and comment process by U.S. EPA on any FS, the U.S. Air Force shall develop a Proposed Plan in consultation with U.S. EPA pursuant to Section 7.  The Air Force shall publish the final Proposed Plan for public review and comment pursuant to Section 117(a) of CERCLA/SARA, 42 U.S.C. 9617.  When public comment has been considered, the Air Force shall develop and submit a draft Record of Decision (ROD), including Responsiveness Summary, to U.S. EPA.  The draft ROD shall be

reviewed by the U.S. EPA in accordance with Section 7. If the Parties agree
on the draft ROD, the draft ROD shall be reissued by the Air Force as the
final ROD. If the parties are unable to reach a consensus on the draft ROD,
the U.S. EPA Administrator shall make final selection of the remedial
action(s) and the U.S. EPA shall develop the final ROD in accordance with
CERCLA Sections 120(e)(4)(A), 120(f), and 121(f), 42 U.S.C. §9620(e)(4)(A),
§9620 (f), and §9621(f). Notice of the final ROD shall be published by U.S.
EPA, and the final ROD shall be made available to the public prior to
commencement of the remedial action in accordance with Section 117 of CERCLA,
42 U.S.C. §9617. The final selection of the remedial action(s) by the U.S.
EPA Administrator shall be final and not subject to dispute by the Air Force.


11.2 - Following finalization of any ROD, the Air Force agrees, subject to
subsection 12.3, to develop and implement a work plan for RD and RA,
including proposed timetables and schedules, as set forth in Section 7 and
Section 12 (Deadlines). The draft RD/RA work plan and Remedial Design
documents shall be subject to the consultation process set forth in Section
7. A dispute arising under this Section on any matter other than U.S. EPA's
final selection of a remedial action shall be resolved pursuant to Section 17
(Dispute Resolution).


## 12. Schedules and Deadlines


12.1 - The following schedules and deadlines have been established for the
submittal of draft primary documents pursuant to this Agreement, except as

provided for in Section 15 and Section 10. For the purpose of considering a document to be final, a draft final document (pursuant to Subsection 7.3) will be final a) as set forth in Subsection 7.3 (a); or b) upon written concurrence by U.S. EPA, whichever is sooner.

29



| Primary Document | Deadline |
|---|---|
| a. New RI/FS Statements of Work pursuant to subsection 7.3 (c) | as they are developed |
| b. RI/FS Work Plans, including QAPP and Field Sampling Plans | Draft submitted for 1st 39 sites. RI/FS Work plans for additional sites due pursuant to subsection 12.5 |
| c. Community Relations Plan | Submitted - subject to annual review and revision |
| d. RI Report including Risk Assessment | As approved in final work plan |
| e. Draft FS Report | 150 days from final RI |
| f. Draft Proposed Plan | 15 days from final FS |
| g. Draft Record of Decision, including Responsiveness Summary | 100 days from final Proposed Plan |
| h. RD/RA Work Plan | As approved pursuant to Subsection 12.4 |
| i. Pre-final (90%) / Final Remedial Design | As approved in the RD-RA work plan, subject to subsection 12.3 |
| j. Construction Quality Control Plan | As approved in the RD/RA work plan, subject to subsection 12.3 |
| k. Project Closeout Report (Final Report) | As approved in the final remedial design. |

12.2 - Within twenty-one (21) days of issuance of the ROD for any remedial action, the Air Force shall propose a schedule and deadline for submittal of the draft Work Plan for Remedial Design and Remedial Action (RD/RA).

12.3 - If the scope of the remedial action is limited, as in an OURA, the parties may agree to bypass the RD/RA work plan and go directly to design. In such case, within twenty-one (21) days of issuance of the ROD the Air Force shall propose a schedule and deadline for development and submittal of the draft RD documents required by this Section and Section 7 of this Agreement.

12.4 - Within fifteen (15) days of receipt, U.S. EPA shall review and provide comments to the Air Force regarding the proposed schedule and deadline pursuant to subsections 12.2 and 12.3. These comments shall indicate whether U.S. EPA will require review of the optional 60% RD phase submittal referenced in Sections 7.7 (h) and 12.6. Within 15 Days following receipt of the comments, the Air Force shall, as appropriate, make revisions and reissue the proposal. The Parties shall confer as necessary to finalize the deadline. If the Parties fail to agree within thirty (30) days on the proposed deadlines, the matter shall be immediately submitted for dispute resolution pursuant to Section 17 of this Agreement.

12.5 - When the Parties identify areas in addition to the first 39 sites that need to be included in an RI/FS, the Air Force shall propose a deadline for submittal of an RI/FS work plan for those areas within 21 days of agreement by the Parties on the proposed sites or site groups. The final RI/FS work plan shall contain deadlines which shall be published by U.S. EPA pursuant to Section 120 (e)(1) of CERCLA, 42 U.S.C. 9620 (e)(1).



12.6 – The Air Force shall complete and transmit to U.S. EPA drafts of the following secondary documents in accordance with the target dates set forth below.

| Secondary Document | Target Date |
|---|---|
| a. Data Quality Objectives | Draft submitted |
| b. Sampling and data results | pursuant to Section 27 of this Agreement |
| c. Description of Current Situation (technical memorandum) | As requested by U.S. EPA RPM (secondary to RI) |
| d. Development of Alternatives (technical memorandum) | Upon completion of that phase of Development of Remedial Alternatives as in (e) below |
| e. Alternatives Array Document (per U.S. EPA RI/FS Guidance, Chapter 4, OSWER Directive 9355.3-01) | No later than 30 days from draft final RI |
| f. Treatability Studies (as needed) | Upon completion (secondary to FS and/or RD) |
| g. U.S.G.S. Ground water Movement Study | Upon completion |
| h. Remedial Design Phases | 30% – as approved in the RD/RA Work Plan 60% – as approved in the RD/RA Work Plan, and upon request of the U.S. EPA RPM pursuant to Subsection 12.4 |
| i. Site Security / Health and Safety Plan, including Contingency Plan per OSWER Directive 9355.5-01 | As agreed pursuant to Subsection 12.4 |

12.7 - The deadlines set forth in this Section, or to be established as set forth in this Section, may be extended pursuant to Section 13 (Extension of Schedules) of this Agreement. The Parties recognize that one possible basis for extension of the deadlines for completion of the Remedial Investigation and Feasibility Study Reports is the identification of significant new Site conditions during the performance of the Remedial Investigation.

## 13. Extensions

13.1 - Timetables, deadlines, and schedules shall be extended upon receipt of a timely request for extension and when good cause exists for the requested extension. Any request for extension by a Party shall be submitted in writing to the other Party and shall specify:

(a)  The timetable, deadline or schedule that is sought to be extended;

(b)  The length of the extension sought;

(c)  The good cause(s) for the extension; and

(d)  The extent to which any related timetable and deadline or schedule would be affected if the extension were granted.

13.2 - Good cause exists for an extension when sought in regard to:

(a)  An event of Force Majeure;

(b)  A delay caused by another Party's failure to meet any requirement of this Agreement;

(c)  A delay caused by the good faith invocation of dispute resolution or the initiation of judicial action;

33

(d)  A delay caused, or which is likely to be caused, by the grant of an extension in regard to another timetable and deadline or schedule;

(e)  Any work stoppage within the scope of Section 15 (Emergencies and Removals); or

(f)  Any other event or series of events mutually agreed to by the Parties as constituting good cause.

13.3 - Absent agreement of the Parties with respect to the existence of good cause, the Air Force may seek and obtain a determination through the dispute resolution process that good cause exists.

13.4 - Within seven (7) business days of receipt of a request for an extension of a timetable, deadline or schedule, the receiving Party shall advise the requesting Party in writing of its position on the request.  Any failure by a Receiving Party to respond within the seven (7)-day period shall be deemed to constitute concurrence with the request for extension.  If a receiving Party does not concur in the requested extension, it shall include in its statement of nonconcurrence an explanation of the basis for its position.

13.5 - If there is consensus among the Parties that the requested extension is warranted, the affected timetable and deadline or schedule will be extended accordingly.  If there is no consensus among the Parties as to whether all or part of the requested extension is warranted, the timetable and deadline or schedule shall not be extended except in accordance with a determination resulting from the dispute resolution process.



13.6 – Within twenty-one (21) days of receipt of a statement of nonconcurrence with the requested extension, the requesting Party may invoke dispute resolution.

13.7 – A timely and good faith request for an extension shall toll any assessment of stipulated penalties or application for judicial enforcement of the affected timetable and deadline or schedule until a decision is reached on whether the requested extension will be approved. If dispute resolution is invoked and the requested extension is denied, stipulated penalties may be assessed and may accrue from the date of the original timetable, deadline or schedule. Following the grant of an extension, an assessment of stipulated penalties or an application for judicial enforcement may be sought only to compel compliance with the timetable, deadline or schedule as most recently extended.

## 14. Force Majeure

14.1 – A Force Majeure shall mean any event arising from causes beyond the control of a Party that causes a delay in or prevents the performance of any obligation under this Agreement, including, but not limited to, acts of God; fire; war; insurrection; civil disturbance; explosion; unanticipated breakage or accident to machinery, equipment or lines of pipe despite reasonably diligent maintenance; adverse weather conditions that could not be reasonably anticipated; unusual delay in transportation; restraint by court order or order of public authority; inability to obtain, at reasonable cost and after exercise of reasonable diligence, any necessary authorizations,

35

approvals, permits or licenses due to action or inaction of any governmental
agency or authority other than the Air Force; delays caused by compliance
with applicable statutes or regulations governing contracting, procurement or
acquisition procedures, despite the exercise of reasonable diligence; and
insufficient availability of appropriated funds, if the Air Force shall have
made timely request for such funds as part of the budgetary process as set
forth in Section 20 (Funding) of this Agreement. A Force Majeure shall also
include any strike or other labor dispute, whether or not within the control
of the Parties affected thereby. Force Majeure shall not include increased
costs or expenses of Response Actions, whether or not anticipated at the time
such Response Actions were initiated.


## 15. Emergencies and Removals


15.1 - Discovery and Notification; If any Party discovers or becomes aware
of an emergency or other situation that may present an endangerment to public
health, welfare or the environment at or near the Site, which is related to
or may affect the work performed under this Agreement, that Party shall
immediately orally notify the other Party. The Air Force shall then take
immediate action to notify the appropriate State and local agencies and
affected members of the public.


15.2 - Work Stoppage; In the event any Party determines that activities
conducted pursuant to this Agreement will cause or otherwise be threatened by
a situation described in subsection 15.1, the Party may propose the
termination of such activities. If the Parties mutually agree, the

activities shall be stopped for such period of time as required to abate the danger. In the absence of mutual agreement, the activities shall be stopped in accordance with the proposal, and the matter shall be immediately referred to the U.S. EPA Hazardous Waste Management Division Director for a work stoppage determination in accordance with Section 17 (Dispute Resolution) of this Agreement.

15.3 - Removal Actions;

a) The provisions of this Section shall apply to all removal actions as defined in CERCLA section 101 (23), 42 U.S.C. 9601(23), including all modifications to, or extensions of, the ongoing removal actions, and all new removal actions proposed or commenced following the effective date of this Agreement.

(b) Any removal actions conducted at the Site shall be conducted in a manner consistent with this Agreement, CERCLA, the NCP and Executive Order 12580.

(c) Nothing in this Agreement shall alter the Air Force's authority with respect to removal actions conducted pursuant to Section 104 of CERCLA, 42 U.S.C. §9604.

(d) Nothing in this Agreement shall alter any authority the State or U.S. EPA may have with respect to removal actions conducted at the Site.

37

(e)  All reviews conducted by U.S. EPA pursuant to 10 U.S.C. §2705(b)(2) will be expedited so as not to unduly jeopardize fiscal resources of the Air Force for funding the removal actions.  In transmitting review material to U.S. EPA, the Air Force shall identify funding deadlines that apply to the appropriate action(s).

(f) Either Party may determine that there may be an endangerment to the public health or welfare, or the environment because of an actual or threatened release of a hazardous substance, contaminant, or pollutant at or from the site, including but not limited to discovery of contamination of a drinking water well at concentrations that exceed any State or federal drinking water action level or standards.  The Air Force agrees to take such response actions as may be necessary to abate such danger or threat, and to protect public health or welfare, or the environment.

15.4 – Notice and Opportunity to Comment

(a)  The Air Force shall provide the U.S. EPA with timely notice and opportunity to review and comment upon any proposed removal action for the Site, in accordance with 10 U.S.C. §2705(a) and (b).  The Air Force agrees to provide the information described below pursuant to such obligation.

(b)  For emergency removal actions, the Air Force shall notify U.S. EPA pursuant to subsection 15.1.  Consistent with the time available for response to begin, such oral notice shall include information concerning the site background, threat to the public health and welfare or the environment



(including the need for response), proposed actions and costs (including a comparison of possible alternatives, means of transportation of any hazardous substances offsite, and proposed manner of disposal), expected change in the situation should no action be taken or should action be delayed (including associated environmental impacts), any important policy issues, and the Air Force On-Scene Coordinator (OSC) recommendations. An OSC Report shall be developed and provided to U.S. EPA and the Regional Response Team within one year of the completion of the emergency removal action pursuant to the NCP at 40 CFR §300.415 l and §300.165.

(c) For removal actions where there is an opportunity for planning prior to implementation of the action, the Air Force shall provide U.S. EPA with any information required by CERCLA, the NCP, and in accordance with pertinent EPA guidance, such as a determination that the response is time-critical or non-time-critical pursuant to 40 CFR §300.415 (b)(3) and (4), Engineering Evaluation/Cost Analyses (as in the case of non-time-critical removals), proposed response schedules, and to the extent it is not otherwise included, all information required to be provided orally in accordance with paragraph (b) of this subsection shall be provided in writing under this subsection. In order to allow sufficient time prior to initiation of the response action for U.S. EPA comments to be submitted to the Air Force, such information shall be furnished:

    i) for time-critical removals, as soon as it is developed by the Air Force;

    ii) for non-time-critical removals, 30 days before the public comment period on the EE/CA.

39

15.5 – The Air Force agrees to undertake the following removal action within the time frame indicated in this subsection to manage migration of contaminated ground water off of WPAFB;

(a)  Current hydrogeologic data indicates that contaminant sources in Areas A and C, and Area B, of WPAFB have contributed to regional ground water and soil contamination at the Site.

(b)  A statement of work (SOW) to conduct a study of this problem and to design a migration control system has been prepared by the Air Force, and a contract for the work to be performed has been awarded.  The Air Force shall submit all technical documents produced under this effort to U.S. EPA for review and comment within the timeframes set forth in the Air Force's SOW. U.S. EPA agrees to expedite reviews on these documents to ensure the most rapid response possible to this problem.

(c)  The response actions selected to mitigate this problem shall be consistent with a final remedial action for the Site, and shall be documented in a Focused Feasibility Study or CERCLA Decision Document, as agreed by the Parties.  Construction shall begin of the system before June 4, 1991.  Once constructed, the Air Force shall operate and maintain the system continuously until the Parties jointly determine that operation of the system is no longer necessary to protect public health or welfare, or the environment.

15.6 – All activities related to ongoing removal actions shall be reported

40



by the Air Force in the Progress Reports as described in Section 24 of this Agreement.

15.7 - Any dispute among the Parties as to whether a proposed non-emergency removal action is; (a) properly considered a removal action, as defined by Section 101(23) of CERCLA, 42 U.S.C. §9601(23); or (b) consistent with the final remedial action, shall be resolved pursuant to Section 17. Such dispute may be brought directly to the DRC or the SEC at any Party's request.

## 16. Additional Work Or Modification To Work

16.1 - In the event that the U.S. EPA determines that additional work, or modification to work, including remedial investigatory work and/or engineering evaluation, is necessary to accomplish the objectives of this Agreement, notification of such additional work or modification to work shall be provided to the Air Force. The Air Force agrees, subject to the dispute resolution procedures set forth in Section 17, to implement any such work.

16.2 - Any additional work or modification to work determined to be necessary by the Air Force shall be proposed by the Air Force and will be subject to the provisions of Section 7 of this Agreement prior to initiating any work or modification to work.

16.3 - Any additional work or modification to work approved pursuant to Subsection 16.1 or 16.2 shall be completed in accordance with the standards,



specifications, and schedules determined or approved by U.S. EPA. If any additional work or modification to work will adversely affect work already scheduled or will require significant revisions to an approved Work Plan, the U.S. EPA Project Manager shall be notified immediately of the situation followed by a written explanation within five (5) business days of the initial notification.

## 17. Dispute Resolution

17.1 - Except as specifically set forth elsewhere in this Agreement, if a dispute arises under this Agreement the procedures of this Section shall apply. All Parties shall make reasonable efforts to informally resolve disputes at the Project Manager or immediate supervisor level. If resolution cannot be achieved informally, the procedures of this Section shall be implemented to resolve a dispute.

17.2 - Within thirty (30) days after:

(a) the issuance of a draft final primary document pursuant to Section 7 of this Agreement; or

(b) any action which leads to or generates a dispute,

the disputing Party shall submit to the Dispute Resolution Committee (DRC) a written statement of dispute setting forth the nature of the dispute, the work affected by the dispute, the disputing Party's position with respect to the dispute and the technical, legal or factual information the disputing Party is relying upon to support its position.

17.3 - Prior to any Party's issuance of a written statement of dispute, the disputing Party shall engage the other Party in informal dispute resolution among the Project Managers and/or their immediate supervisors. During this informal dispute resolution period, the Parties shall meet as many times as are necessary to discuss and attempt resolution of the dispute.

17.4 - The DRC will serve as a forum for resolution of disputes for which agreement has not been reached through informal dispute resolution. The Parties shall each designate one individual and an alternate to serve on the DRC. The individuals designated to serve on the DRC shall be employed at the policy level (SES or equivalent) or be delegated the authority to participate on the DRC for the purposes of dispute resolution under this Agreement. The U.S. EPA representative on the DRC is the Waste Management Division Director of U.S. EPA's Region V. The Air Force's designated member is the Commander, 2750 Air Base Wing, WPAFB. Written notice of any delegation of authority from a Party's designated representative on the DRC shall be provided to all other Parties pursuant to the procedures of Section 26 (Notification).

17.5 - Following elevation of a dispute to the DRC, the DRC shall have twenty-one (21) days to unanimously resolve the dispute and issue a written decision signed by all Parties. If the DRC is unable to unanimously resolve the dispute within this twenty-one (21) day period, the written statement of dispute shall be forwarded to the Senior Executive Committee (SEC) for resolution, within seven (7) days after the close of the twenty-one (21) day resolution period.

43

17.6 - The SEC will serve as the forum for resolution of disputes for which agreement has not been reached by the DRC. The U.S. EPA representative on the SEC is the Regional Administrator of U.S. EPA's Region V. The Air Force's representative on the SEC is the Chief of Staff, Air Force Logistics Command, HQ AFLC, Wright Patterson, AFB, Ohio. The SEC members shall, as appropriate, confer, meet and exert their best efforts to resolve the dispute and issue a written decision signed by all parties. If unanimous resolution of the dispute is not reached within twenty-one (21) days, U.S. EPA's Regional Administrator shall issue a written position on the dispute. The Air Force may, within twenty-one (21) days of the Regional Administrator's issuance of U.S. EPA's position, issue a written notice elevating the dispute to the Administrator of U.S. EPA for resolution in accordance with all applicable laws and procedures. In the event that the Air Force elects not to elevate the dispute to the Administrator within the designated twenty-one (21) day escalation period, the Air Force shall be deemed to have agreed with the Regional Administrator's written position with respect to the dispute.

17.7 - Upon escalation of a dispute to the Administrator of U.S. EPA pursuant to Subsection 17.6 above, the Administrator will review and resolve the dispute within twenty-one (21) days. Upon request, and prior to resolving the dispute, the U.S. EPA Administrator shall meet and confer with the Air Force's Secretariat Representative to discuss the issue(s) under dispute. Upon resolution, the Administrator shall provide the Air Force with



a written final decision setting forth resolution of the dispute. The duties
of the Administrator set forth in this Part shall not be delegated.

17.8 - The pendency of any dispute under this Part shall not affect the
Air Force's responsibility for timely performance of the work required by
this Agreement, except that the time period for completion of work affected
by such dispute shall be extended for a period of time usually not to exceed
the actual time taken to resolve any good faith dispute in accordance with
the procedures specified herein. All elements of the work required by this
Agreement which are not affected by the dispute shall continue and be
completed in accordance with the applicable timetable and deadline or
schedule.

17.9 - When dispute resolution is in progress, work affected by the dispute
will immediately be discontinued if the Waste Management Division Director
for U.S. EPA's Region V requests, in writing, that work related to the
dispute be stopped because, in U.S. EPA's opinion, such work is inadequate or
defective, and such inadequacy or defect is likely to yield an adverse effect
on human health or the environment, or is likely to have substantial adverse
effect on the remedy selection or implementation process. To the extent
possible, U.S. EPA shall consult with the Air Force prior to initiating a
work stoppage request. After work stoppage, if the Air Force believes that
the work stoppage is inappropriate or may have potential significant adverse
impacts, the Air Force may meet with the Division Director to discuss the
work stoppage. Following this meeting, and further consideration of the
issues, the Division Director will issue, in writing, a final decision with

45

respect to the work stoppage. The final written decision of the Division Director may immediately be subject to formal dispute resolution. Such dispute may be brought directly to either the DRC or the SEC, at the discretion of the Air Force.

17.10 - Within twenty-one (21) days of resolution of a dispute pursuant to the procedures specified in this Section, the Air Force shall incorporate the resolution and final determination into the appropriate plan, schedule or procedures and proceed to implement this Agreement according to the amended plan, schedule or procedures.

17.11 - Resolution of a dispute pursuant to this Part of the Agreement constitutes a final resolution of any dispute arising under this Agreement. All Parties shall abide by all terms and conditions of any final resolution of dispute obtained pursuant to this Section of this Agreement.

## 18. Enforceability

18.1 - The Parties agree that:

(a) Upon the effective date of this Agreement, any standard, regulation, condition, requirement or order which has become effective under CERCLA and is incorporated into this Agreement is enforceable by any person pursuant to Section 310 of CERCLA, and any violation of such standard, regulation, condition, requirement or order will be subject to civil penalties under Sections 310(c) and 109 of CERCLA;

(b) All timetables or deadlines associated with the RI/FS shall be enforceable by any person pursuant to Section 310 of CERCLA, and any violation of such timetables or deadlines will be subject to civil penalties under Sections 310(c) and 109 of CERCLA;

(c) All terms and conditions of this Agreement associated with removal actions and interim and/or final remedial actions, including corresponding timetables, deadlines or schedules, and all work associated with the removals and interim and/or final remedial actions, shall be enforceable by any person pursuant to Section 310(c) of CERCLA, and any violation of such terms or conditions will be subject to civil penalties under Sections 310(c) and 109 of CERCLA; and

(d) Any final resolution of a dispute pursuant to Section 17 of this Agreement which establishes a term, condition, timetable, deadline or schedule shall be enforceable by any person under Section 310(c) of CERCLA and any violation of such term, condition, timetable, deadline or schedule will be subject to civil penalties under Sections 310(c) and 109 of CERCLA.

18.2 - *Nothing in this Agreement shall be construed as authorizing any person to seek judicial review of any action or work where review is barred by any provision of CERCLA, including Section 113(h) of CERCLA.*

18.3 - *Nothing in this Agreement shall be construed as a restriction or waiver of any rights that U.S. EPA may have under CERCLA, including but not limited to any rights under CERCLA sections 113 and 310, 42 U.S.C. §9613 and*

47

§9659. The Air Force does not waive any rights it may have under Section 120 of CERCLA, 42 U.S. C 9620, Section 211 of SARA, 10 U.S.C. 2701 et seq, and Executive Order 12580.

18.4 - The Parties agree to exhaust their rights under Section 17 prior to exercising any rights to judicial review that they may have.

18.5 - The Parties agree that all Parties shall have the right to enforce the terms of this Agreement.

## 19. Stipulated Penalties

19.1 - In the event that the Air Force fails to submit a primary document (as defined in Section 7 of this Agreement) to U.S. EPA pursuant to the appropriate timetable or deadline in accordance with the requirements of this Agreement, or fails to comply with a term or condition of this Agreement which relates to an operable unit remedial action and/or final remedial action, the U.S. EPA may assess a stipulated penalty against the Air Force. A stipulated penalty may be assessed in an amount not to exceed $5,000.00 for the first week (or part thereof), and $10,000.00 for each additional week (or part thereof) for which a failure set forth in this Paragraph occurs.

19.2 - Upon determining that the Air Force has failed in a manner set forth in Subsection 19.1, the U.S. EPA shall so notify the Air Force in writing. If the failure in question is not already subject to dispute resolution at the time such notice is received, the Air Force shall have fifteen (15) days



after receipt of the notice to invoke dispute resolution on the question of whether the failure did in fact occur. The Air Force shall not be liable for the stipulated penalty assessed by U.S. EPA if the failure is determined, through the dispute resolution process, not to have occurred. No assessment of a stipulated penalty shall be final until the conclusion of dispute resolution procedures related to the assessment of the stipulated penalty.

19.3 - The annual reports required by Section 120(e)(5) of CERCLA shall include, with respect to each final assessment of a stipulated penalty against the Air Force under this Agreement, each of the following:

(a) The facility responsible for the failure;

(b) A statement of the facts and circumstances giving rise to the failure;

(c) A statement of any administrative or other corrective action taken at the relevant facility, or a statement of why such measures were determined to be inappropriate;

(d) A statement of any additional action taken by or at the facility to prevent recurrence of the same type of failure; and

(e) The total dollar amount of the stipulated penalty assessed for the particular failure.

19.4 - Stipulated penalties assessed pursuant to this Section shall be payable to the Hazardous Substances Response Trust Fund only in the manner and to the extent expressly provided for in Acts authorizing funds for, and appropriations to, the DOD.

49

19.5 - In no event shall this Section give rise to a stipulated penalty in excess of the amount set forth in Section 109 of CERCLA.

19.6 - This Section shall not affect the Air Force's ability to obtain an extension of a timetable, deadline or schedule pursuant to Section 13 of this Agreement.

19.7 - Nothing in this Agreement shall be construed to render any officer or employee of the Air Force personally liable for the payment of any stipulated penalty assessed pursuant to this Section.

## 20. Funding

20.1 - It is the expectation of the Parties to this Agreement that all obligations of the Air Force arising under this Agreement will be fully funded. The Air Force agrees to seek sufficient funding through the DoD budgetary process to fulfill its obligations under this Agreement.

20.2 - In accordance with Section 120(e)(5)(B) of CERCLA, 42 U.S.C. §9620(e)(5)(B), the Air Force shall include in its annual report to Congress the specific cost estimates and budgetary proposals associated with the implementation of this Agreement.

20.3 - Any requirement for the payment or obligation of funds, including stipulated penalties by the Air Force established by the terms of this Agreement, shall be subject to the availability of appropriated funds, and no

50



provision herein shall be interpreted to require obligation or payment of funds in violation of the Anti-Deficiency Act, 31 U.S.C. §1341. In cases where payment or obligation of funds would constitute a violation of the Anti-Deficiency Act, the dates established requiring the payment or obligation of such funds shall be appropriately adjusted.

20.4 - If appropriated funds are not available to fulfill the Air Force's obligations under this Agreement, U.S. EPA reserves the right to initiate an action against any other person, or to take any response action, which would be appropriate absent this Agreement.

20.5 - Funds authorized and appropriated annually by Congress under the "Environmental Restoration, Defense" appropriation in the DoD Appropriation Act, and allocated by the Deputy Assistant Secretary of Defense (Environment) to the Air Force, will be the source of funds for activities required by this Agreement consistent with Section 211 of SARA, 10 U.S.C. Chapter 160. However, should the Environmental Restoration, Defense appropriation be inadequate in any year to meet the total Air Force CERCLA implementation requirements, the DoD shall employ and the Air Force shall follow a standardized DoD prioritization process which allocates that year's appropriations in a manner which maximizes the protection of human health and the environment. A standardized DoD prioritization model shall be developed and utilized with the assistance of U.S. EPA and the states.

21. Statutory Compliance / RCRA-CERCLA Integration

21.1 – The Parties intend to integrate the Air Force's CERCLA response obligations and RCRA corrective action obligations which relate to the release(s) of hazardous substances, hazardous wastes, pollutants or contaminants covered by this Agreement into this comprehensive Agreement. Therefore, the Parties intend that activities covered by this Agreement will achieve compliance with CERCLA, 42 U.S.C. §9601 et seq.; satisfy the corrective action requirements of Sections 3004(u) and (v) of RCRA, 42 U.S.C. §6924(u) and (v), for a RCRA permit, and RCRA Section 3008(h), 42 U.S.C. §6928(h), for interim status facilities; and meet or exceed all applicable or relevant and appropriate Federal and State laws and regulations, to the extent required by Section 121 of CERCLA, 42 U.S.C. §9621.

21.2 – Based upon the foregoing, the Parties intend that any remedial action selected, implemented and completed under this Agreement will be protective of human health and the environment such that remediation of releases covered by this Agreement shall obviate the need for further corrective action under RCRA (i.e., no further corrective action shall be required). The Parties agree that with respect to releases of hazardous waste covered by this Agreement, RCRA shall be considered an applicable or relevant and appropriate requirement pursuant to Section 121 of CERCLA, 42 U.S.C. §9621.

21.3 – The Parties recognize that the requirement to obtain permits for response actions undertaken pursuant to this Agreement shall be as provided for in CERCLA and the NCP. The Parties further recognize that on-going hazardous waste management activities at the Site may require the issuance of permits under Federal and State laws. This Agreement does not affect the requirements, if any, to obtain such permits. However, if a permit is issued to the Air Force for on-going hazardous waste management activities at the Site, U.S. EPA shall reference and incorporate any appropriate provisions, including appropriate schedules (and the provision for extension of such schedules), of this Agreement into such permit. The Parties intend that any judicial review of any permit conditions which reference this Agreement shall, to the extent authorized by law, only be reviewed under the provisions of CERCLA.

## 22.   Project Managers

22.1 – The U.S. EPA and the Air Force shall each designate a Project Manager and Alternate (hereinafter jointly referred to as Project Manager) for the purpose of overseeing the implementation of this Agreement. Within ten (10) days of the effective date of this Agreement, each Party shall notify the other Party of the name, address and telephone number of its Project Manager.

Any Party may change its designated Project Manager by notifying the other Parties, in writing, within five days of the change.

22.2 - The Project Managers shall be responsible on a daily basis for assuring proper implementation of all RI/FS and RD/RA activities, and oversight of any removal actions in accordance with the terms of the Agreement. In addition to the formal notice provisions set forth in Section 26, to the maximum extent possible, communications between the Parties on all documents, including reports, comments, and other correspondence concerning activities performed pursuant to this Agreement, shall be directed through the Project Managers. Each Project Manager shall be responsible for assuring that all communications from the other Project Manager are appropriately disseminated and processed by the entities which the Project Manager represents.

22.3 - The authority of the U.S. EPA Project Manager shall include, but is not limited to:

(a) Take samples, request split samples of Air Force samples and ensure that work is performed properly and pursuant to U.S. EPA protocols as well as pursuant to the Attachments and plans incorporated into this Agreement;

(b) Observe all activities performed pursuant to this Agreement, take photographs and/or films and make such other reports on the progress of the work as the Project Manager deems appropriate, subject to the limitations set forth in Section 30 (Site Access);

(c) Review records, files and documents relevant to this Agreement;

54

(d)  Coordinate with the Air Force Project Manager about the form and specific content of the Project Manager meetings and of progress reports based on such meetings;

(e)  Recommend and request minor field modifications to the work to be performed pursuant to this Agreement, or in techniques, procedures or design utilized in carrying out this Agreement which are necessary to complete the project.

22.4 – The authority of the Air Force Project Manager shall include, but not be limited to, the authority of the lead agency Remedial Project Manager and/or the On-Scene Coordinator as provided in the NCP. The Air Force Project Manager may also recommend and request minor field modifications to the work to be performed under this agreement, or in techniques, procedures, or design utilized in carrying out this agreement, which are necessary to complete the project.

22.5 – Any field modifications proposed under this Section by any Party must be approved orally by all Project Managers to be effective. If agreement cannot be reached on the proposed additional work or modification to work, and if the proposed minor field modification involves modification of an existing final report, then any Party may invoke the subsequent modification of final documents under Section 8 of this Agreement. If no modification of an existing final report is involved, then any Party may invoke dispute resolution under Section 17 of this Agreement.

22.6 – The Project Manager for the Air Force, or his/her alternate, shall be physically present at the Site or reasonably available to oversee work during all hours of work performed at the Site pursuant to this Agreement and shall make himself/herself reasonably available to the U.S. EPA Project Manager for the pendency of this Agreement.

22.7 – The Project Managers shall be reasonably available to consult on work performed pursuant to this Agreement and shall make themselves available to each other for the pendency of this Agreement. The absence of the U.S. EPA Project Manager or Air Force Project Manager from the facility shall not be cause for work stoppage.

### 23. Permits

23.1 – The Parties recognize that under Sections 121(d) and 121(e)(1) of CERCLA/SARA, 42 U.S.C. §9621(d) and §9621(e)(1), and the NCP, portions of the response actions called for by this Agreement and conducted entirely on-site are exempted from the procedural requirement to obtain a federal, state, or local permit but must satisfy all the applicable or relevant and appropriate federal and state standards, requirements, criteria, or limitations and other substantive permit requirements which would have been uniformly applied and which would have been included in any such permit.

23.2 – Subsection 23.1 above is not intended to relieve the Air Force from any and all regulatory requirement(s), including obtaining a permit whenever it proposes a response action involving either the movement of hazardous



substances, pollutants or contaminants off-site, or the conduct of a response action offsite.

23.3 - The Air Force shall notify the U.S. EPA in writing of any permits required for off-site activities as soon as it becomes aware of the requirement. The Air Force agrees to obtain any permits necessary for the performance of any work under this Agreement. Upon request, the Air Force shall provide to the U.S. EPA copies of all such permit applications and any other documents related to the permit process. Copies of permits obtained in implementing this Agreement shall be appended to the appropriate submittal or progress report. Upon request by the Air Force Project Manager, the U.S. EPA Project Manager will assist WPAFB, to the extent possible, in obtaining any required permit.

23.4 - During any appeal of any permit required to implement this Agreement or during review of any modifications proposed by the Air Force, the Air Force shall continue to implement those portions of this Agreement which can be reasonably implemented pending final resolution of the permit issue(s).

## 24.  Reporting

24.1 – The Air Force agrees to submit to the U.S. EPA copies of the monthly written Progress Reports currently being submitted to OEPA pursuant to the Ohio Consent Order.  The Progress Reports will describe the actions the Air Force has taken during the previous month to implement the parallel requirements of the Ohio Consent Order and this Agreement.  Progress Reports shall also detail the activities scheduled to be taken during the next month and provide a general schedule with target weeks for activities and meetings for the month thereafter.  Progress reports shall be submitted by the tenth (10th) day of each month following the effective date of this Agreement.  The progress reports shall, at a minimum, include a detailed statement of the manner and extent to which the requirements and time schedules of this Agreement and Attachments are being met.  In addition, the Progress Reports shall identify any anticipated delays in meeting requirements and time schedules, the reason(s) for the delay(s) and actions taken to prevent or mitigate the delay, and any need for additional work.

## 25.  Quality Assurance

25.1 – In order to provide quality assurance and maintain quality control regarding all field work and sample collection performed pursuant to this Agreement, the Air Force agrees to designate a Quality Assurance Officer (QAO) who will ensure that all work is performed in accordance with approved work plans, sampling plans, and QAPPs.  The QAO shall maintain for inspection



a log of quality assurance field activities and provide a copy to U.S. EPA upon request.

25.2 - To ensure compliance with the QAPP, the Air Force shall arrange for access, upon request by U.S. EPA, to all laboratories performing analyses on behalf of the Air Force pursuant to this agreement.

### 26.  Notification

26.1 - Unless otherwise specified, the Parties shall transmit all notices required herein and all primary and secondary documents and comments thereon, required by this Agreement, by next day mail or certified mail, return receipt requested, hand delivery or facsimile.  Time limitations shall commence upon receipt by the Project Manager, or in his absence by the Alternate Project Manager.

26.2 - Notice to the individual Parties pursuant to this Agreement shall be sent to the addresses specified by the Parties.  Initially these shall be as follows:

U.S. Environmental Protection Agency, Region V
WPAFB Project Manager  5HS-11
Waste Management Division
OH-MN Section
230 South Dearborn Street
Chicago, Illinois  60604

WPAFB Remedial Project Manager
2750th Air Base Wing/EMR
Wright-Patterson Air Force Base, Ohio  45433-5000

26.3 – Unless otherwise requested, all routine correspondences may be sent via regular mail to the above-named persons.

## 27. Sampling and Data/Document Availability

27.1 – The Parties shall make available to each other quality assured results of sampling, tests, or other data generated by either Party, or on their behalf, with respect to the implementation of this Agreement within sixty (60) days of their collection or performance. If the collection or performance involves more than one day, the sixty (60) days shall run from the last day of collection or performance. If the quality assurance procedures are not completed within sixty (60) days, raw data or results shall be made available within the sixty (60) day period and quality assured data or results may be submitted as soon as they become available.

27.2 – At the request of either Party taking samples, the other Party shall allow split or duplicate samples to be taken during sample collection during the implementation of this Agreement. The sampling Party's Project Manager shall notify the other Project Manager not less than fourteen (14) days in advance of any sample collection. If it is not possible to provide fourteen (14) days prior notification, the sampling Party's Project Manager shall notify the other Project Manager as soon as possible after becoming aware that samples will be collected.

### 28. Confidential Information

28.1 - The Air Force may possess information which is subject to a confidentiality claim as established by the Air Force pursuant to regulations found at 32 CFR Part 806. In the event that the Air Force submits information to U.S. EPA pursuant to this Agreement which is subject to a confidentiality claim, such information shall be clearly designated by the Air Force as confidential. If no confidentiality claim accompanies the information when it is submitted to U.S. EPA, the information may be made available to the public without further notice to the Air Force.

28.2 - Upon receipt of material claimed as confidential, U.S. EPA shall review the confidentiality claim pursuant to 40 CFR Part 2, and shall make an independent confidentiality determination. The Air Force's prior confidentiality determination made pursuant to 32 CFR Part 806 shall be relevant to, but shall not control, U.S. EPA's confidentiality determination.

28.3 - In the event that U.S. EPA determines that information submitted by the Air Force pursuant to this Agreement contains confidential business information ("CBI"), U.S. EPA shall manage such information according to U.S. EPA procedures for the management of CBI.

28.4 - In the event that U.S. EPA determines that information submitted by the Air Force pursuant to this Agreement does not contain CBI as established pursuant to 40 CFR Part 2, the Parties to this Agreement recognize that the

61

conflicting confidentiality determinations made by U.S. EPA and the Air Force give rise to a unique inter-agency dispute. Therefore, in the event of such conflicting determinations, U.S. EPA and the Air Force agree to jointly elevate the resulting dispute to their respective offices of General Counsel for assistance in resolving the dispute. U.S. EPA and the Air Force agree to abide by the final inter-agency resolution of the dispute resulting from such elevation, including appropriate management of the information in question in accordance with the resolution of the dispute.

28.6 - Nothing in this Section shall serve as a limitation of the Air Force's right to classify information for national security purposes pursuant to the national security provisions referenced in section 120(j)(2) of CERCLA, 42 U.S.C. 9620(j)(2), or to seek site-specific Presidential orders under section 120(j)(1), 42 U.S.C. 9620(j)(1). Except as otherwise provided by section 120(j) of CERCLA, analytical data shall not be claimed as confidential by the Air Force.

### 29. Preservation of Records

29.1 - Despite any document retention policy to the contrary, the Parties shall preserve, during the pendency of this Agreement and for a minimum of ten (10) years after termination of this Agreement, all records and documents contained in the Administrative Record and any additional records and documents retained in the ordinary course of business which relate to the actions carried out pursuant to this Agreement.



29.2 – After this ten (10) year period, each Party shall notify the other Party at least forty-five (45) days prior to destruction or disposal of any such documents or records. Upon request by any Party, the requested Party shall make available such records or documents, or copies of any such records or documents to the requesting Agency, unless withholding is authorized and determined to be appropriate by law. Records necessary to comply with the notice requirements of section 120(h)(3) of CERCLA, 42 U.S.C. 9620(h)(3), should be retained by the Air Force.

### 30. U.S. EPA Site Access

30.1 – Without limitations on any authority conferred on U.S. EPA by statute or regulation, the U.S. EPA, and/or its authorized representatives, shall have authority to enter the Site at all reasonable times for purposes consistent with this Agreement. Such access shall include, but not be limited to, reviewing the progress of the Air Force in carrying out the terms of this Agreement; ascertaining that work performed pursuant to this Agreement is in accordance with approved work plans, sampling plans, and QAPPs; and conducting such tests as U.S. EPA or the Project Managers deem necessary.

30.2 – The Air Force shall honor all reasonable requests for such access by the U.S. EPA upon presentation of proper credentials. However, such access shall be obtained through the Air Force Project Manager in conformance with Air Force Security regulations (AFR 125-37, The Installation and Resource Protection Plan) and in a manner minimizing interference with any military operations at the Site.

30.3 - To the extent that access is required to areas of the Site presently owned by or leased to parties other than the Air Force, the Air Force agrees to use its best efforts, including its authority under Section 104 (e) of CERCLA, 42 U.S.C §9604 (e), to obtain access agreements from the present owners and/or lessees which shall provide reasonable access for the Air Force, U.S. EPA and their authorized representatives within thirty (30) days after the effective date of this Agreement if such access then appears to U.S. EPA to be necessary, or, if later appropriate, within thirty (30) days after the relevant submittals which require access become final pursuant to Section 7 (Consultation) of this Agreement.

30.4 - With respect to non-Air Force property upon which monitoring wells, pumping wells, treatment facilities, sample locations, or other response actions are to be located, the Air Force shall use its best efforts to ensure that any access agreements shall provide for the continued right of entry for all Parties for the performance of such remedial activities. In addition, any access agreement shall provide that no conveyance of title, easement, or other interest in the property shall be consummated without the continued right of entry.

30.5 - The access agreements shall also provide that the owners of the Site or of any property where monitoring wells, pumping wells, treatment facilities sampling locations, or other response actions may be located shall notify the Air Force, and the U.S. EPA by certified mail, at least thirty (30) days prior to any conveyance, of the property owner's intent to convey

64

any interest in the property and of the provisions made for the continued operation of the monitoring wells, treatment facilities, or other response actions installed pursuant to this Agreement.

30.6 - In the event that Site access is not obtained within the thirty (30) day time period set forth in Subsection 30.3 above, within fifteen (15) days after the expiration of the thirty (30) day period the Air Force shall notify the U.S. EPA regarding the lack of, and efforts to obtain, such access agreements.

30.7 - The Air Force may request the assistance of U.S. EPA where access problems arise. The U.S. EPA will make every reasonable effort to assist in obtaining access if requested, except nothing herein shall require U.S. EPA to take judicial action to obtain access.

30.8 - Nothing in this Section limits, or otherwise affects, U.S. EPA's right of access and entry as provided in 42 U.S.C section 9604(e), except as that right may be limited by 42 U.S.C. 9620(j)(2), Executive Order 12580, or other applicable national security regulations or federal law.

### 31. Technical Review Committee (TRC)

31.1 - Pursuant to 10 U.S.C. 2705(c), the Air Force has established a Technical Review Committee (TRC). The purpose of the TRC is to afford a forum for cooperation between the Air Force and the local community and to provide a meaningful opportunity for members to become informed about, and



express their opinions on, si__ _ficant aspects of the investigations and response actions at the site. Both Parties shall provide a representative to the TRC as required by SARA Section 211, 10 U.S.C. 2705 (c).

## 32. Public Participation

32.1 - The Parties agree that this Agreement and any proposed removal actions and proposed remedial action alternative(s) and subsequent plan(s) for remedial action at the Site arising out of this Agreement shall comply with the administrative record and public participation requirements of CERCLA, including Sections 113 and 117 of CERCLA, 42 U.S.C. §9613 (k) and §9617, relevant community relations provisions in the NCP, U.S. EPA guidance and practice. The provisions of this Section shall be carried out in a manner consistent with, and shall fulfill the intent of, Section 21 (RCRA/CERCLA Integration).

32.2 - The Air Force has developed and is implementing a Community Relations Plan (CRP) pursuant to subsection 31.1 above which responds to the need for an interactive relationship with all interested community elements, both on-Site and off, regarding activities and elements of work undertaken by the Air Force.

32.3 - The Air Force has established and is maintaining an administrative record near the Site (at the Wright State University Library) in accordance with Section 113(k) of CERCLA, 42 U.S.C. 9613(k). The administrative record shall continue to be maintained in accordance with U.S. EPA policy and



guidelines, as amended. A copy of each document placed in the administrative record, not already provided, will be provided to the U.S. EPA. The administrative record developed by the U.S. Air Force shall be updated and new documents or microfiche documents supplied to U.S. EPA on at least a quarterly basis if additional documents have been added. An index of documents in the administrative record will accompany each update of the administrative record.

32.4 - Except in case of an emergency, any Party issuing a formal press release to the media regarding any of the work required by this Agreement shall advise the other Parties of such press release and the contents thereof, at least forty-eight (48) hours before the issuance of such press release and of any subsequent changes prior to release.

## 33. Five Year Review

33.1 - If a remedial action is selected that results in any hazardous substances, pollutants, or contaminants remaining at the Site, the Parties shall review such remedial action in accordance with Section 121(c) of CERCLA, 42 U.S.C. 9621(c) and with this Agreement. The review shall occur no less often than every five (5) years after the initiation of the remedial action to assure that human health and the environment are being protected by the remedial action being implemented. The U.S. EPA Project Manager shall advise the Air Force Project Manager of U.S. EPA's findings in this regard. In the event U.S. EPA guidance is not available on the documentation needed for the five-year review, the Parties shall agree between themselves what

constitutes adequate documentation for the review. If the Air Force determines that additional action is required, such action will be undertaken pursuant to Section 16 of this Agreement. Air Force determinations under this Section shall be subject to dispute resolution.

33.2 - To synchronize the five-year reviews for all remedial actions, the following procedure will be used: Review of sites and/or site groups will be conducted every five years counting from the initiation of the RA until initiation of the final remedial action for the Site. At that time a separate review for all ongoing remedial actions shall be conducted. Review of the final remedial action (including all OURAs) shall be conducted every five years, thereafter.

34. Transfer of Real Property

34.1 - The Air Force shall not transfer any real property comprising the federal facility except in compliance with section 120(h) of CERCLA, 42 U.S.C. 9620(h), as set out in 40 CFR 373. Prior to any sale of any portion of the land comprising the federal facility which includes an area within which any release of hazardous substance has come to be located, the Air Force shall give written notice of that condition to the buyer of the land. At least thirty (30) days prior to any conveyance subject to section 120(h) of CERCLA, the Air Force shall notify all Parties of the transfer of any real property subject to this Agreement and the provisions made for any additional remedial actions, if required.

34.2 - Notification of any subsequent owner beyond the immediate next owner may be accomplished by recording a reference to this Agreement and any information required by CERCLA/SARA section 120(h)(3), 42 U.S.C. 9620(h)(3), as instruments of title to real estate are recorded in the State of Ohio.

## 35. Amendment or Modification of Agreement

35.1 - This Agreement may be amended or modified by a written agreement between the Air Force and U.S. EPA. Such amendments or modifications may be proposed by any Party and shall be effective the third business day following the day the last Party to sign the amendment or modification sends its notification of signing to the other Party. The Parties may agree to a different effective date.

## 36. Termination

36.1 - The provisions of this Agreement shall be deemed satisfied and terminated upon receipt by the Air Force of written notice from U.S. EPA, that the Air Force has demonstrated that all the terms of this Agreement have been satisfied. If U.S. EPA denies or otherwise fails to grant a termination notice within ninety (90) days of receiving a written Air Force request for such notice, U.S. EPA shall provide a written statement of the basis for its denial and describe the Air Force actions which, in the view of the U.S. EPA, would be a satisfactory basis for granting a notice of completion. Such denial shall be subject to Section 17 of this Agreement.

## 37. Reservation of Rights

37.1 - U.S. EPA expressly reserves all rights and defenses that it may have, including the right both to disapprove of work performed by the Air Force and to request, in accordance with Section 16 of this Agreement, that the Air Force perform tasks in addition to those stated in work plans developed under this Agreement.

37.2 - Compliance by the Air Force with the terms of this Agreement shall not relieve the Air Force of its obligation to comply with all applicable State or Federal laws. U.S. EPA reserves the right to take enforcement action pursuant to RCRA, CERCLA, and/or any available legal authority against the Air Force or its contractors/operators for violations of applicable laws or regulations, except that U.S. EPA agrees to exhaust all remedies provided by this agreement, including as provided for in Sections 7 and 17. Nothing in this Agreement shall preclude U.S. EPA from exercising any administrative, legal, and equitable remedies available to them (including assessment of civil penalties and damages if such are otherwise legally assessable) to require additional response actions (subject to the requirements of Sections 8, 16, and 17 of this Agreement) in the event that:

(a) conditions previously unknown or undetected by U.S. EPA arise or are discovered at the Site; or

(b) U.S. EPA receives additional information not previously available concerning the premises which it employed in reaching the terms of this

70

Agreement, and the implementation of the requirements of this agreement are no longer protective of human health and the environment.

37.3 – U.S. EPA reserves any rights it may have to perform any portion of the work agreed to herein with respect to any site characterization, feasibility study, and abatement action against release of hazardous substances it deems necessary to protect human health and the environment. Notwithstanding compliance with the terms of this Agreement, the Air Force is not released from liability, if any, for the costs of any response action taken by U.S. EPA.

## 38.  Other Claims

38.1 – Nothing in this Agreement shall constitute or be construed as a bar or release from any claim, cause of action or demand in law or equity by or against any person, firm, partnership or corporation not a signatory to this Agreement for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from WPAFB.

38.2 – Unless specifically agreed to in writing by the Parties, the U.S. EPA shall not be held as a party to any contract entered into by the Air Force to implement the requirements of this Agreement.



38.3 - This Agreement shall not restrict U.S. EPA from taking any legal or response action for any matter not specifically part of the work covered by this Agreement.

## 39. Recovery of Expenses

39.1 - The parties agree to amend this Agreement at a later date in accordance with any subsequent resolution of the issue of U.S. EPA cost reimbursement. Pending such resolution, the Parties reserve any rights they may have with respect to cost reimbursement.

## 40. Effective Date and Public Comment

40.1 - Within fifteen (15) days of the date of the execution of this Agreement, the U.S. EPA shall announce the availability of this Agreement to the public for review and comment. U.S. EPA shall accept comments from the public for a period of forty-five (45) days after such announcement. At the end of the comment period, the Parties shall review all such comments and shall either:

(a) Determine that the Agreement should be made effective in its present form, in which case the Air Force shall be so notified in writing, and the Agreement shall become effective on the date said notice is issued; or

(b) Determine that modification of the Agreement is necessary, in which case the Parties will meet to discuss and agree upon any proposed

72

changes. If the Parties do not mutually agree on all needed changes within fifteen (15) days from the close of the public comment period, or within such other time period mutually agreed upon by the Parties, the Parties shall submit their written notices of position, concerning those provisions still in dispute, directly to the Dispute Resolution Committee, and the procedures of Section 17 (Dispute Resolution) shall be applied to the disputed provisions. Upon resolution of any proposed changes, the Agreement, as modified, shall be re-executed by the Parties. The U.S. EPA shall promptly issue a notice to the Air Force that the agreement shall become effective on the date the notice is issued.

40.2 - In the event of significant revision or public comment, notice procedures of Sections 117 and 211 of CERCLA/SARA shall be followed and a responsiveness summary shall be published by the U.S. EPA.

IT IS SO AGREED:

By: _____     21 Mar 91
Commander                        Date
2750th Air Base Wing

By: _____     Dec. 7th, 1990.
Regional Administrator           Date
U.S. Environmental Protection
Agency

73



Topographic Map of Wright–Patterson Air Force Base.

2-4

ATTACHMENT 2

| | Submitted to USEPA Reg V | Submitted to OEPA | USEPA Reg V Concurrence | OEPA Concurrence |
|---|---|---|---|---|
| **Preliminary Assessments** | | | | |
| Landfill 1 | x | x | | x |
| Landfill 2 | x | x | | x |
| Landfill 3 | x | x | | x |
| Landfill 4 | x | x | | x |
| Landfill 5 | x | x | | x |
| Landfill 6 | x | x | | x |
| Landfill 7 | x | x | | x |
| Landfill 8 | x | x | | x |
| Landfill 9 | x | x | | x |
| Landfill 10 | x | x | | x |
| Landfill 11 | x | x | | x |
| Landfill 12 | x | x | | x |
| Landfill 13 | x | x | | x |
| Landfill 14 | x | x | | x |
| Fire Training Area 1 | x | x | | x |
| Fire Training Area 2 | x | x | | x |
| Fire Training Area 3 | x | x | | x |
| Fire Training Area 4 | x | x | | x |
| Fire Training Area 5 | x | x | | x |
| Central Heating Plant (Bldg 66) | x | x | | x |
| Central Heating Plant (Bldg 271) | x | x | | x |
| Central Heating Plant (Bldg 1240) | x | x | | x |
| Central Heating Plant (Bldg 770) | x | x | | x |
| Central Heating Plant (Bldg 170) | x | x | | x |
| Long-Term Coal Storage Pile | x | x | | x |
| Spill Site 1 | x | x | | x |
| Spill Site 2 | x | x | | x |
| Spill Site 3 | x | x | | x |
| Spill Site 4 | x | x | | x |
| Spill Site 5 | x | x | | x |
| Spill Site 7 | x | x | | x |
| Spill Site 9 | x | x | | x |
| Spill Site 10 | x | x | | x |
| Chemical Burial Site 1 | x | x | | x |
| Chemical Burial Site 2 | x | x | | x |
| Chemical Burial Site 3 | x | x | | x |
| Chemical Burial Site 4 | x | x | | x |
| Coal & Chemical Disposal Area | x | x | | x |
| Chemical Disposal Area | x | x | | x |
| UST - Bldg 71a | x | x | | x |

| | Submitted to USEPA Reg V | Submitted to OEPA | USEPA Reg V Concurrence | OEPA Concurrence |
|---|:---:|:---:|:---:|:---:|
| **Preliminary Assessments (Con't)** | | | | |
| UST - Bldg 4020 | x | x | | x |
| Earthfill Disposal Area 1 | x | x | | x |
| Earthfill Disposal Area 2 | x | x | | x |
| Earthfill Disposal Area 3 | x | x | | x |
| Earthfill Disposal Area 4 | x | x | | x |
| Earthfill Disposal Area 5 | x | x | | x |
| Earthfill Disposal Area 6 | x | x | | x |
| Earthfill Disposal Area 7 | x | x | | x |
| Earthfill Disposal Area 8 | x | x | | x |
| Earthfill Disposal Area 9 | x | x | | x |
| Earthfill Disposal Area 10 | x | x | | x |
| Earthfill Dispsoal Area 11 | x | x | | x |
| Earthfill Disposal Area 12 | x | x | | x |
| Tank Farm 49A | x | x | | x |
| East Ramp Tank Removal | x | x | | x |
| Temporary Coal Storage | x | x | | x |
| Gravel Lake Tanks | x | x | | x |
| Coal Storage: Bldg 89 | x | x | | x |
| UST: BODG 30119 | x | x | | |
| Community Relations Plan | x | x | | x |
| | | | | |
| Phase I Records Search | | | | |
| - Feb 82 Engineering-Science | x | x | | |
| | | | | |
| SI Report: Landfills 8, 10, 12 | | | | |
| - Sep 86 Dames & Moore | x | x | | |
| | | | | |
| Part 1 SI: EFDZ 1-8 Final Rpt | | | | |
| - Feb 88 Engineering-Science | x | x | | x |
| | | | | |
| Draft Part 2 SI Work Plan: | | | | |
| EFDZ 1-8 - Jan 90 E-S | x | x | | |
| | | | | |
| Draft SI Work Plan: New Sites | | | | |
| - Jan 90 SAIC | x | x | | |
| | | | | |
| Phase II-Stage 1 Final Rpt | | | | |
| - Sep 85 Weston | x | x | | |
| | | | | |
| Phase II-Stage 2 Final Rpt | | | | |
| - Jul 89 Weston | x | x | | |
| | | | | |
| Draft RI/FS Work Plan: 39 Sites | x | x | | |
| - Nov 89 Engineering-Science | | | | |