# EXHIBIT D

 

John C. Musto, Deputy Director
Department of Law, Civil Division
**CITY OF DAYTON**
101 W. Third Street
Dayton, OH 45401
937.333.4116
john.musto@daytonohio.gov

Stephen N. Haughey, Partner
Environmental Practice Group
**FROST BROWN TODD LLP**
301 E. Fourth Street, Suite 3300
Cincinnati, OH 45202
513.651.6127
shaughey@fbtlaw.com

June 3, 2025

**Via Certified Mail:**
Pete Hegseth, Secretary
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Troy Meink, Secretary
U.S. Air Force
1670 Air Force Pentagon
Washington, DC 20330-1670

General Duke Richardson, Commander
Colonel Joe Luker, Vice-Commander
88th Air Base Wing
Wright-Patterson Air Force Base
5135 Pearson Road, Building 10
Wright-Patterson AFB, OH 45433

**Via Regular First Class U.S. Mail:**
Lee Zeldin, Administrator
U.S. EPA
1200 Pennsylvania Avenue, N.W.
Mail Code 1101A
Washington, DC 20460

Anne Vogel, Regional Administrator
Robert Kaplan, Regional Counsel
U.S. EPA Region 5
77 West Jackson Boulevard
Chicago, IL 60604-3507

John Logue, Director
Todd Anderson, Dep. Director Legal Affairs
Ohio EPA
P.O. Box 1049
Columbus, Ohio 43216-1049

Pamela Bondi. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Adam R.F. Gustafson, Acting
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dave Yost, Ohio Attorney General
30 East Broad Street, 14th Floor
Columbus, OH 43215

Aaron Farmer, Section Chief
Environmental Enforcement Section
Ohio Attorney General's Office
30 East Broad Street, 25th Floor
Columbus, OH 43215

Re:     Notice of Intent to Enforce Violations of the Comprehensive Environmental
        Response, Compensation and Liability Act Arising from Contamination of
        Dayton's Water Supply by the Release of Per- and Polyfluoroalkyl Substances at
        Wright-Patterson Air Force Base

To All Concerned:

U.S. Department of Defense, *et. al*.
June 3, 2025
Page 2

Please take notice that the City of Dayton, Ohio ("the City" or "Dayton") intends to file a citizen suit pursuant to 42 U.S.C. § 9659 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*., and implementing rules codified at 40 C.F.R. Part 374, against Wright-Patterson Air Force Base ("WPAFB" or "the Base"), the U.S. Department of Defense, and the U.S. Air Force ("the Defense Agencies" collectively, or individually as "WPAFB" or "the Base," "DOD," and "USAF," respectively), to address ongoing violations of the Federal Facility Agreement ("FFA") signed by WPAFB in March 1991 under Section 120 of CERCLA, 42 U.S.C. § 9620, and violations of CERCLA's National Contingency Plan ("NCP"), codified at 40 C.F.R. Part 300, which is incorporated into the FFA and made a binding obligation thereunder.

These violations include failing to request an appropriation of funds from Congress, and to apply said funds promptly, and without delay, to develop and implement emergency removal and/or remedial actions required by the FFA and CERCLA's NCP once WPAFB, as the lead agency[1] under the FFA and the NCP, knew that the release of PFAS, a CERCLA-designated hazardous substance, pollutant and contaminant, from its operations at the Base: (a) had contaminated the City's drinking water wells at levels substantially exceeding the health advisory level ("HAL") issued by U.S. EPA under Section 300g-1(b)(1)(F) of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f *et seq*., and (b) had contaminated the City's treated drinking water at levels substantially exceeding drinking water standards issued by U.S. EPA under Section 300g-1(b)(1)(A) of the SDWA.

WPAFB knew that the release of PFAS from the Base had caused these impacts no later than June 2022, when U.S. EPA issued a revised HAL for PFAS, and June 10, 2024, when U.S. EPA's new drinking water standards for PFAS compounds went into effect, but has failed continuously since these dates to take the mandatory emergency measures under the FFA and the NCP to eliminate the imminent and substantial threat faced by the City's residents, businesses and contract water customers. A copy of the FFA is enclosed as Exhibit A.

Unless the Defense Agencies agree immediately to comply with all applicable requirements of the FFA and the NCP to address the imminent and substantial threat to Dayton's drinking water, the City will file a citizen suit once the required 60-day notice period expires to obtain injunctive relief for such compliance, the imposition of civil penalties, and an award of legal fees and expenses. Please contact the undersigned if the Defense Agencies wish to enter into negotiations for an administrative or judicial consent order containing such relief.

CERCLA's "preenforcement review bar" under Section 113(h), 42 U.S.C. § 9613(h), does not preclude Dayton from filing such action. While the Defense Agencies' ongoing CERCLA response at WPAFB ordinarily precludes a preenforcement challenge to removal or remedial actions *selected* for the Base, as explained below, despite clear, unequivocal terms in the FFA and the NCP that require otherwise, WPAFB has never initiated, commenced, instituted, or investigated, in any way or to any degree, nor even requested federal funding in order to begin

---

[1] Under the NCP, DOD/WPAFB is the designated "lead agency" responsible for all CERCLA response actions when, as here, the source of the contamination is a defense installation. *See* 40 C.F.R. §§ 300.5 and 300.175(b)(4).

U.S. Department of Defense, *et. al*.
June 3, 2025
Page 3

doing so, the selection of an emergency removal or remedial action to eliminate the imminent and substantial endangerment that the Base has known for years its release of PFAS has caused to the health and welfare of Dayton's residents, businesses and contract water customers.

On one hand, WPAFB complied with the terms of the FFA and NCP that require prompt emergency action to address an imminent threat to human health and welfare when the Base acted swiftly to fund, design and install *in less than six months* early in the summer of 2017 a pump and treat system to remove the PFAS contamination from WPAFB's own drinking water wells that supply potable water to its approximately 25,000 military, civilian and contract personnel.

However, with respect to the same contamination of Dayton's much larger water supply, WPAFB has repeated refused to take any of the actions as required under the FFA and the NCP to develop emergency removal or remedial measures to eliminate the same threat to the health and welfare of over 400,000 residents, businesses and contract water customers. *These refusals included ignoring or rejecting two separate letters sent by Ohio Governor DeWine in 2020 and 2021 to DOD and USAF requesting that the Defense Agencies enter into an agreement with Dayton to begin this process immediately.*[2]

Congress added an exemption to CERCLA's "preenforcement review bar" for situations like this, where the party that caused the contamination is its own "lead agency," thus responsible for undertaking the necessary response actions, but steadfastly refuses to do so despite clear legal obligations. Notwithstanding the bar, Section 113(h)(4) of CERCLA, 42 U.S.C. § 9613(h)(4), allows citizens (defined to include the City) to file suit when a removal or remedial action taken[3] *is in violation of any requirement* of CERCLA, which requirements include the NCP and a FFA that is entered into under Section 120 of the statute. *See e.g. Frey v. Environmental Protection Agency*, 751 F.3d 461 (7th Cir. 2014); *Monterey Bay United Air Pollution Control District v. U.S. Department of the Army*, 176 F.Supp. 2d 979 (N.D. Cal. 2001). As explained below, WPAFB has violated, and continues to violate, clear legal duties under the FFA and the NCP to take emergency steps eliminate the imminent and substantial threat faced by the City's residents, businesses and contract water customers caused by the release of PFAS at the Base. Thus, CERCLA's "preenforcement review bar" is inapplicable.

### Background Facts

1.      Dayton provides potable water to close to 400,000 residents, businesses, and contract customers. The City's service area includes most of Montgomery County, Ohio, including the Cities of Dayton, Kettering, Riverside, Centerville, Trotwood, and Brookville, and

---

[2] Governor DeWine's August 27, 2020, and January 8, 2021, letters are enclosed as Exhibit B.

[3] In this situation, the action "taken" by WPAFB is a constructive decision for a "no action" emergency removal or remedial action despite a clear legal requirement to do so. *See e.g. Sierra Club v. Hladick*, 2020 WL 5642788 *1 at *2,*8 (W.D. Wash. 2020) (finding that Washington's years of delay developing a plan to eliminate water quality impairment in Spokane River despite a clear legal duty under the Clean Water Act constituted a constructive "no action" decision, stating that "[t]here comes a point at which continual delay of a [legal obligation] and detours to illusory alternatives ripen into a constructive submission that no action will be taken").

U.S. Department of Defense, *et. al*.
June 3, 2025
Page 4

Harrison Township; customers in Greene County, Ohio; and service to the Dayton International Airport.

2.      The City's distribution lines extend over 50 square miles and carry an average of close to 72 million gallons each day. The City's Water Department operates wellfields in the Great Miami River and Mad River basins that include production wells supplying groundwater to two water treatment plants, one lime recovery facility, two main pumping stations, six booster pumping stations. and eleven water storage facilities. Surrounding the City's production wells are hundreds of monitoring wells ("sentinel wells") installed as an early warning system to detect potential contaminants in groundwater that may be migrating into the capture zone of the production wells. Sentinel wells are required as a part of Ohio EPA's delegated SDWA program. WPAFB's operations are located immediately upgradient of the City's Mad River wellfield. Some of the Base's operations are only a few hundred yards upgradient of the nearest sentinel wells.

3.      Dayton relies solely on groundwater for its source of drinking water. There is no other source if the aquifer becomes contaminated and unusable. In order to protect the aquifer, the City successfully petitioned U.S. EPA in 1988 to designate the aquifer as a "sole source aquifer" under Section 300h-3(a) of the SDWA, the first such designation in the Midwest, and one of the largest sole source aquifers in the U.S., providing drinking water for over 2.5 million residents and businesses in Southwest Ohio.

4.      Under the SDWA, U.S. EPA's sole source designation required, among other things, that Dayton develop, implement, and enforce a comprehensive aquifer management plan, wellfield/source protection plan, and wellfield protection ordinance ("WPO"), in order to control surface activities that could contaminate the aquifer.

5.      Under the City's wellfield protection program, operations at WPAFB Areas A and B are located inside the 1-year time of travel boundaries for the nearest production wells, which are groundwater contour lines approved by Ohio EPA under Ohio's delegated SDWA program that establish zones in which restrictions are imposed under the WPO to minimize the risk of contaminating the aquifer. For this reason, for decades WPAFB has been subject to the City's WPO after the sole source designation was issued, and the Base was required thereunder to develop and implement written procedures, restrictions and other controls for the storage and handling of chemicals in order to avoid spills or releases that could contaminate the aquifer that supplies Dayton's water. Under the WPO, WPAFB entered into multiple 5-year term MOUs with the City to implement the Base's written procedures, restrictions and controls, thus acknowledging the threat its operations presented to the City's water supply.

6.      WPAFB's records indicate that it began using PFAS-containing aqueous firefighting liquids and foam(s) ("AFFFs") in 1970 to extinguish aviation fuel-based and oil-based fires, and to conduct firefighting training exercises. Thousands of gallons of PFAS-containing AFFF liquid concentrate were stored each year at the Base and used in hanger fire suppression systems, mobile firefighting equipment, and firefighting training exercises. Based on WPAFB's own records, the storage, handling and use of these liquids and application of

U.S. Department of Defense, *et. al.*
June 3, 2025
Page 5

AFFFs occurred under circumstances where little or no steps were taken to minimize the potential for significant runoff of PFAS-containing spills and residues onto the ground and into surrounding soils and nearby surface waters and storm drains. These included dozens of spills ranging, at one end of the spectrum, from as little as a few gallons to 800 gallons, to, at the other end of the spectrum, a 10,000-gallon spill from a hanger fire suppression system in Area B near Building 479 in December 2008, and an even larger 52,000-gallon spill from a hanger fire suppression system in Area A at former Hanger 4028 in November 2001.

7.      WPAFB's knowledge that the release of chemicals at the Base, if not promptly remediated, has a direct, rapid pathway to reach the groundwater that feeds Dayton's production wells is both longstanding and undisputed. The Base acknowledged this pathway at least as far back as the early 90s, when it (a) installed a groundwater pump and treat system directly adjacent and upgradient of the City's wells to remove chlorinated solvents released at the Base that were migrating into the City's wells; and (b) agreed to reimburse the City for the costs to investigate the impact of the solvents on its wellfield and water supply, and install and operate a separate treatment system at the City's Ottawa Street water treatment plant to remove the solvents. Most recently, in 2021 USGS, working in cooperation with WPAFB and USAFCEC,[4] updated the groundwater flow model for the aquifer underlying WPAFB specifically to track and confirm the rapid movement of particles released at the Base into and through the aquifer.[5]

### Legal Obligations of the Defense Agencies

8.      WPAFB knew at least as far back as early 1988 that a lack of sufficient controls over the handling and use of PFAS-containing liquids and AFFFs had contaminated numerous areas at the Base. For example, in February 1988 the Base entered into an administrative order with Ohio EPA, obligating WPAFB to investigate and potentially remediate 58 separate areas of spills and waste disposal at the Base, a list that included numerous past and current fire suppression systems and firefighting training areas. When U.S. EPA subsequently determined that the scope of contamination was so significant that it warranted placing the Base on CERCLA's National Priorities List,[6] WPAFB separately executed the March 1991 FFA with U.S. EPA Region 5 to formalize the Base's obligations under Section 120 of CERCLA to address these areas. (FFA at p. 10)

9.      The FFA underscored the significance of the threat to Dayton's water supply by

---

[4] The U.S. AFCEC (Air Force Civil Engineer Center), located at Joint Base San Antonio-Lackland, Texas, is a subordinate unit of the Air Force Installation and Mission Support Center, Air Force Materiel Command. Its missions include USAF facility investment planning, design and construction, operations support, real property management, energy support, environmental compliance and restoration, audit assertions, acquisition and program management. *See* https://www.afcec.af.mil/About-Us/Fact-Sheets/Display/Article/466125/air-force-civil-engineer-center/. The AFCEC also maintains the administrative record that WPAFB and other USAF facilities involved in a CERCLA response are required under the NCP to create to document their actions. *See* https://ar.cce.af.mil/Search.
[5] The report is available at https://pubs.usgs.gov/sir/2021/5115/sir20215115.pdf.
[6] The National Priorities List (NPL) is the list of sites of *national priority* among the known releases or threatened releases of hazardous substance across the U.S. and its territories. Of the thousands of military bases and supporting installations in the U.S. and its territories, only 157 locations have contamination so significant that it warrants placement on the NPL. *See* https://www.epa.gov/superfund/superfund-national-priorities-list-npl.

U.S. Department of Defense, *et. al.*
June 3, 2025
Page 6

contamination at the Base. For example, in its findings of fact, the FFA stated:

> (b) WPAFB overlies a portion of the Miami Buried Valley Aquifer which is the source of potable water for WPAFB and the Cities of Dayton and Fairborn. The Miami Buried Valley Aquifer consists generally of upper and lower sand and gravel water bearing zones in which the potential for migration of contamination to area aquifers is high due to their characteristic high permeabilities and transmissivities.

(FFA, p. 9)

10. To address this threat, among its other commitments, WPAFB agreed to take the following action:

> (f) Either Party may determine that there may be an endangerment to the public health or welfare, or the environment because of an actual or threatened release of a hazardous substance, contaminant, or pollutant at or from the site, including but not limited to discovery of contamination of a drinking water well at concentrations that exceed any State or federal drinking water action level or standards. The Air Force agrees to take such response actions as may be necessary to abate such danger or threat, and to protect public health or welfare, or the environment.

(FFA at p. 38)

11. This commitment was not limited to contamination of drinking water wells on the Base's property, but included "any area off WPAFB to or under which a release of hazardous substances, pollutants, or contaminants has migrated, or threatens to migrate, from a source on or at WPAFB." (FFA at p. 8)

12. WPAFB also committed in the FFA to (a) "expedite the cleanup process to the extent consistent with protection of human health and the environment" (FFA at p. 2); (b) to "carry out all activities under the FFA so as to protect the public health, welfare and the environment" (FFA at p. 14); and (c) to "timely request" "sufficient funding though the DOD budgetary process to fulfill its obligations under the FFA" (FFA at pp. 13, 50) The Base also agreed that its failure to timely request funding to meet its obligations would not be a force majeure defense to its failure to meet its obligations under the FFA. (FFA at p. 36)

13. WPAFB also agreed to comply with all applicable requirements of the NCP. (FFA at pp. 13, 37) These include, but are not limited to: (a) prioritizing responses to releases that may present an imminent and substantial danger to public health or welfare (40 C.F.R. § 300.3); and (b) complying with all applicable USAF directives (40 C.F.R. § 300.170), which includes USAF Directive 32-70, issued July 20, 1994, containing the following directives:

U.S. Department of Defense, *et. al.*
June 3, 2025
Page 7

> 1.3.1. Cleanup. The Air Force will reduce health and environmental risks created or caused by past operations. At each installation, the Air Force will move as rapidly as possible to identify, characterize, and clean up contamination. The Air Force will ensure open, unbiased, and comprehensive processes for cost-effective cleanup and protection of human health and public well-being by involving the public and regulatory agencies in the clean-up activities. At locations in foreign countries, the Air Force will restore sites contaminated by Air Force activities to sustain current operations and eliminate known
(i)  imminent and substantial dangers to human health and safety.

> 1.4. The Air Force will seek sufficient funding to carry out all environmental activities needed to meet its legal obligations. All funds appropriated by the Congress for these activities will be administered
(ii) responsibly.

(Directive 32-70 at pp. 1-2)

14.     Other NCP obligations included (a) engaging in prompt hazardous substance response, being sensitive to local community concerns, when a response requires federal funding (40 C.F.R. § 300.400(c)); and (b) perhaps most importantly, undertaking as soon as possible an emergency removal and/or remedial action, backed up, if time permits, by a site assessment, investigation and feasibility review, "to abate, prevent, minimize, stabilize, mitigate or eliminate [a] threat to public health or welfare of the United States or the environment," and "mak[ing] any necessary determinations"…"as soon as possible," to meet this requirement, with particular emphasis on taking these steps when information showed "***actual or potential contamination of drinking water supplies***." (40 C.F.R. §§ 300.410, 300.415) And when an emergency removal and/or remedial action is needed to address a contaminated water supply, the NCP states further that the actions that must be considered include treatment of groundwater to eliminate or reduce human exposure, and provision of an alternative water supply. (40 C.F.R. § 300.415)

15.     Under the FFA and the NCP, DOD is responsible for WPAFB's obligations thereunder, including requesting the necessary funding. (FFA at p. 6; 40 C.F.R. § 300.175)

16.     Finally, with respect to enforcement of the Defense Agencies' obligations, Dayton's right to do so under the citizen-suit provision (*i.e.* Section 310) of CERCLA was made expressly clear:

```
    (a)  Upon the effective date of this Agreement, any standard,
regulation, condition, requirement or order which has become effective under
CERCLA and is incorporated into this Agreement is enforceable by any person
pursuant to Section 310 of CERCLA, and any violation of such standard,
regulation, condition, requirement or order will be subject to civil
penalties under Sections 310(c) and 109 of CERCLA;
```
                                    *   *   *   *

U.S. Department of Defense, *et. al.*
June 3, 2025
Page 8

    (c)  All terms and conditions of this Agreement associated with removal actions and interim and/or final remedial actions, including corresponding timetables, deadlines or schedules, and all work associated with the removals and interim and/or final remedial actions, shall be enforceable by any person pursuant to Section 310(c) of CERCLA, and any violation of such terms or conditions will be subject to civil penalties under Sections 310(c) and 109 of CERCLA; and

(FFA at pp. 46-47)

### WPAFB's Violations of its FFA and NCP Obligations Relating to PFAS Contamination of Dayton's Production Wells and Drinking Water Supply

17.    Upon information and belief, WPAFB first detected PFAS contamination of groundwater under the Base sometime in 2014 or early 2015 when drinking water obtained from its own production wells that supply potable water to its approximately 25,000 military, civilian and contract personnel was tested under the SDWA's emerging contaminants rule. A subsequent site assessment performed in 2015 concluded that PFAS contamination had been documented at 25 different areas sufficient to warrant a formal investigation, most significantly underneath and downgradient of four fire suppression systems and firetraining areas no more than a mile from the City's nearest production wells, and only a few hundred yards from its nearest sentinel wells, contamination so substantial that WPAFB's consultant classified it as "Group 1," meaning "High mass of AFFF released and probability of groundwater contamination."

18.    When WPAFB resampled its own drinking water again in 2016 and found it to be above U.S. EPA's 2016 HAL, consistent with the Base's obligations under the FFA and the NCP, it immediately took emergency removal measures, including issuing health advisories to Base personnel, supplying bottled water, and shutting down impacted on-site wells.

19.    However, when Ohio EPA issued letters dated June 2 and 20, 2016, to WPAFB under the emergency provisions in the above-referenced 1988 administrative order between the Agency and WPAFB, directing it to undertake "an expedited removal action…to ensure that PFAS detected in ground water at the Base are prevented from affecting…the downgradient City of Dayton production wells," the Base refused to take the actions required by the FFA and NCP to address the imminent threat, despite the Agency's urgency in the June 20 letter:

> "The activities outlined in this letter…are paramount to protecting Dayton's drinking water supply. Ohio EPA has diligently worked with you in an attempt to reach agreement on a reasonable schedule for the work which is protective of the Dayton drinking water supply. It appears, despite our best efforts, you have not been willing to commit to the removal activities…Please be advised that…Ohio EPA will pursue all legal actions available to it to ensure citizens are safe. Legal actions may include, but are not limited to, administrative orders and/or coordination with the Ohio Attorney General to pursue judicial remedies."[7]

20.    WPAFB has never commenced or undertaken, nor even requested funding for, the

---

[7] Ohio EPA's June 2 and 20, 2016, letters to WPAFB are enclosed as Exhibit C.

U.S. Department of Defense, *et. al.*
June 3, 2025
Page 9

development of the emergency removal action directed by Ohio EPA, action that is required by clear, unequivocal terms in the FFA and the NCP incorporated therein. WPAFB's violations forced the City to take its own interim emergency measures by shutting down seven production wells closest to WPAFB, in an effort to slow the migration, followed subsequently by shutting down another five wells, resulting in a substantial (33%) loss of the City's production capacity from the Mad River wellfield.

21.     Since beginning PFAS monitoring in mid-2016, Dayton has consistently detected PFAS three to four times or more higher than U.S. EPA's 2016 HAL (70 ppt combined PFOA/PFOS) in the City's wells, and more than a thousand-fold higher than the Agency's subsequently-revised HAL (0.004 ppt for PFOA, 0.020 ppt for PFOS) issued in June 2022. This data was provided to WPAFB, but it took no action, despite its agreement under the FFA to take all emergency response actions needed to abate a danger or threat from the discovery of contamination of a drinking water well at concentrations that exceed *any federal drinking water action level*, and to protect public health and welfare. (FFA at p. 38) Its "no action" included not requesting any funding that would be needed in order to undertake any of the necessary steps to take such emergency action.

22.     WPAFB's failure to act in response to this information violated, and continues to violate today, Sections 1.2(g), 6.1, 6.3, 6.4(b), 15.3 (including 15.3(f)), and 20.1 of the 1991 FFA, as well as Sections 300.175(b)(4), 300.400(c), 300.410, and 300.415 of the NCP incorporated into the FFA.

23.     Even when U.S. EPA turned its SDWA HALs from federal drinking water "action levels" into enforceable drinking water standards, WPAFB failed to take the required actions under the FFA and the NCP. On April 10, 2024, U.S. EPA issued new enforceable drinking water standards for PFAS, including for PFOA (4 ppt) and PFOS (4 ppt), the two PFAS compounds found consistently in Dayton's wells and in the treated water it supplies to more than 400,000 residents, businesses and contract customers.

24.     Despite Dayton taking its own interim emergency measures to (a) shut down the 12 production wells closest to WPAFB in an effort to slow the migrating PFAS plume, and (b) spend millions of dollars to transport uncontaminated water from the Miami River wellfield to blend with Mad River wellfield water in order to reduce PFAS contamination, treated water from the City's Ottawa Street water treatment plant consistently exceeds the new drinking water standard at least three to four fold. Based on the PFAS concentrations found in the City's sentinel wells, if the City brought the 12 wells back into use, the exceedance would increase dramatically.

25.     The new standards took effect on June 10, 2024, triggering a detailed mandatory, multi-year process for the City to devise a means (*i.e.*, treatment, expansion of the blending program, or siting a new wellfield, or some combination thereof) to meet the new standards, which have a compliance deadline of June 10, 2029. Dayton's engineers have determined that the only way to meet the new standard by the deadline is to install a membrane treatment system, one that, due to the size of the system and volume of water to be treated, is estimated to cost

U.S. Department of Defense, *et. al.*
June 3, 2025
Page 10

more than $350 million dollars. *Dayton currently has no source of affordable funding to install such system to meet the federal compliance deadline.*

26.     Dayton continued to provide WPAFB with the City's sampling and monitoring data, showing levels in treated water consistently three to four fold above the new drinking water standards, as well as levels in production and/or sentinel wells as high as close to one hundred-fold above the new standards, the latter showing a significant PFAS plume that continues to migrate into the City's wellfield. Dayton also provided WPAFB with its engineering report/capital estimate for a PFAS treatment system. The Base also knows that the City currently has no source of affordable funding to construct such system.

27.     Despite receiving this information, WPAFB once again took no action, despite its agreement under the FFA to take all emergency response actions needed to abate a danger or threat from the discovery of contamination of a drinking water well at concentrations that exceed *any federal drinking water standard*, and to protect public health and welfare. (FFA at p. 38) Its "no action" included not requesting any funding that would be needed in order to undertake any of the necessary steps to take such emergency action.

28.     WPAFB's failure to act in response to this additional information violated, and continues to violate today, Sections 1.2(g), 6.1, 6.3, 6.4(b), 15.3 (including 15.3(f)), and 20.1 of the 1991 FFA, as well as Sections 300.175(b)(4), 300.400(c), 300.410, and 300.415 of the NCP incorporated into the FFA.

29.     It is particularly disturbing that WPAFB acted immediately, without any delay whatsoever, to take the emergency actions required under the FFA and the NCP in response to discovering PFAS contamination of its own drinking water supply eight years ago, yet since then forcing Dayton's 400,000+ residents, businesses, and contract water purchasers to fend for themselves in response to the same contamination.

30.     Not only have the Defense Agencies failed to take the required emergency actions to eliminate the health threat to Dayton's water supply, WPAFB has separately failed to take known, readily-available remedies *at the Base* that would reduce the migrating PFAS plume, and potentially (long-term) eliminate it, or at least significantly reduce the City's estimated capital and O&M cost to treat the incoming water. As noted above, WPAFB continues to operate a groundwater pump and treat system directly upgradient of the City's wells to treat/remove chlorinated solvents that continue to migrate to the wellfield from previous spills/releases at the Base. Despite repeated requests from the City for WPAFB to expand the existing system to pump more groundwater and treat/remove PFAS, thus shrinking the plume that continues to migrate off the Base, WPAFB has ignored the City's requests.

31.     WPAFB's failure to take this mitigating measure is a separate, continuing violation of Sections 1.2(g), 6.1, 6.3, 6.4(b), 15.3 (including 15.3(f)), and 20.1 of the 1991 FFA, as well as Sections 300.175(b)(4), 300.400(c), 300.410, and 300.415 of the NCP incorporated into the FFA, which require that the Base undertake without delay all feasible emergency mitigation measures to reduce the ongoing, substantial threat to the City's water supply.

U.S. Department of Defense, *et. al.*
June 3, 2025
Page 11

### Diligent Prosecution under CERCLA

32.     Neither Ohio EPA nor U.S. EPA has commenced and is diligently prosecuting the ongoing violations by the Defense Agencies of the March 1991 FFA, nor their ongoing violations of the NCP incorporated into the FFA. Therefore, the City of Dayton will commence an action under Section 310 of CERCLA, 42 U.S.C. § 9659, in the U.S. District Court for the Southern District of Ohio to obtain injunctive and other relief to abate the ongoing violations.

---

As the owner and operator of WPAFB, the DOD and the USAF are responsible for allowing widespread releases of PFAS-containing liquids and foams onto soils and into surface waters and groundwater immediately upgradient of the City of Dayton's Mad River wellfield, a wellfield that WPAFB knows draws its water from a specially-designated "sole source aquifer" under the SDWA. The Base has known for decades that its operations are located inside the wellfield protection zones for the City's wellfield, and that acts or omissions occurring during the handling of chemicals could easily, and rapidly, contaminate the aquifer that supplies those wells.

It is particularly distressing that for WPAFB's own drinking water customers it moved at near breakneck speed to undertake the emergency actions required under the FFA and the NCP to fund an assessment of the contamination, evaluate alternative remedies, and install a treatment system that the Base reports reduces the PFAS concentration to nondetect. Yet when it comes to addressing the ongoing migration of the same contamination into the adjoining public wellfield that serves almost 20 times the number of customers, DOD and the USAF have refused to take any emergency action, nor even to request funding in order to commence such action, leaving Dayton's customers to drink and otherwise make use of water WPAFB knows (1) to exceed applicable health-based drinking water standards for PFAS, and (2) that Dayton has no source of affordable funding with which to treat to meet the new standards.

The City of Dayton has been more than patient the past eight years. Dayton is unwilling to continue to sit idly by with significant production wells closed for almost eight years, with the City incurring millions of dollars annually in interim emergency measures, and with the City facing a daunting, wholly-unaffordable, capital cost estimate to address an environmental problem that WPAFB created.

In order to avoid the filing of a citizen suit, please contact the undersigned immediately to discuss the steps DOD and the USAF will commit to in order to eliminate the ongoing violations, and alleviate the ongoing, substantial endangerment to the City's water supply.

Very truly yours,

**CITY OF DAYTON, OHIO**                              **FROST BROWN TODD LLP**

By: *ss/John C. Musto*                                                By: *ss/Stephen N. Haughey*
   John C. Musto, Esq.                                                     Stephen N. Haughey, Esq.

U.S. Department of Defense, *et. al*.
June 3, 2025
Page 12

    Chief Trial Counsel                                        Lindsey A Bryant, Esq.
    Department of Law, Civil Division                   Environmental Practice Group

Enclosures (Exhibits A, B, and C)

cc:     Barbara Doseck, Esq., City of Dayton Law Director

0105357.0730840 4927-3519-4437v1